# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| | § | |
| In re: | § | **Chapter 11** |
| | § | |
| **EVERSTREAM SOLUTIONS LLC**, *et al.*, | § | **Case No. 25-90144 (CML)** |
| | § | |
| | § | **(Jointly Administered)** |
| Debtors.[1] | § | **Re: Docket No. 561** |
| | § | |

## DEBTORS' MEMORANDUM OF LAW IN SUPPORT OF CONFIRMATION OF SECOND AMENDED JOINT CHAPTER 11 PLAN OF EVERSTREAM SOLUTIONS LLC AND ITS AFFILIATED DEBTORS

**WEIL, GOTSHAL & MANGES LLP**
Gabriel A. Morgan (24125891)
Clifford W. Carlson (24090024)
700 Louisiana Street, Suite 3700
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511

*Attorneys for Debtors*
*and Debtors in Possession*

Dated: November 17, 2025
      Houston, Texas

**WEIL, GOTSHAL & MANGES LLP**
Matthew S. Barr (admitted *pro hac vice*)
Andriana Georgallas (admitted *pro hac vice*)
Alexander P. Cohen (24109739)
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Midwest Fiber Holdings LP (3804); Midwest Fiber Acquisition Topco LLC (N/A); Midwest Fiber Acquisition Midco1 LLC (6061); Midwest Fiber Acquisition LLC (N/A); Everstream Solutions LLC (2361); Everstream Networks LLC (4542); Everstream GLC Holding Company LLC (4493); American Fiber Comm L.L.C. (2389); HRS Internet, LLC (5042); Lynx Network Group, Inc. (6261); 15955 State Street LLC (2731); Rocket Fiber LLC (7722); Lynx Fiber One, LLC (7151); and Lynx Fiber Two, LLC (3416). The Debtors' mailing address is 1228 Euclid Ave. Suite 250, Cleveland, OH 44115.

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ....................................................................................1

BACKGROUND ..........................................................................................................4

I.     Declarations in Support of Confirmation.................................................................4

II.    Chapter 11 Cases and Development of Plan...........................................................5

        A.    Case Background ...........................................................................................5

        B.    Sale Transaction ............................................................................................6

        C.    Plan Summary................................................................................................8

        D.    Debtors' Governance and Investigations ......................................................9

        E.    Creditors' Committee Settlement ...............................................................11

III.    Plan Solicitation ..................................................................................................13

IV.    Plan Supplement ..................................................................................................16

V.    Tabulation ............................................................................................................16

ARGUMENT ..............................................................................................................17

I.     Plan Settlement and Release, Exculpation, and Injunction Provisions Are Appropriate and Should Be Approved....................................................................17

        A.    Plan Settlements Are Reasonable and Satisfy Bankruptcy Rule 9019 ......17

        B.    Plan Releases Are Appropriate and Should Be Approved...........................19

        C.    Exculpation Provision Is Appropriate, Consistent with Fifth Circuit Precedent, and Should Be Approved ...........................................................30

        D.    Injunction Provisions Are Appropriate and Should Be Approved ...............32

II.    Plan Satisfies Bankruptcy Code's Requirements and Should Be Confirmed....................34

        A.    Section 1129(a)(1) of Bankruptcy Code:  Plan Complies with Applicable Provisions of Bankruptcy Code ....................................................................34

        B.    Section 1129(a)(2):  Debtors Have Complied with Bankruptcy Code ................38

        C.    Section 1129(a)(3):  Plan Has Been Proposed in Good Faith and Not by Any Means Forbidden by Law ............................................................................42

        D.    Section 1129(a)(4):  Plan Provides that Professional Fees and Expenses Are Subject to Court Approval ...........................................................................44

        E.    Section 1129(a)(5):  Debtors Have Disclosed All Necessary Information Regarding Directors, Officers, and Insiders ..............................................45

        F.    Section 1129(a)(6):  Plan Does Not Contain Any Rate Changes ..........................46

        G.    Section 1129(a)(7):  Plan Satisfies Best Interests Test ...........................................46

i

**H.**     Section 1129(a)(8):  Plan Has Been Accepted by Impaired Voting Class ............49

**I.**     Section 1129(a)(9):  Plan Provides for Payment in Full of All Allowed Priority Claims ....................................................................................50

**J.**     Section 1129(a)(10):  At Least One Class of Impaired Claims Has Accepted Plan ...........................................................................................51

**K.**     Section 1129(a)(11):  Plan Is Feasible .................................................51

**L.**     Section 1129(a)(12):  All Statutory Fees Have Been or Will Be Paid.................53

**M.**     Sections 1129(a)(13)–(16) and 1129(e):  Inapplicable Provisions .......................54

**N.**     Plan Satisfies "Cram Down" Requirements for Non-Accepting Classes Under Section 1129(b) of Bankruptcy Code .........................................54

**O.**     Section 1129(c):  Plan Is Only Plan on File....................................58

**P.**     Section 1129(d):  Principal Purpose of Plan Is Not Avoidance of Taxes.............58

**R.**     Request for Waiver of Bankruptcy Rules 3020(e) and 6004(h) ..........................58

**III.**    Bankruptcy Court Should Overrule Unresolved U.S. Trustee Objection and Confirm Plan ......................................................................59

**A.**     Third-Party Releases in Plan Are Consensal ......................................60

CONCLUSION................................................................................64

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Adelphia Commc'ns Corp.*,
  368 B.R. 140 (Bankr. S.D.N.Y. 2007), *appeal dismissed*, 371 B.R. 660
  (S.D.N.Y. 2007), *aff'd*, 544 F.3d 420 (2d Cir. 2008) ..............................49

*Applewood Chair Co. v. Three Rivers Plan. & Dev. Dist. (In re Applewood Chair Co.)*,
  203 F.3d 914 (5th Cir. 2000) ...........................................................25

*In re Armstrong World Indus., Inc.*,
  348 B.R. 111 (D. Del. 2006) ............................................................56

*Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
  526 U.S. 434 (1999) .......................................................................47

*Bank of N.Y. Tr. Co. v. Off. Unsecured Creditors' Comm. (In re Pac. Lumber Co.)*,
  584 F.3d 229 (5th Cir. 2009) ....................................................31, 61

*Baron v. Sherman (In re Ondova Ltd.)*,
  914 F.3d 990 (5th Cir. 2019) ...........................................................31

*In re Bigler LP*,
  442 B.R. 537 (Bankr. S.D. Tex. 2010) .............................17, 20, 21, 24

*In re Boy Scouts of Am. & Del. BSA LLC*,
  642 B.R. 504 (Bankr. D. Del 2022), *aff'd*, 650 B.R. 87 (D. Del. 2023), *aff'd in part*, *rev'd in part*, 137 F.4th 126 (3d Cir. 2025), *petition for cert. filed*,
  No. 25-490 (U.S. Oct. 21, 2025) .......................................................62

*Brite v. Sun Country Dev., Inc. (In re Sun Country Dev., Inc.)*,
  764 F.2d 406 (5th Cir. 1985) ...........................................................43

*Cadle Co. v. Mims (In re Moore)*,
  608 F.3d 253 (5th Cir. 2010) ...........................................................21

*In re Chapel Gate Apartments, Ltd.*,
  64 B.R. 569 (Bankr. N.D. Tex. 1986) ................................................44

*In re CiCi's Holdings, Inc.*,
  No. 21-30146 (SGJ), 2021 WL 819330 (Bankr. N.D. Tex. Mar. 3, 2021) ............................62

*Cole v. Nabors Corp. Servs., Inc. (In re CJ Holding Co.)*,
  597 B.R. 597 (S.D. Tex. 2019) ...........................................................................63

*In re Couture Hotel Corp.*,
  536 B.R. 712 (Bankr. N.D. Tex. 2015) ...............................................................43

*In re Cypresswood Land Partners, I*,
  409 B.R. 396 (Bankr. S.D. Tex. 2009) ...............................................................34

*In re Derosa-Grund*,
  567 B.R. 773 (Bankr. S.D. Tex. 2017) ...............................................................21

*Dodson v. Huff (In re Smyth)*,
  207 F.3d 758 (5th Cir. 2000) ..............................................................................31

*In re Drexel Burnham Lambert Grp.*,
  138 B.R. 723 (Bankr. S.D.N.Y. 1992) ................................................................56

*In re Eagle Bus Mfg., Inc.*,
  134 B.R. 584 (Bankr. S.D. Tex. 1991), *aff'd*, 158 B.R. 421 (S.D. Tex. 1993) .......................35

*In re Energy Partners, Ltd.*,
  No. 09-32957, 2009 WL 2898876 (Bankr. S.D. Tex. Aug. 3, 2009) ....................59

*Feld v. Zale Corp. (In re Zale Corp.)*,
  62 F.3d 746 (5th Cir. 1995) ................................................................................61

*Fin. Sec. Assurance, Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans
  Ltd. P'ship)*,
  116 F.3d 790 (5th Cir. 1997) .........................................................................43, 51

*In re Finlay Enters., Inc.*,
  No. 09-14873 (JMP), 2010 WL 6580628 (Bankr. S.D.N.Y. June 29, 2010) .........52

*FOM P.R. S.E. v. Dr. Barnes Eyecenter Inc.*,
  255 F. App'x 909 (5th Cir. 2007) .......................................................................25

*In re Gen. Homes Corp.*,
  134 B.R. 853 (Bankr. S.D. Tex. 1991) ................................................................20

*In re Harborwalk, LP*,
  Nos. 10-80043, 10-80044, 10-80045, 2010 WL 5116620 (Bankr. S.D. Tex.
  Oct. 25, 2010) .....................................................................................................39

*Harrington v. Purdue Pharma, L.P.*,
  603 U.S. 204 (2024) .............................................................................26, 30, 60, 61

*Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters., Ltd., II (In re Briscoe Enters., Ltd., II)*,
994 F.2d 1160 (5th Cir. 1993) ................................................................34

*In re Heritage Org., L.L.C.*,
375 B.R. 230 (Bankr. N.D. Tex. 2007) ...........................................20, 21

*In re Highland Cap. Mgmt., L.P.*,
132 F.4th 353 (5th Cir. 2025), *pet. for cert filed,* No. 25-119 (July 31, 2025) ......................33

*Hilal v. Williams (In re Hilal)*,
534 F.3d 498 (5th Cir. 2008) ................................................................31

*Hinojosa Eng'g, Inc. v. Lopez (In re Treyson Dev., Inc.)*,
No. 14-70256, 2016 WL 1604347 (Bankr. S.D. Tex. Apr. 19, 2016) ...................................25

*Hooks v. Samson Lone Star, Ltd. P'ship*,
457 S.W.3d 52 (Tex. 2015) ................................................................62

*In re Idearc Inc.*,
423 B.R. 138 (Bankr. N.D. Tex. 2009), *subsequently aff'd,* 662 F.3d 315 (5th Cir. 2011) ...................18, 52, 59

*In re J. Reg. Co.*,
407 B.R. 520 (Bankr. S.D.N.Y. 2009) ................................................................52

*In re J T Thorpe Co.*,
308 B.R. 782 (Bankr. S.D. Tex. 2003), *aff'd,* No. 02-41487-H5-11, 2004 WL 720263 (S.D. Tex. Mar. 3, 2024) ................................................34, 39

*In re Johns-Manville Corp.*,
68 B.R. 618 (Bankr. S.D.N.Y. 1986), *aff'd,* 78 B.R. 407 (S.D.N.Y. 1987),
*aff'd sub nom. Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988) .........................56

*Kane v. Johns-Manville Corp.*,
843 F.2d 636 (2d Cir. 1988) ................................................................51

*In re Lakeside Glob. II, Ltd.*,
116 B.R. 499 (Bankr. S.D. Tex. 1989) ................................................................52

*Mabey v. Sw. Elec. Power Co. (In re Cajun Elec. Power Coop., Inc.)*,
150 F.3d 503 (5th Cir. 1998) ...........................................39, 44, 45

*In re Mirant Corp.*,
348 B.R. 725 (Bankr. N.D. Tex. 2006), *aff'd sub nom. Objecting Class 3 Claimholders v. New Mirant Entities*, No. 4:06-CV-744-A, 2006 WL 3780884 (N.D. Tex. Dec. 26, 2006) ................................................................21

*In re Mirant Corp.*,
  No. 03-46590 (DML), 2005 WL 6443614 (Bankr. N.D. Tex. Dec. 9, 2005).........................35

*In re Moody Nat'l SHS Hous. H, LLC*,
  No. 10-30172 (MI), 2010 WL 5116872 (Bankr. S.D. Tex. June 30, 2010) .....................25, 39

*NexPoint Advisors, L.P. v. Highland Cap. Cap. Mgmt., L.P. (In re Highland Cap. Mgmt., L.P.)*,
  48 F.4th 419 (5th Cir. 2022), *cert. denied*, Nos. 22-631 and 22-669
  (U.S. Jul. 2, 2024) ...............................................................30, 31, 32, 33

*Off. Comm. of Unsecured Creditors v. Cajun Elec. Power Coop., Inc. (In re Cajun Elec. Power Coop., Inc.)*,
  119 F.3d 349 (5th Cir. 1997) .............................................................18

*Off. Comm. of Unsecured Creditors v. Moeller (In re Age Refin., Inc.)*,
  801 F.3d 530 (5th Cir. 2015) .............................................................18

*In re Pisces Energy, LLC*,
  No. 09-36591-H5-11, 2009 WL 7227880 (Bankr. S.D. Tex. Dec. 21, 2009) ..................35, 49

*Pizza of Haw., Inc. v. Shakey's, Inc. (In re Pizza of Haw., Inc.)*,
  761 F.2d 1374 (9th Cir. 1985) ............................................................52

*Republic Supply Co. v. Shoaf*,
  815 F.2d 1046 (5th Cir. 1987) ........................................................24, 25

*Rivercity v. Herpel (In re Jackson Brewing Co.)*,
  624 F.2d 599 (5th Cir. 1980) .............................................................21

*In re Robertshaw US Holding Corp*,
  662 B.R. 300 (Bankr S.D. Tex. 2024) ............................................... *passim*

*Ronit, Inc. v. Stemson Corp. (In re Block Shim Dev. Co.-Irving)*,
  939 F.2d 289 (5th Cir. 1991) ........................................................43, 47

*In re Roqumore*,
  393 B.R. 474 (Bankr. S.D. Tex. 2008) .............................................18, 19, 21

*Safeco Ins. Co. of Am. v. Clear Vision Windshield Repair, LLC*,
  564 S.W.3d 913 (Tex. App. 2018).........................................................62

*In re Sandridge Energy, Inc.*,
  No. 16-32488, 2016 Bankr. LEXIS 4622 (Bankr. S.D. Tex. Sept. 20, 2016) ......................62

*In re Sentry Op. Co. of Tex.*,
  264 B.R. 850 (Bankr. S.D. Tex. 2001) ....................................................35

*In re Smallhold, Inc.*,
  665 B.R. 704 (Bankr. D. Del. 2024) ..................................................................63

*In re Star Ambulance Serv. LLC*,
  540 B.R. 251 (Bankr. N.D. Tex. 2015)..............................................................39

*In re Tex. Extrusion Corp.*,
  844 F.2d 1142 (5th Cir. 1988) ..........................................................................47

*United States v. Energy Res. Co.*,
  495 U.S. 545 (1990)...........................................................................................51

*In re Vista Proppants & Logistics, LLC*,
  No. 20-42002-ELM-11, 2020 WL 6325526 (Bankr. N.D. Tex. Oct. 28, 2020)....................62

*In re Vitro Asset Corp.*,
  No. 11-32600-hdh, 2013 WL 6044453 (Bankr. N.D. Tex. Nov. 14, 2013) ..........................35

*W. Real Estate Equities, L.L.C. v. Vill. at Camp Bowie I, LP (In re Vill. at Camp Bowie I, L.P.)*,
  710 F.3d 239 (5th Cir. 2013) ............................................................................43

*In re Wool Growers Cent. Storage Co.*,
  371 B.R. 768 (Bankr. N.D. Tex. 2007)........................................................24, 25

**Statutes**

11 U.S.C. § 105 .........................................................................................................38

11 U.S.C. § 109 .........................................................................................................39

11 U.S.C. § 507 ....................................................................................................50, 53

11 U.S.C. § 524 .........................................................................................................32

11 U.S.C. § 1103 .....................................................................................30, 31, 32, 38

11 U.S.C. § 1107 .............................................................................................5, 32, 38

11 U.S.C. § 1108 .........................................................................................................5

11 U.S.C. § 1114 .......................................................................................................54

11 U.S.C. § 1122 ............................................................................................. *passim*

11 U.S.C. § 1123 ............................................................................................. *passim*

11 U.S.C. § 1125 ............................................................................................. *passim*

11 U.S.C. § 1126 ............................................................................................... *passim*

11 U.S.C. § 1127 ............................................................................................... 40, 41

11 U.S.C. § 1129 ............................................................................................... *passim*

11 U.S.C. § 1141 ............................................................................................... 38, 60

**Other Authorities**

Fed. R. Bankr. P. 1015(b) ................................................................................. 5

Fed. R. Bankr. P. 3019(a) ................................................................................. 40, 41

Fed. R. Bankr. P. 3020(e) ................................................................................. 58

Fed. R. Bankr. P. 6004(h) ................................................................................. 58, 59

Fed. R. Bankr. P. 9019 ...................................................................................... 19

H.R. Rep. No. 95-595 (1977) ............................................................................ 34

S. Rep. No. 95-989 (1978) ................................................................................ 34

Everstream Solutions LLC and its debtor affiliates, as debtors and debtors in possession (collectively, the "**Debtors**" or the "**Company**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), submit this memorandum of law and reply in support of their request for entry of an order confirming the *Second Amended Joint Chapter 11 Plan of Everstream Solutions LLC and Its Affiliated Debtors*, dated November 11, 2025 (Docket No. 561) (as amended, supplemented, or otherwise modified from time to time, the "**Plan**"),[2] including the agreements and other documents set forth in that certain supplement to the Plan, dated November 4, 2025 and November 11, 2025 (Docket Nos. 543 & 564) (as amended, supplemented, or otherwise modified from time to time, the "**Plan Supplement**"), and respectfully represent as follows:

## PRELIMINARY STATEMENT

1.      The Debtors are pleased to be before the Court seeking confirmation of the Plan, which has the support of all major stakeholders, including the Official Committee of Unsecured Creditors (the "**Creditors' Committee**"), the Prepetition Lenders, and the DIP Lenders (each, as defined below).

2.      The Debtors commenced the Chapter 11 Cases to pursue and implement a value-maximizing going-concern sale for substantially all their assets and to wind down any remaining assets following such sale.  Following an extensive sale process that spanned over eight months between the prepetition and postpetition periods and included a full-day, in-person auction (the "**Auction**"), the Debtors selected Bluebird MidWest, LLC ("**Bluebird**") as the Successful Bidder for WholeCo (as defined below) pursuant to that certain *Asset Purchase Agreement*, dated

---

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

as of July 31, 2025, with Bluebird (the "**Bluebird APA**") and Metro Everstream Bidco, LLC ("**Metro Comm**") as the Back-Up Bidder pursuant to that certain *Asset Purchase Agreement*, dated as of July 31, 2025, with Metro Comm (the "**Metro Comm APA**").[3]  The Auction yielded multiple rounds of competitive bidding among qualified bidders, with Bluebird and Metro Comm competing for several additional hours, primarily over purchase price, assumed liabilities, and provisions related to regulatory approvals until Bluebird's final bid was selected as the highest or otherwise best bid.  In addition to increases in the purchase price for Bluebird's Successful Bid, the Debtors also were able to negotiate a number of improvements from the initial Bluebird APA, including provisions related to the timing of regulatory filings and approvals.

3.       In parallel with the sale process for the WholeCo Sale Transaction, the Debtors developed and negotiated the terms of the Plan with the Prepetition Lenders and the DIP Lenders.  As initially proposed, the Plan contemplated the distribution of proceeds from the WholeCo Sale Transaction with the Successful Bidder, a wind down of the Debtors' remaining assets (the "**Wind Down**"), and the appointment of a plan administrator (the "**Plan Administrator**") to facilitate the Wind Down.  Importantly, Allowed OpCo General Unsecured Claims were to receive no recovery under the initial Plan.

4.       Prior to the hearing to consider approval of the Disclosure Statement, the Debtors, the Prepetition Lenders, and the DIP Lenders engaged in several weeks of discussions and negotiations with the Creditors' Committee (collectively, the "**Settlement Parties**") regarding the terms of an amended version of the Plan.  Following such negotiations, the parties reached a global compromise and settlement with respect to the Plan and the Chapter 11 Cases

---

[3]       On August 1, 2025, the Court entered an order approving the WholeCo Sale Transaction (as defined below) and the Debtors' entry into both the Bluebird APA and the Metro Comm APA (Docket No. 364) (the "**Sale Order**").

(the "**Creditors' Committee Settlement**"), the terms of which are memorialized in the Plan. Pursuant to the Creditors' Committee Settlement, the Creditors' Committee—and all of its members in their individual capacities as creditors in the Chapter 11 Cases—now support the Plan that the Debtors seek to confirm. Among other things, the Creditors' Committee Settlement (i) provides that the OpCo Lenders will contribute $2 million of WholeCo Sale Transaction proceeds to which they otherwise would be entitled (the "**Creditors' Committee Settlement Amount**") to fund distributions to holders of Allowed OpCo General Unsecured Claims, (ii) ends the Creditors' Committee investigation into Claims and Causes of Action, which the Debtors believe—through the independent SIC Investigation—were not viable or worth pursuing, and (iii) forecloses litigation with the Creditors' Committee and its members with respect to the Plan that would have cost valuable Estate resources. The broad support of the Plan by all Voting Classes (as defined below) is a testament to the efforts of the Settlement Parties to reach consensus for the benefit of all the Debtors' creditors.

5.      Among the numerous creditors and stakeholders in the Chapter 11 Cases, the Debtors received a mere two objections to confirmation of the Plan (together, the "**Objections**").[4] The Debtors have worked constructively with the parties that filed Objections and various parties that contacted the Debtors with informal comments to the Plan to narrow issues and, where possible, reach consensual resolutions, including through the addition of provisions in the Proposed Confirmation Order (as defined below). The Objections, resolutions, and Debtors' responses are summarized in the chart annexed hereto as **Exhibit A** (the "**Response Chart**"). At this time, the only Objection that remains outstanding is the U.S. Trustee Objection and solely

---

[4]     *See* (i) *United States Trustee's Objection to Confirmation of Amended Joint Chapter 11 Plan of Everstream Solutions LLC and Its Affiliated Debtors* (Docket No. 551) (the "**U.S. Trustee Objection**") and (ii) *Objection to Confirmation of Plan* (Docket No. 553) filed by Cigna Health and Life Insurance Company.

with respect to one issue: whether the Plan includes nonconsensual Third-Party Releases (as defined below). The Debtors submit that the Third-Party Releases, which afforded voting and non-voting parties with an opportunity to opt out, are consensual within well-established Fifth Circuit precedent and the U.S. Trustee Objection should be overruled.

6.     For the reasons set forth herein and in the Confirmation Declarations (as defined below), the Plan satisfies the requirements for confirmation under section 1129 of the Bankruptcy Code (as defined below) and achieves the objectives of chapter 11. Accordingly, the Plan should be confirmed. A proposed order confirming the Plan has been filed contemporaneously herewith (the "**Proposed Confirmation Order**").

## BACKGROUND

### I.     Declarations in Support of Confirmation

7.     In support of confirmation, the Debtors filed the following declarations and affidavits (collectively, the "**Confirmation Declarations**"):

    i.    *Certificate of Service*, filed on October 21, 2025 (Docket No. 524) (the "**Solicitation Certificate**");

    ii.    *Affidavit of Publication of The Wall Street Journal Regarding the Notice of (I) Approval of (A) Disclosure Statement, (B) Solicitation and Voting Procedures, and (C) Procedures for Assumption or Rejection of Executory Contracts and Unexpired Leases, (II) Confirmation Hearing, and (III) Establishment of Notice and Objection Procedures for Confirmation of Proposed Plan*, filed on October 21, 2025 (Docket No. 522) (the "**Publication Certificate**");

    iii.    *Declaration of Alexa Westmoreland of Stretto, Inc. Regarding Solicitation and Tabulation of Ballots Cast on Second Amended Joint Chapter 11 Plan of Everstream Solutions LLC and Its Affiliated Debtors*, filed on November 14, 2025 (Docket No. 569) (the "**Tabulation Declaration**");

    iv.    *Declaration of Melker Sandberg in Support of Confirmation of Second Amended Joint Chapter 11 Plan of Everstream Solutions LLC and Its Affiliated Debtors* (the "**Sandberg Declaration**"), filed contemporaneously herewith, which addresses the releases contemplated by the Plan; and

v. *Declaration of Justin Schmaltz in Support of Confirmation of Amended Joint Chapter 11 Plan of Everstream Solutions LLC and Its Affiliated Debtors* (the "**Schmaltz Declaration**"), filed contemporaneously herewith, which addresses the satisfaction of certain elements under section 1129 of the Bankruptcy Code and the Liquidation Analysis (as defined below).

8. The Confirmation Declarations and any testimony and other declarations that may be adduced or submitted at, or in connection with, the Confirmation Hearing (as defined below) are incorporated in full herein.

## II. Chapter 11 Cases and Development of Plan

### A. Case Background

9. On May 28, 2025 (the "**Petition Date**"), the Debtors each commenced with the Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the Chapter 11 Cases.

10. On June 11, 2025, the Office of the United States Trustee for the Southern District of Texas (the "**U.S. Trustee**") appointed the Creditors' Committee (Docket No. 136).

11. The Chapter 11 Cases are being jointly administered for procedural purposes pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 1015-1 of the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Local Rules**").

12. The pertinent facts relating to the commencement of the Chapter 11 Cases and the key events during the cases are more fully set forth in the *Disclosure Statement for Amended Joint Chapter 11 Plan of Everstream Solutions LLC and Its Affiliated Debtors*, filed on October 14, 2025 (Docket No. 505) (the "**Disclosure Statement**").

B.    **Sale Transaction**

13.    Prior to the Petition Date, the Debtors commenced outreach to a large universe of strategic and financial counterparties with experience in the telecommunications space as part of a thorough marketing process to solicit interest in a potential going-concern acquisition of their business and substantially all of their assets other than the Select Businesses[5] (collectively, "**WholeCo**" and such sale, the "**WholeCo Sale Transaction**").  These efforts, which are further described in the Disclosure Statement, were extensive and allowed the Debtors to canvass the market for the highest offer available to them prior to the filing of the Chapter 11 Cases.

14.    In parallel with this process, the Debtors engaged proactively in negotiations and discussions with the lenders party to the HoldCo Credit Agreement (the "**HoldCo Lenders**"), the lenders party to the OpCo Credit Agreement (the "**OpCo Lenders**" and, together with the HoldCo Lenders, the "**Prepetition Lenders**"), and the Sponsor[6] in connection with the Debtors' review of strategic alternatives.  Such negotiations and discussions were based, in large part, on (i) obtaining committed debtor-in-possession financing (the "**DIP Facility**") from certain of the OpCo Lenders to ensure a smooth transition into chapter 11, (ii) continuing, on a postpetition basis, the Debtors' WholeCo sale process for higher or otherwise better bids than the stalking horse Bluebird APA (the "**Postpetition Sale Process**"), and (iii) the wind down of the Pennsylvania Business (the "**Prepetition Stakeholder Engagement**").

---

[5]    The "**Select Businesses**" includes, collectively, operations in the states (and surrounding states) of Illinois (the "**Illinois Business**"), Missouri (the "**Missouri Business**"), and Pennsylvania (the "**Pennsylvania Business**").

[6]    "**Sponsor**" means, collectively, InfraBridge Investors (GIF II G.P.) S.à.r.l. (as general partner of InfraBridge Global Infrastructure Fund II A LP, InfraBridge Global Infrastructure Fund II B LP, InfraBridge Global Infrastructure Fund II C LP and InfraBridge Global Infrastructure Fund II E LP), Midwest Fiber Intermediate US LP and Midwest Fiber Management LP.

15.     On May 22, 2025, the Company entered into a stalking horse purchase agreement with Bluebird for a purchase price of $285 million in Cash (subject to purchase price adjustments) plus the assumption of certain liabilities.  Shortly thereafter, the Debtors commenced the Chapter 11 Cases, and the Court approved the Debtors' proposed bidding and auction procedures, which were designed to promote a competitive and efficient Postpetition Sale Process. *See Order Establishing Bidding Procedures Relating to Sale of Debtors' Assets* (Docket No. 216) (the "**Bidding Procedures Order**").

16.     Following additional marketing and discussions with potential purchasers, on July 22, 2025, the Debtors held an in-person auction for WholeCo that included multiple rounds of competitive bidding (the "**Auction**").  The Postpetition Sale Process and Auction were a success,[7] resulting in the designation of Bluebird's final bid, which provided for an aggregate Cash purchase price of $384.6 million (subject to certain purchase price adjustments) plus certain assumed liabilities, as the Successful Bid.  The Debtors also selected Metro Comm's final bid, which provided for an aggregate Cash purchase price of $366 million (subject to certain purchase price adjustments) plus certain assumed liabilities, including the liabilities associated with the Pennsylvania Business, as the Back-Up Bid (as defined in the Bidding Procedures Order).  On July 31, 2025, HoldCo and Bluebird entered into the Bluebird APA, memorializing the terms of the WholeCo Sale Transaction.

17.     On August 1, 2025, the Court entered the WholeCo Sale Order approving the (i) WholeCo Sale Transaction, (ii) assumption and assignment of certain of the Debtors' executory contracts and unexpired leases pursuant to the Bluebird APA, and (iii) designation of

---

[7]     A complete summary of the Postpetition Sale Process, including details of the Auction held in respect thereof and the material terms of the Successful Bid are set forth below and in the *Supplement in Support of the Sale Transaction* (Docket No. 298) and the *Supplemental Declaration of James Henry in Support of Sale Transaction* (Docket No. 348).

Metro Comm's bid as the Back-Up Bid (*see* Docket No. 364).  Closing of the WholeCo Sale Transaction is expected as soon as later this year, subject to the receipt of several regulatory approvals.  If the Debtors are unable to consummate the WholeCo Sale Transaction with Bluebird, the Sale Order allows the Debtors to (i) file a notice designating Metro Comm as the Successful Bidder and its Back-Up Bid as the Successful Bid, (ii) serve such notice on parties in interest, and (iii) seek to consummate the WholeCo Sale Transaction pursuant to Metro Comm's bid.

### C.    Plan Summary

18.    The Plan provides for the distribution of proceeds from the WholeCo Sale Transaction and procedures for an efficient and orderly completion of the Wind Down after the Effective Date through the appointment of the Plan Administrator.  In addition to implementing the Wind Down, the Plan Administrator will administer all provisions of the Plan pursuant to the terms thereof, including (i) making distributions in accordance with the Plan, (ii) prosecuting, settling, or otherwise resolving all Retained Causes of Action, (iii) objecting to or settling any Claim, and (iv) ultimately dissolving each Debtor, in each case, in accordance with the Plan and Plan Supplement.  Further, the Plan provides for, among other things:

    i.    approval of the Creditors' Committee Settlement (as further described below);

    ii.    the following treatment of Claims against, and Interests in, the Debtors:[8]

        a.    holders of Allowed Other Secured Claims and Allowed Other Priority Claims are Unimpaired under the Plan and will receive payment in full or other treatment (as applicable) in accordance with the Bankruptcy Code and the Plan;

        b.    each holder of an OpCo Lender Secured Claim will receive such holder's Pro Rata share of (i) the Sale Proceeds Distributable Consideration, if any, subject to the Waterfall Recovery Priority, *less* the Creditors' Committee Settlement Amount, (ii) its Pro Rata share of the Wind Down Co Interim Distributions (if any), and (iii) its Pro Rata

---

[8]    The treatment described herein is a summary and is qualified in its entirety by reference to the full text of the Plan.

share of the Wind Down Reversion Amount (if any) prior to the dissolution of Wind Down Co;

c.   each holder of an Allowed OpCo General Unsecured Claim will receive such holder's Pro Rata share of the Creditors' Committee Settlement Amount;

d.   each holder of a HoldCo Lender Secured Claim will receive such holder's Pro Rata share of any remaining cash in the Credit Card Program Bank Account after all Credit Card Program Obligations are satisfied in full in cash *less* the amount of cash necessary to fund amounts to pay holders of Allowed (and reserve for Disputed) HoldCo Administrative Expense Claims;

e.   holders of (i) HoldCo General Unsecured Claims, (ii) Subordinated Claims, and (iii) HoldCo Equity Interests will not receive any distribution on account of such Claims or Interests, as applicable, and such Claims and Interests, as applicable, will be cancelled, released, and extinguished;

f.   holders of Intercompany Claims and/or Intercompany Interests will not receive distributions under the Plan, but such Claims and Interests will be reinstated or cancelled, released, and extinguished at the option of the Debtors or the Plan Administrator, as applicable;

iii.   funding of the Wind Down Fund on the Effective Date in accordance with the Plan, the Plan Supplement, and the Wind Down Budget; and

iv.   appointment of the Plan Administrator to carry out and implement all provisions of the Plan and Plan Supplement, and subject to the Wind Down Budget after the Effective Date, liquidate the remaining Assets of the Debtors, make distributions in accordance with the Plan, and wind down the Estates.

### D.   Debtors' Governance and Investigations

19.   As further detailed in Sections IV.B.1 of the Disclosure Statement, on July 2, 2023, the board of managers for HoldCo and Midwest Fiber Acquisition LLC ("**OpCo**") each formed special committees (together, the "**Special Committee**") to, among other things, review, evaluate, investigate, pursue, and negotiate any proposal made in respect of, and any terms and conditions with respect to, potential liability management transactions.  From August 2023 through October 2023, the Special Committee, with the assistance of Weil, Gotshal & Manges

LLP ("**Weil**") as counsel, oversaw an investigation (the "**SC Investigation**") pursuant to its mandate.  *See* Disclosure Statement § IV.B.1.a.

20.     As part of the SC Investigation, Weil analyzed whether there were viable Claims against any of the Debtors' then current and former directors, managers, officers and employees, affiliates (including direct and indirect subsidiaries), and the Sponsor.  The SC Investigation included interviews of the Debtors' current and former officers, directors, and employees, the review of over twenty thousand documents, and forensic analyses by the Debtors' financial advisor, Alvarez & Marsal North America, LLC.  The Special Committee did not identify any viable Claims or Causes of Action worth pursuing.  As a result, the Special Committee approved the mutual releases described in the Disclosure Statement as part of the 2023 Recapitalization Transactions (as defined in the Disclosure Statement).  *See* Sandberg Decl. ¶ 10; Disclosure Statement § IV.B.1.b.

21.     As further detailed in <u>Sections IV.B.2.</u> of the Disclosure Statement, on September 13, 2024, the board of managers and directors, as applicable, for HoldCo, OpCo, and Lynx Network Group, Inc. (collectively, the "**Boards**") each formed a special investigation committee (collectively, the "**SIC**") to, among other things, conduct and oversee an investigation of certain potential Claims and Causes of Action belonging to the Company with respect to certain current and former members of the Boards, affiliates, equityholders, officers, and other insiders of the Debtors (the "**SIC Investigation**").  In September 2024, the SIC engaged Richards, Layton & Finger, PA ("**RL&F**") as counsel to assist the SIC in fulfilling its mandate and commenced the SIC Investigation.  As part of the SIC Investigation conducted prior to the Petition Date, RL&F made extensive diligence requests to the Debtors, reviewed thousands of pages of documents, including Board materials and internal documents, and conducted four interviews of certain current

officers and directors.  Ultimately, based on the SIC Investigation, the SIC concluded that none of the Claims or Causes of Action subject to the SIC Investigation were viable and worth pursuing. *See* Sandberg Decl. ¶¶ 7–8; Disclosure Statement § IV.B.2.b.

22.     After the Petition Date, on August 13, 2025, the Creditors' Committee sent a demand letter (the "**Demand Letter**") to the Debtors asserting the existence of certain potential Claims and Causes of Action against certain Entities and individuals that fell within the scope of the SIC's authority to investigate.  As a result of that Demand Letter, the SIC, with the assistance of RL&F, conducted a further investigation examining the allegations in the Demand Letter, which raised issues beyond those previously raised to and investigated by the SIC.  RL&F reviewed hundreds of additional pages of documents and conducted several additional interviews of the Debtors' advisors and current officers.  Ultimately, based on the SIC Investigation, the SIC concluded that none of the Claims or Causes of Action outlined in the Demand Letter were viable and worth pursuing.  *See* Sandberg Decl. ¶ 9; Disclosure Statement § IV.B.2.b.

E.     **Creditors' Committee Settlement**

23.     Following months of negotiations and multiple extensions of the deadline for the Creditors' Committee to investigate and, if desired, assert challenges to the OpCo Stipulations and HoldCo Stipulations (each, as defined in the Disclosure Statement), on October 7, 2025, the Settlement Parties reached the Creditors' Committee Settlement.  The Creditors' Committee Settlement is the result of good faith, arm's-length negotiations among the Settlement Parties and represents a global resolution of issues among the Creditors' Committee, the Debtors, the OpCo Lenders, the HoldCo Lenders, and the lenders party to the DIP Credit Agreement (the "**DIP Lenders**").

24. The Creditors' Committee Settlement will be implemented pursuant to Section 5.2 of the Plan and provides, among other things:[9]

    i.    On the Effective Date, the OpCo Lenders will contribute the Creditors' Committee Settlement Amount, on a Pro Rata basis, from the Sale Proceeds Distributable Consideration to which they otherwise would be entitled, which will be held by Wind Down Co in trust for the benefit of holders of OpCo General Unsecured Claims and constitutes the sole source of recovery under the Plan for holders of OpCo General Unsecured Claims;

    ii.    The OpCo Lenders, the OpCo Agent, the HoldCo Lenders, and the HoldCo Agent retained their respective deficiency Claims and the right to vote any such Claims (which the OpCo Lenders did) but will waive any entitlement to a recovery from the Creditors' Committee Settlement Amount on account of such Claims;

    iii.    The Creditors' Committee Advisors are entitled to seek compensation for Fee Claims in accordance with Section 2.3 of the Plan, applicable orders of the Bankruptcy Court, and applicable Bankruptcy Code provisions; *provided* that, notwithstanding anything in the Plan to the contrary, the Creditors' Committee Advisors shall not be entitled to payment by the Debtors or Wind Down Co, as applicable, of Fee Claims in excess of $3,400,000 in the aggregate;

    iv.    The OpCo Lenders, the OpCo Agent, the HoldCo Lenders, and the HoldCo Agent will waive certain Adequate Protection Claims to which they are entitled under the Plan;

    v.    Weil, as counsel to the Debtors, will hold a weekly call with McDermott Will & Schulte LLP, as counsel to the Creditors' Committee, to discuss the Plan, closing of the WholeCo Sale Transaction, and the Wind Down (which weekly calls have already commenced);

    vi.    The Debtors will commence and use commercially reasonable efforts to facilitate the reconciliation of and, if necessary, objection to Proofs of Claims submitted on, before, or after the Claims Bar Date prior to the Effective Date (which reconciliation the Debtors, through their advisors, have already commenced);

    vii.    Any Avoidance Actions against holders of General Unsecured Claims will not be pursued to the extent such holders of General Unsecured Claims do not (i) vote to reject the Plan and (ii) opt out of the releases set forth in Section 10.6(b) of the Plan;

---

[9]    The following summary of the Creditors' Committee Settlement is qualified in its entirety by the terms and provisions of the Plan.

viii.  Following the Effective Date, Wind Down Co will honor any undisputed obligations under any executory contract or unexpired lease that Wind Down Co has not rejected or assumed and assigned to a third party with funds from the Counterparty Reserve, which will be held in trust for the benefit of the counterparties to such executory contracts and unexpired leases, with the Court retaining jurisdiction over any dispute between the Wind Down Co and any applicable counterparty;

ix.  The Creditors' Committee may, with the consent of (a) the Debtors or the Plan Administrator, as applicable, and (b) the Requisite Prepetition Lenders, appoint a Claims ombudsman (the "**Claims Ombudsman**") with certain powers and authority with respect to the reconciliation, allowance, and settlement of General Unsecured Claims as set forth in the Plan and the Claims Ombudsman Agreement; and

x.  The Debtors and the Plan Administrator, as applicable, will not reject any executory contracts or unexpired leases on a post-Effective Date basis after the Rejection Outside Date.

*See* Plan § 5.2.

25.  Pursuant to the Creditors' Committee Settlement, the Creditors' Committee and its members, in their capacity as members of the Creditors' Committee and in their individual capacity as creditors in the Chapter 11 Cases, have agreed to support the Plan in its entirety, as amended to reflect the settlement, including the Third-Party Releases and Exculpation Provision (each, as defined below) set forth in the Plan. The Creditors' Committee Settlement results in improved recoveries to holders of Allowed OpCo General Unsecured Claims, establishes a framework to address the unique matters presented by the Chapter 11 Cases, including treatment of the numerous executory contracts and unexpired leases related to the Debtors' business operations and the Wind Down, and forecloses litigation with the Creditors' Committee and its members with respect to the Plan that would have cost valuable Estate resources.

## III.   **Plan Solicitation**

26.  On October 14, 2025, the Court entered the Order (I) Approving Disclosure Statement, (II) Establishing Solicitation, Voting, and Related Procedures, (III) Scheduling

Confirmation Hearing, (IV) Approving Notice Procedures for Assumption or Rejection of Executory Contracts and Unexpired Leases, (V) Establishing Notice and Objection Procedures for Confirmation of Plan, and (VI) Granting Related Relief (Docket No. 501) (the "**Disclosure Statement Order**").

27.     Pursuant to the Disclosure Statement Order, the Court, among other things, (i) approved the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code, (ii) scheduled the hearing to consider confirmation of the Plan (the "**Confirmation Hearing**"), (iii) established November 11, 2025 at 4:00 p.m. (prevailing Central Time) as the deadline to (a) vote to accept or reject the Plan (the "**Voting Deadline**") and (b) object to confirmation of the Plan (the "**Plan Objection Deadline**"), (iv) approved the proposed procedures for (a) soliciting, receiving, and tabulating votes to accept or reject the Plan, (b) voting to accept or reject the Plan, and (c) filing objections to the Plan (the "**Solicitation and Voting Procedures**"), (v) approved the form of ballots with voting instructions (the "**Ballots**") and certain other notices, (vi) approved the form and manner of notice of the Confirmation Hearing (the "**Confirmation Hearing Notice**"), and (vii) approved the procedures for the assumption, assumption and assignment, or rejection of the Debtors' executory contracts and unexpired leases.

28.     On October 21, 2025, the Debtors served on all holders of Claims and Interests and other parties in interest in the Chapter 11 Cases and published in *The Wall Street Journal* the Confirmation Hearing Notice.  *See* Solicitation Certificate; Publication Certificate. Also on October 21, 2025, the Debtors commenced the solicitation of votes on the Plan in accordance with the Disclosure Statement Order by causing Stretto, Inc. ("**Stretto**"), the Debtors' solicitation agent, to distribute copies of the Plan, Disclosure Statement Order (without exhibits except as otherwise provided in the Solicitation Package), Disclosure Statement (with all exhibits,

including the Plan), Solicitation and Voting Procedures, statement from the Creditors' Committee, Confirmation Hearing Notice, and applicable Ballot (collectively, the "**Solicitation Package**") to each creditor entitled to vote on the Plan. *See* Solicitation Certificate; Tabulation Decl. ¶ 7. The materials included in the Solicitation Package were also made available at no cost on Stretto's website at https://cases.stretto.com/everstream.

29. The Disclosure Statement and Ballots directed Class 3 (OpCo Lender Secured Claims), Class 4 (OpCo General Unsecured Claims), and Class 5 (HoldCo Lender Secured Claims) (collectively, the "**Voting Classes**") to cast a vote to accept or reject the Plan by following the instructions contained in the applicable Ballot. These instructions provided that the Voting Classes could return their properly executed and completed Ballot by (i) by first-class mail in the return envelope provided with each Ballot, (ii) overnight courier, (iii) hand delivery, or (iv) Stretto's online balloting portal at https://cases.stretto.com/everstream, so as to be received by Stretto no later than the Voting Deadline. Each Ballot also contained detailed instructions on how to complete it and how to make any applicable elections contained therein.

30. If holders of Claims and Interests were not entitled to vote on the Plan, on October 21, 2025, Stretto served such holders with (i) the Confirmation Hearing Notice and (ii) a notice informing them of their non-voting status (the "**Notice of Non-Voting Status**"), which contained the full text of the release, exculpation, and injunction provisions set forth in Article X of the Plan and advised such holders that they would be deemed to be bound by the Third-Party Releases unless they timely and properly opted out of such release contained in the opt-out form attached to the Notice of Non-Voting Status (the "**Release Opt-Out Form**"), in accordance with Rule 40 of the *Procedures for Complex Cases in the Southern District of Texas* (the "**Complex**

15

**Case Rules**") and the Disclosure Statement Order.  *See* Solicitation Certificate; Tabulation Decl. ¶ 8.

## IV.   Plan Supplement

31.    On November 4, 2025 and November 11, 2025, the Debtors filed the Plan Supplement (Docket Nos. 543 & 564).  The Plan Supplement included the following documents and information:  (i) Schedule of Retained Causes of Action; (ii) Schedule of Assumed Contracts; (iii) Schedule of Rejected Contracts; (iv) Schedule of Transferred Contracts; (v) Schedule of Shared Contracts; (vi) Wind Down Co Organizational Documents; (vii) Wind Down Budget; (viii) certain information required to be disclosed pursuant to section 1129(a)(5) of the Bankruptcy Code; (ix) Plan Administrator Agreement; (x) Claims Ombudsman Agreement; and (xi) Plan Transactions Exhibit.  *See* Plan Suppl., Exs. A–H.

## V.   Tabulation

32.    After the Voting Deadline, Stretto reviewed and tabulated all of the Ballots timely received.  *See* Tabulation Decl. ¶¶ 11–14.  Exhibit A to the Tabulation Declaration also describes in detail the voting results for each Debtor.  As reflected in the Tabulation Declaration, the chart below summarizes the voting results on an aggregate basis:

| | Accept | | Reject | | |
|---|---|---|---|---|---|
| **Class** | **Amount (% of Amount Voted)** | **Number (% of Number Voted)** | **Amount (% of Amount Voted)** | **Number (% of Number Voted)** | **Result** |
| Class 3 (OpCo Lender Secured Claims) | $685,019,943.26 (100%) | 14 (100%) | $0 (0%) | 0 (0%) | Accepts |
| Class 4 (OpCo General Unsecured Claims) | $646,562,389.59 (100%) | 62 (96.9%) | $202,288.02 (0%) | 2 (3.1%) | Accepts |
| Class 5 (HoldCo Lender Secured Claims) | $266,083,760.54 (100%) | 14 (100%) | $0 (0%) | 0 (0%) | Accepts |

## ARGUMENT

33.     This argument section is divided into three parts.   *Part I* addresses satisfaction of the applicable requirements for the settlements and release, exculpation, and injunction provisions contained in a chapter 11 plan pursuant to Bankruptcy Rule 9019, section 1123 of the Bankruptcy Code, and applicable Fifth Circuit law.   *Part II* demonstrates the satisfaction of each of the requirements for confirmation of the Plan under section 1129 of the Bankruptcy Code.   *Part III* responds to the remaining issue raised in the U.S. Trustee Objection.

**I.      Plan Settlement and Release, Exculpation, and Injunction Provisions Are Appropriate and Should Be Approved**

**A.      Plan Settlements Are Reasonable and Satisfy Bankruptcy Rule 9019**

34.     The Plan embodies a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a holder of a Claim or Interest may have with respect to any such Allowed Claim or Allowed Interest or any distribution to be made on account thereof.

35.     In the Fifth Circuit, "[t]he standard for evaluating the validity of a settlement contained in a Chapter 11 plan is the same as the standard for evaluating a settlement between a debtor and another party outside the context of [a] plan . . . . Stated differently, settlement provisions in a Chapter 11 plan must satisfy the standards used to evaluate compromises under [Bankruptcy] Rule 9019." *In re Bigler LP*, 442 B.R. 537, 543 n.6 (Bankr. S.D. Tex. 2010) (citing *In re MCorp Fin., Inc.*, 160 B.R. 941, 951 (S.D. Tex. 1993)).   Accordingly, approval should be given "if the settlement is 'fair and equitable and in the best interest of the estate.'"   *Off. Comm. of Unsecured Creditors v. Cajun Elec. Power Coop., Inc. (In re Cajun Elec. Power Coop., Inc.)*, 119 F.3d 349, 355 (5th Cir. 1997) (quoting *Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortg. Corp.)*, 68 F.3d 914, 917 (5th Cir. 1995).

36.     To determine whether a settlement is fair and equitable, courts "apply [a] three-part test . . . with a focus on comparing the 'terms of the compromise with the likely rewards of litigation.'"  *Off. Comm. of Unsecured Creditors v. Moeller (In re Age Refin., Inc.)*, 801 F.3d 530, 540 (5th Cir. 2015) (quoting *Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599, 602 (5th Cir. 1980)).  Specifically, a bankruptcy court evaluates (i) "the probability of success in litigating the claim subject to settlement, with due consideration for the uncertainty in fact and law[,]" (ii) "the complexity and likely duration of litigation and any attendant expense, inconvenience, and delay," and (iii) "all other factors bearing on the wisdom of the compromise[,]" including (a) "the best interests of the creditors, with proper deference to their reasonable views" and (b) "the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion."  *Id.* (first citing *Jackson Brewing*, 624 F.2d at 602; then quoting *Cajun Elec. Power*, 119 F.3d at 356; and then quoting *Foster Mortg.*, 68 F.3d at 917–18) (internal quotation marks omitted).

37.     Although the debtor bears the burden of establishing that a settlement is fair and equitable based on the balance of the above factors, "the [debtor's] burden is not high."  *See In re Roquemore*, 393 B.R. 474, 480 (Bankr. S.D. Tex. 2008).  The court need only determine that the settlement does not "fall beneath the lowest point in the range of reasonableness."  *See In re Idearc Inc.*, 423 B.R. 138, 182 (Bankr. N.D. Tex. 2009), *subsequently aff'd*, 662 F.3d 315 (5th Cir. 2011) (citation omitted); *Roquemore*, 393 B.R. at 480 ("The Trustee need only show that his decision falls within the 'range of reasonable litigation alternatives.'") (citations omitted).

38.     Among the settlements contemplated thereby, the Plan includes the Creditors' Committee Settlement, which represents a culmination of the Debtors' efforts to resolve issues raised by the Creditors' Committee and provides a consensual path to confirmation and

emergence from chapter 11.  As set forth in greater detail above (*see supra* ¶¶ 23–25), the Creditors' Committee Settlement is the result of good-faith, arm's-length negotiations among the Settlement Parties, which resulted in numerous compromises and concessions in exchange for the support of the Creditors' Committee and its members.  The Creditors' Committee Settlement ensures an efficient path to confirmation, forecloses potential costly and lengthy litigation with the Creditors' Committee over, among other things, potential Claims and Causes of Action and Plan matters, and provides holders of Allowed OpCo General Unsecured with a recovery that they would not have otherwise received pursuant to the Debtors' initial Plan.  Thus, the Creditors' Committee Settlement maximizes value and satisfies the requirements set forth under Bankruptcy Rule 9019 and applicable law in the Fifth Circuit.

39.    Accordingly, the settlements set forth in the Plan, including the Creditors' Committee Settlement, represent a reasonable resolution of issues raised in the Chapter 11 Cases, result in a Plan that is fair, equitable, and in the best interest of the Estates, and should be approved.

### B.    Plan Releases Are Appropriate and Should Be Approved

40.    The Plan provides for the release of all Claims and Causes of Action by (i) the Debtors and their Estates as set forth in Section 10.6(a) of the Plan (the "**Debtor Releases**") and (ii) certain non-Debtor third parties as set forth in Section 10.6(b) of the Plan (the "**Third-Party Releases**" and, together with the Debtor Releases, the "**Plan Releases**") in favor of the Released Parties.[10]  The Plan Releases are integral components of the Plan, were

---

[10]    "**Released Parties**" means, collectively, each in their respective capacities as such, (i) the Debtors, (ii) the Plan Administrator, (iii) the Prepetition Lenders, (iv) the Sponsor, (v) the Agents, (vi) the DIP Lenders, (vii) the DIP Agent, (viii) the Successful Bidder, (ix) the Creditors' Committee and each of its members, and (x) each Related Party of each of the foregoing Persons in clauses (i) through (ix).  Notwithstanding anything to the contrary in the Plan, the following parties shall not constitute "Released Parties":  (a) any Person that opts out of the releases set forth in Section 10.6(b) of the Plan; (b) any former officer of the Debtors that departed the Debtors from October 24, 2023 through the Petition Date; (c) the Select Former Officers and Directors, solely in their respective capacities as former officers and directors of the Debtors; (d) the RSM Parties, solely in their capacities as auditor to the Debtors; and (e) the Former Sponsors.

negotiated in good faith, are appropriate and necessary under the circumstances, and comply with the Bankruptcy Code and applicable case law in the Fifth Circuit.  For the reasons set forth below, the Plan Releases should be approved.

### 1.    Debtor Releases

41.    Under section 1123(b)(3)(A) of the Bankruptcy Code, a chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."  11 U.S.C. § 1123(b)(3)(A).  Accordingly, a debtor may release causes of action as consideration for concessions made by its stakeholders pursuant to a chapter 11 plan.  *See, e.g.*, *Bigler*, 442 B.R. at 547 (finding that plan release provision "constitutes an acceptable settlement under § 1123(b)(3) because the [d]ebtors and the [e]state are releasing claims that are property of the [e]state in consideration for funding of the Plan"); *In re Heritage Org., L.L.C.*, 375 B.R. 230, 308 (Bankr. N.D. Tex. 2007) ("[T]he plain language of § 1123(b)(3) provides for the inclusion in a plan of a settlement of claims belonging to the debtor or to the estate . . . .") (emphasis omitted); *In re Gen. Homes Corp.*, 134 B.R. 853, 861 (Bankr. S.D. Tex. 1991) ("To the extent that . . . the plan purports to release any causes of action against the [creditor] which the [d]ebtor could assert, such provision is authorized by § 1123(b)(3)(A) . . . .").

42.    In considering the appropriateness of a release of claims by a debtor, courts consider whether the release is (i) "fair and equitable" and (ii) "in the best interest of the estate." *See Jackson Brewing*, 624 F.2d at 602 (citing *Protective Comm. for Indep. S'holders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968)); *see Bigler*, 442 B.R. at 543 n.6; *see In re Derosa-Grund*, 567 B.R. 773, 784–85 (Bankr. S.D. Tex. 2017); *see also In re Mirant Corp.*, 348 B.R. 725, 738 (Bankr. N.D. Tex. 2006), *aff'd sub nom. Objecting Class 3 Claimholders v. New Mirant Entities*, No. 4:06-CV-744-A, 2006 WL 3780884 (N.D. Tex. Dec. 26, 2006); *Heritage*, 375 B.R. at 259.  Courts generally determine whether a release is "fair and equitable"

and "in the best interests of the estate" by reference to the following so-called "*Foster Mortgage*" factors:

    i.    the probability of success in litigation, with due consideration for the uncertainty in fact and law;

    ii.   the complexity and likely duration of the litigation and any attendant expense, inconvenience, and delay, including the difficulties, if any, to be encountered in the matter of collection;

    iii.  the paramount interest of the creditors and a proper deference to their respective views;

    iv.   the extent to which the settlement is truly the product of arm's-length bargaining and not fraud or collusion; and

    v.    all other factors bearing on the wisdom of the compromise.

*Cadle Co. v. Mims (In re Moore)*, 608 F.3d 253, 263 (5th Cir. 2010) (citing *Foster Mortg.*, 68 F.3d at 917–18); *see also Derosa-Grund*, 567 B.R. at 784–85; *Roqumore*, 393 B.R. at 479–80.

43.     The Debtor Releases meet the foregoing standard and are in the best interest of the Estates. *First*, with respect to the Debtor Releases contained in the Plan, no colorable Claims that could have resulted in a net positive value for the Estates were identified. Specifically, as set forth in greater detail above (*see supra* ¶¶ 19–22), the Debtors performed not one but two prepetition investigations—the SC Investigation and the SIC Investigation—to investigate and evaluate potential Claims and Causes of Action belonging to the Debtors with respect to certain current and former members of the Boards, affiliates, equity holders, officers, and other insiders of the Debtors. In each case, the Special Committee and SIC concluded that none of the Claims or Causes of Action subject to the SC Investigation and the SIC Investigation, respectively, were viable and worth pursuing. Moreover, following receipt of the Creditors' Committee's Demand Letter, the SIC conducted a further investigation to examine the allegations in the Demand Letter, including reviewing hundreds of additional pages of documents and interviewing several of the

Debtors' advisors and current officers.  As a result of this second SIC Investigation, the SIC concluded that none of the Claims or Causes of Action outlined in the Demand Letter were viable and worth pursuing.  *See* Sandberg Decl. ¶¶ 8-10; Disclosure Statement § IV.B.2.

44.     *Second*, the Debtor Releases were a material inducement for the Settlement Parties, among other Released Parties, to support the Chapter 11 Cases, the WholeCo Sale Process, and the Plan and reflect a reasonable balance of the risk and expense of litigating the released Claims and Causes of Action, on the one hand, against (i) the benefits provided to the Debtors by the Released Parties, along with (ii) the benefits of resolving various disputes and issues, on the other hand.  *See* Sandberg Decl. ¶ 11.  The Plan, including the Debtor Releases, reflects an integrated compromise, which averts the need for costly and protracted litigation that would otherwise pose a substantial impediment to consummating the WholeCo Sale Transaction, confirmation of the Plan, and the efficient Wind Down of the Estates.  *See id.* at ¶¶ 11, 20.

45.     *Third*, any such potential Claims against the Released Parties would be subject to any defenses and would involve protracted litigation even if successful in this Court, thus making collection difficult.  The drain on Estate resources based on unsubstantiated Claims would significantly outweigh any potential recovery (which the Debtors think would be de minimis, if not zero) that could be received.

46.     *Fourth*, the Released Parties provided substantial contributions to the success of the Chapter 11 Cases, which further supports the appropriateness of the Debtor Releases.  *Id.* at ¶¶ 13-16.  For example, the Debtors' Related Parties that are Released Parties provided substantial contributions, both before and after the Petition Date, to the success of the Chapter 11 Cases.  The service of those parties, which, in many instances, exceeded their normal duties, were critical to the successful WholeCo Sale Process and Plan process.  In addition, the

Sponsor and its Related Parties made critical and necessary contributions, both before and after the Petition Date, which directly contributed to the success of the Chapter 11 Cases. Among other things, the Sponsor and its Related Partes supported the Company through capital contributions made before the Petition Date, consented to the delegation of decision-making authority to the Special Committee, the RAC and the SIC and, overall, have been both cooperative and supportive throughout the entirety of the chapter 11 process. Further, in the nearly two years leading up to the Petition Date, the Prepetition Lenders made substantial efforts to support the Debtors' business and ensure that the Debtors were able to file the Chapter 11 Cases on a consensual basis and pursue the value maximizing WholeCo Sale Transaction for the benefit of all of the Debtors' stakeholders. Among other things, in addition to the significant contributions and concessions that the Prepetition Lenders made as part of the Creditors' Committee Settlement, the Prepetition Lenders agreed to the following:

    i. Several amendments to the OpCo Credit Agreement and HoldCo Credit Agreement, which, among other things, waived entitlement to sale proceeds, granted multiple instances of covenant relief, and most importantly, provided the Debtors with more than $187 million of liquidity through a combination of PIK relief, escrowing of the Illinois Sale Proceeds and Missouri Sale Proceeds, and funding of the OpCo Super-Priority DDTL; and

    ii. To support the WholeCo Sale Process and ultimate Wind Down by providing the Debtors with much-needed liquidity for the Chapter 11 Cases in the form of the DIP Facility, including $55 million of new money DIP Loans, which ensured that the Chapter 11 Cases were adequately funded.

47. *Finally*, the Debtor Releases have broad support from the Debtors' stakeholders. No party objected to the Debtor Releases. In fact, all Voting Classes voted overwhelmingly in favor of the Plan. *See* Tabulation Decl., Ex. A. Further, the Creditors' Committee, which is an independent fiduciary of the Estates, supports the Debtor Releases, and Claims and Causes of Action subject to the Debtor Releases are currently the DIP Lenders'

collateral under the Final DIP Order and the DIP Lenders support the Plan, including the Debtor Releases.

48.     Accordingly, the Debtor Releases are fair, equitable, and in the best interest of the Estates, are consistent with prevailing Fifth Circuit law, and should be approved by the Court.

### 2.     Third-Party Releases

49.     In addition to the Debtor Releases, Section 10.6(b) of the Plan provides for certain consensual Third-Party Releases.  Section 1123(b)(6) of the Bankruptcy Code provides that a chapter 11 plan may "include any other appropriate provision not inconsistent with the applicable provisions of [the Bankruptcy Code]."  11 U.S.C. § 1123(b)(6).  Under Fifth Circuit law, a plan may include releases of third parties if such releases are being provided by parties that consented to such releases and received consideration in exchange therefor.  *See Bigler*, 442 B.R. at 549; *see Republic Supply Co. v. Shoaf*, 815 F.2d 1046, 1050 (5th Cir. 1987) (acknowledging that Bankruptcy Code does not prohibit a non-debtor release "when it has been accepted and confirmed as an integral part of a plan of reorganization"); *In re Wool Growers Cent. Storage Co.*, 371 B.R. 768, 775 (Bankr. N.D. Tex. 2007) ("Most courts allow consensual nondebtor releases to be included in a plan.") (citations omitted).  If these requirements are satisfied, a release should be approved when it is "an essential means of implementing [a] [p]lan pursuant to Section 1123(a)(5) of the Bankruptcy Code . . . ."  *In re Moody Nat'l SHS Hous. H, LLC*, No. 10-30172 (MI), 2010 WL 5116872, at *5 (Bankr. S.D. Tex. June 30, 2010) (approving consensual nondebtor release).

50.     Employing that standard, Fifth Circuit courts routinely allow third-party releases in chapter 11 plans when the third-party releases are (i) consensual, (ii) specific in language, (iii) integral to the plan, (iv) a condition of a settlement, and (v) given for consideration, so long as such releases do not otherwise violate any provision of the Bankruptcy Code.  *See, e.g.*,

24

*Wool Growers*, 371 B.R. at 776 ("Consensual nondebtor releases that are specific in language, integral to the plan, a condition of the settlement, and given for consideration do not violate section 524(e).") (citations omitted); *see also FOM P.R. S.E. v. Dr. Barnes Eyecenter Inc.*, 255 F. App'x 909, 912 (5th Cir. 2007) (enforcing a non-debtor release where "the release of claims was an integral part of the bankruptcy order [and] was not simply boilerplate language that was inserted into the [reorganization plan], but rather a necessary part of the [reorganization plan] itself"); *Applewood Chair Co. v. Three Rivers Plan. & Dev. Dist. (In re Applewood Chair Co.)*, 203 F.3d 914, 920 (5th Cir. 2000) (declining to uphold a general release that did not contain a specific discharge of indebtedness of a third-party); *Shoaf*, 815 F.2d at 1050 (upholding a third-party release that was specifically provided for in confirmed plan); *Hinojosa Eng'g, Inc. v. Lopez (In re Treyson Dev., Inc.)*, No. 14-70256, 2016 WL 1604347, at *15–17 (Bankr. S.D. Tex. Apr. 19, 2016) (noting that "[t]he Fifth Circuit require[s] that the language in the plan must be specific as to the parties involved and the claim(s) released in order to be sufficient.") (citations omitted).

51.     In determining whether a third-party release is consensual, courts in the Fifth Circuit have focused on two things—notice and an opportunity to object—*i.e.*, whether "notice has gone out, parties have actually gotten it, they've had the opportunity to look over it, [and] the disclosure is adequate so that they can actually understand what they're being asked to do and the options that they're being given."  Conf. Hr'g Tr. at 47, *In re Energy & Expl. Partners, Inc.*, No. 15-44931 (RFN) (Bankr. N.D. Tex. April 21, 2016) (Docket No. 730) (approving third-party releases as consensual, over objection, in light of sufficient notice and opportunity to object); *see also* Conf. Hr'g Tr. 91:15-92:5, *In re Cutera, Inc.*, No. 25-90088 (ARP) (Bankr. S.D. Tex. Apr. 16, 2025) (Docket No. 251) (analyzing the facts and circumstances surrounding opt-out third-party releases before determining such releases were appropriate); *In re DRF Logistics, LLC*,

No. 24-90447 (CML) (Bankr. S.D. Tex. Nov. 25, 2024) (Docket No. 530) (approving third-party releases as consensual over objections from parties in interest, including U.S. Trustee).

52.     Moreover, as the Court has consistently confirmed over the past few years, nothing in the Supreme Court's decision in *Purdue* has modified the law in this jurisdiction that opt-out features are an appropriate mechanism to obtain consensual third-party releases.  *See In re Robertshaw US Holding Corp*, 662 B.R. 300, 323 (Bankr S.D. Tex. 2024) (holding that the use of opt-out mechanisms in plans of reorganization is an appropriate method to obtain consensual third-party releases and explaining that "[h]undreds of chapter 11 cases have been confirmed in this District with consensual third-party releases with an opt-out.  And, again, *Purdue* did not change the law in this Circuit."); *see, e.g.*, *In re Mosaic Sustainable Fin. Corp.*, No. 25-90156 (CML) (Bankr. S.D. Tex. Sept. 5, 2025) (Docket No. 671) (confirming chapter 11 plan with consensual third-party releases obtained via an opt-out feature); *In re Steward Health Care Sys. LLC*, No. 25-90213 (CML) (Bankr. S.D. Tex. July 25, 2025) (Docket No. 5774) (same).

53.     Furthermore, the Complex Case Rules permit consensual third-party releases with an opt-out mechanism.  Specifically, the Complex Case Rules provide:

> If a proposed plan seeks consensual pre- or post-petition releases with respect to claims that creditors may hold against non-debtor parties, then a ballot must be sent to creditors entitled to vote on the proposed plan and notices must be sent to non-voting creditors and parties-in-interest.  The ballot and the notice must inform the creditors of such releases and provide a box to check to indicate assent or opposition to such consensual releases together with a method for returning the ballot or notice.

Complex Case Rules ¶ 40.

54.     Here, the Third-Party Releases satisfy the Fifth Circuit's standard for approval of third-party releases under the Bankruptcy Code and the Complex Case Rules and should be approved.

55.     *First*, as set forth above and in compliance with the Disclosure Statement Order, parties in interest were provided extensive notice of the Chapter 11 Cases, the Plan, the proposed Third-Party Releases, and the Objection Deadline.  *See* Tabulation Decl. ¶¶ 6–10.  The Confirmation Hearing Notice, the Notice of Non-Voting Status, and the Ballots expressly included, in bold font, the terms of the Third-Party Releases, as set forth in Section 10.6(b) of the Plan.  *See* Confirmation Hearing Notice; Solicitation Certificate.  The Confirmation Hearing Notice, the Notice of Non-Voting Status, and the Ballots advised careful review and consideration of the terms of the Third-Party Releases.  *Id.*  The language of the Third-Party Releases was also emphasized using bold font in the Plan and was included in the Disclosure Statement.  *See* Plan § 10.6(b); Disclosure Statement, Ex. C.

56.     In addition, the Notice of Non-Voting Status, the Release Opt-Out Form, and the Class 4 (OpCo General Unsecured Claims) Ballots[11] each set forth the procedures for opting out of such Third-Party Releases, and the Class 4 (OpCo General Unsecured Claims) Ballots and Release Opt-Out Form each included the appropriate form for parties to opt out of the Third-Party Releases in compliance with Paragraph 40 of the Complex Case Rules.  *See* Disclosure Statement Order, Scheds. 3A–3C, 4.  The Class 4 (OpCo General Unsecured Claims) Ballots and the Release Opt-Out Form, which was attached to the Notice of Non-Voting Status, included a checkbox to opt out of the consensual Third-Party Releases.  *See* Disclosure Statement Order, Scheds. 3B, 4.  Thus, the par ties to be bound as "Releasing Parties" either consented to the Third-

---

[11]    The Prepetition Lenders filed the *Joinder of the Ad Hoc Group of Secured Lenders to the Debtors' Memorandum of Law in Support of Confirmation of Second Amended Joint Chapter 11 Plan of Everstream Solutions LLC and Its Affiliated Debtors* contemporaneously herewith.  In exchange for their inclusion as Released Parties and Releasing Parties, consented and agreed to be bound by the release, exculpation, and injunction provisions set forth in Article X of the Plan.  Indeed, the Plan was filed with the unanimous support of the Prepetition Lenders.  Accordingly, the Class 3 (OpCo Lender Secured Claims) Ballots and Class 5 (HoldCo Lender Secured Claims) Ballots did not contain an opt-out option for the Third-Party Releases.

Party Releases by not exercising their right to opt out from such releases or by providing their consent prior to the filing of the Plan.

57.     *Second*, the Third-Party Releases are sufficiently specific to put the Releasing Parties on notice of the Claims being released.  The Third-Party Releases describe the nature and type of Claims being released, including Claims with respect to:

> [T]he Debtors, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of or Claim against the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, execution, filing, and/or consummation of this Plan, the DIP Loan Documents, the Disclosure Statement, the WholeCo Sale Process, the WholeCo Sale Transaction, the WholeCo Sale Documents, the Definitive Documents, and the documents in the Plan Supplement, or related agreements, instruments, or other documents relating thereto, or the solicitation of votes with respect to the Plan, in all cases, based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Plan § 10.6(b).

58.     *Third*, the Third-Party Releases are an integral part of the Plan.  The Settlement Parties, among other Released Parties, engaged in good-faith, arm's-length negotiations regarding the terms of the releases set forth in Article X of the Plan.  *See* Sandberg Decl. ¶ 20.  The Third-Party Releases were heavily negotiated by sophisticated parties represented by competent counsel and also facilitated participation of the Released Parties in both the Plan and the chapter 11 processes.  Such participation and support resulted in, among other things, a consensual WholeCo Sale Transaction, the Creditors' Committee's Settlement, and broad creditor support for the Plan, including the releases and exculpations set forth in Article X of the Plan.

59.     *Fourth*, the Third-Party Releases are given for consideration.  As described above, each of the Released Parties has provided and continues to provide meaningful support to the Debtors.  These contributions, including pursuant to the Prepetition Stakeholder Engagement, have resulted in, among other things, a stalking horse purchase agreement, the Bluebird APA and the Metro Comm APA, the consensual use of cash collateral and the delivery of the DIP Facility to fund the Chapter 11 Cases, guaranteed distributions from the Creditors' Committee Settlement Amount being made available for holders of Allowed OpCo General Unsecured Claims, and a consensual confirmation process.  All parties in interest benefit from the transactions contemplated by the Plan and the significant contributions of the Released Parties in furtherance thereof.  *See* Sandberg Decl. ¶¶ 12–18.

60.     *Finally,* the support for the Plan, including the Third-Party Releases, by the Creditors' Committee and its members in their individual capacities as creditors in the Chapter 11 Cases also demonstrates that the Third-Party Releases benefit the Debtors' stakeholders and are appropriate.

61.     Notwithstanding the foregoing and the Court's clear guidance in *Robertshaw* that "[t]here is nothing improper with an opt-out feature for consensual third-party releases in a chapter 11 plan," the U.S. Trustee raises the same arguments in its Objection that this Court rejected in *Robertshaw* and numerous cases in this Court that have followed.  *See Robertshaw*, 662 B.R. at 322–24.  Specifically, the U.S. Trustee asserts that the Plan's opt-out feature, which complies with the Complex Case Rules and case law in this District, is insufficient to render the Third-Party Releases consensual in light of the Supreme Court's decision in *Purdue*.  *See* U.S. Trustee Obj. ¶ 33-51.  The U.S. Trustee, however, adopts an overly expansive view of *Purdue*, which was about non-consensual third-party releases and did not "express a view on what

qualifies as a consensual release." *Harrington v. Purdue Pharma, L.P.*, 603 U.S. 204, 226 (2024). As this Court recognized, "*Purdue* did not change the law in this Circuit." *Robertshaw*, 662 B.R. at 323.

62.     Accordingly, the Court should approve the Third-Party Releases in the Plan as they are appropriate and justified under the circumstances and comply with the Bankruptcy Code, the Complex Case Rules, and controlling Fifth Circuit standards.

### C.     Exculpation Provision Is Appropriate, Consistent with Fifth Circuit Precedent, and Should Be Approved

63.     In addition to the foregoing releases, <u>Section 10.7</u> of the Plan provides for the exculpation of certain parties (the "**Exculpation Provision**"). Courts in this circuit permit the exculpation of debtors for actions short of gross negligence committed during the course of bankruptcy and, although more carefully scrutinized, permit the exculpation of non-debtor parties where a separate statutory basis for exculpation exists. *See NexPoint Advisors, L.P. v. Highland Cap. Cap. Mgmt., L.P. (In re Highland Cap. Mgmt., L.P.),* 48 F.4th 419, 437–38 (5th Cir. 2022) ("*Highland I*"), *cert. denied*, Nos. 22-631 and 22-669 (U.S. Jul. 2, 2024) ("[Section] 524(e) does not permit absolving the non-debtor from any negligent conduct that occurred during the course of the bankruptcy absent another source of authority.") (citation modified). In this vein, section 1103(c) of the Bankruptcy Code is widely recognized as a separate statutory basis for exculpation for creditors' committees. *See Bank of N.Y. Tr. Co. v. Off. Unsecured Creditors' Comm. (In re Pac. Lumber Co.)*, 584 F.3d 229, 253 (5th Cir. 2009) (approving the exculpation of a creditors' committee and its members because section 1103(c) of the Bankruptcy Code implies "qualified immunity for [committee members'] actions within the scope of their duties").

64.     In *Highland I*, the Fifth Circuit expressly adopted and applied precedent providing qualified immunity to bankruptcy trustees[12] to exculpate certain non-debtors acting within the scope of duties of a trustee.  *Highland I*, 48 F.4th at 436–37.  Based on the facts and circumstances before it, the court in *Highland I* determined that, in such capacity, (i) each of the three independent directors appointed as fiduciaries were properly exculpated by the Plan and (ii) certain other non-debtor parties that were not acting in such a capacity could not be exculpated. *Id.*  Citing section 1107(a) of the Bankruptcy Code, the court reasoned that "[l]ike a debtor-in-possession, the Independent Directors are entitled to all the rights and powers of a trustee" and were therefore entitled to exculpation.  *Id.* at 637.

65.     Here, the Exculpation Provision protects the Exculpated Parties[13] from, among other things, Claims and Causes of Action related to, in connection with, or arising out of the administration of the Chapter 11 Cases and the negotiations and agreements made in connection therewith, including, among other things, the WholeCo Sale Transaction.  *See* Plan § 10.7.  Unlike the Third-Party Releases, the Exculpation Provision does not affect the liability of third parties *per se* but rather sets a standard of care of "actual fraud, willful misconduct, or gross negligence" in hypothetical future litigation against an Exculpated Party for acts arising out of the Chapter 11 Cases.  *Id.*  As such, the Exculpation Provision prevents future collateral attacks against

---

[12]    *See, e.g.*, *Hilal v. Williams (In re Hilal)*, 534 F.3d 498, 501 (5th Cir. 2008) ("In this circuit, trustees cannot be subjected to personal liability for damages to the bankruptcy estate unless they are found to have acted with gross negligence."); *Dodson v. Huff (In re Smyth)*, 207 F.3d 758, 762 (5th Cir. 2000) ("[W]e conclude that trustees should not be subjected to personal liability unless they are found to have acted with gross negligence."); *Baron v. Sherman (In re Ondova Ltd.)*, 914 F.3d 990, 993 (5th Cir. 2019) ("We thus hold that bankruptcy trustees in the Fifth Circuit are entitled to qualified immunity for personal harms caused by actions that, while not pursuant to a court order, fall within the scope of their official duties.").

[13]    "**Exculpated Parties**" means, collectively, solely in their capacities as such, (i) the Debtors, (ii) the Independent Managers, and (iii) the Creditors' Committee and the members of the Creditors' Committee solely in their capacity as such.

Estate fiduciaries that have exercised their fiduciary duties to maximize value for the Debtors and their Estates.

66.     Additionally, each of the Exculpated Parties participated in the Chapter 11 Cases in good faith.  The Exculpation Provision will provide such parties with appropriate protections supported by express sources of authority within the Bankruptcy Code, including sections 524(e), 1103(c), and 1107(a) thereof.  Furthermore, the Exculpation Provision in the Plan is narrowly tailored to protect the Exculpated Parties from inappropriate litigation based on the Chapter 11 Cases and does not release any claim based on any act or omission that constitutes actual fraud, willful misconduct, or gross negligence as determined by a final order by a court of competent jurisdiction.  The Exculpation Provision is further limited such that it only covers actions from the Petition Date through the Effective Date.  Moreover, each of the Exculpated Parties—including the Independent Managers (as defined below)—acted as Estate fiduciaries during the pendency of the Chapter 11 Cases.

67.     Accordingly, the Court should approve the Exculpation Provision as it is appropriate and justified under the circumstances and complies with *Highland I* and controlling Fifth Circuit precedent.

### D.     Injunction Provisions Are Appropriate and Should Be Approved

68.     The Plan also provides for the injunction of certain actions as set forth in Sections 10.5 and 10.8 of the Plan (the "**Injunction Provisions**").  The Injunction Provisions are appropriate because they comply with the Bankruptcy Code and are necessary to implement and enforce the Plan.

69.     The Injunction Provisions are integral to the Plan because, among other things, they (i) provide certainty that the Plan will be enforceable in accordance with its terms and (ii) enforce the Plan Releases and Exculpation Provision.  Importantly, the Injunction Provisions

implement the Plan by enjoining any Entity from commencing or continuing in any manner any Claim that was released or exculpated pursuant to such provisions.  The Injunction Provisions include a "gatekeeper provision," which provides that, before any Claim or Cause of Action is brought against a Released Party or Exculpated Party, the Court must (i) determine, after notice and a hearing, that such Claim or Cause of Action is colorable and has not been released or exculpated under the Plan and (ii) specifically authorize such person or Entity to bring such Claim or Cause of Action (the "**Gatekeeper Provision**").  The Gatekeeper Provision is consistent with the one authorized by the Fifth Circuit in *Highland I* and, more recently, in *In re Highland Cap. Mgmt., L.P.*, 132 F.4th 353 (5th Cir. 2025), *pet. for cert filed,* No. 25-119 (July 31, 2025) ("**Highland II**").  *See Highland I*, 48 F.4th at 438–39 ("Courts have long recognized bankruptcy courts can perform a gatekeeping function . . . . [W]e affirm the inclusion of the injunction and the gatekeeper provisions in the Plan."); *Highland II*, 132 F.4th at 362 (clarifying that the scope of a gatekeeper provision may not extend beyond claims subject to the plan's injunction); *see, e.g.*, *In re Party City Holdco Inc.*, No. 24-90621 (ARP) (Bankr. S.D. Tex. Aug. 27, 2025) (Docket No. 1827) (confirming chapter 11 plan that included an injunction and gatekeeper provisions); *In re Steward Health Care Sys. LLC*, No. 24-90213 (CML) (Bankr. S.D. Tex. July 25, 2025) (Docket No. 5774) (same); *In re DocuData Sols., L.C.*, No. 25-90023 (CML) (Bankr. S.D. Tex. June 23, 2025) (Docket No. 834) (same); *In re Cutera, Inc.*, No. 25-90088 (ARP) (Bankr. S.D. Tex. April 15, 2025) (Docket No. 227) (same).

70.     The Injunction Provisions are an integral component of the Plan, appropriate and necessary under the circumstances, narrowly tailored, and consistent with the Bankruptcy Code and applicable case law in the Fifth Circuit.  For the reasons set forth above, the Injunction Provisions should be approved.

## II.      Plan Satisfies Bankruptcy Code's Requirements and Should Be Confirmed

71.      To obtain confirmation of the Plan, the Debtors must demonstrate that the Plan satisfies section 1129 of the Bankruptcy Code by a preponderance of the evidence.  *See Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters., Ltd., II (In re Briscoe Enters., Ltd., II)*, 994 F.2d 1160, 1165 (5th Cir. 1993) ("[P]reponderance of the evidence is the debtor's appropriate standard of proof both under § 1129(a) and in a cramdown."); *In re Cypresswood Land Partners, I*, 409 B.R. 396, 422 (Bankr. S.D. Tex. 2009); *In re J T Thorpe Co.*, 308 B.R. 782, 785–87 (Bankr. S.D. Tex. 2003), *aff'd,* No. 02-41487-H5-11, 2004 WL 720263 (S.D. Tex. Mar. 3, 2024).

72.      For the reasons set forth below and in the Confirmation Declarations, the Plan satisfies all applicable requirements of section 1129 of the Bankruptcy Code and complies with all other applicable sections of the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, and applicable non-bankruptcy law.

### A.      Section 1129(a)(1) of Bankruptcy Code:  Plan Complies with Applicable Provisions of Bankruptcy Code

73.      Under section 1129(a)(1) of the Bankruptcy Code, a plan must comply with the applicable provisions of the Bankruptcy Code.  11 U.S.C. § 1129(a)(1).  The legislative history of section 1129(a)(1) explains that this provision encompasses the requirements of sections 1122 and 1123 of the Bankruptcy Code governing classification of claims and contents of a plan, respectively.  *See* H.R. Rep. No. 95-595, at 412 (1977); S. Rep. No. 95-989, at 126 (1978).

### 1.      Section 1122:  Plan's Classification Structure Is Proper

74.      Section 1122(a) of the Bankruptcy Code provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."  11 U.S.C. § 1122(a).  Here, the Plan has ten Classes of Claims against and Interests in each Debtor as follows:  (i) Class 1 (Other Secured Claims);

(ii) Class 2 (Other Priority Claims); (iii) Class 3 (OpCo Lender Secured Claims); (iv) Class 4 (OpCo General Unsecured Claims); (v) Class 5 (HoldCo Lender Secured Claims); (vi) Class 6 (HoldCo General Unsecured Claims); (vii) Class 7 (Intercompany Claims); (viii) Class 8 (Subordinated Claims); (ix) Class 9 (HoldCo Equity Interests); and (x) Class 10 (Intercompany Interests).

75.     A plan proponent is afforded significant flexibility in classifying claims and interests into different classes as long as there is a rational legal or factual basis to do so and all claims or interests within a particular class are substantially similar. *See In re Pisces Energy, LLC*, No. 09-36591-H5-11, 2009 WL 7227880, at *8 (Bankr. S.D. Tex. Dec. 21, 2009); *In re Sentry Op. Co. of Tex.*, 264 B.R. 850, 860 (Bankr. S.D. Tex. 2001) (noting that "[section] 1122 is permissive of any classification scheme that is not proscribed, and that substantially similar claims may be separately classified") (emphasis omitted); *In re Eagle Bus Mfg., Inc.*, 134 B.R. 584, 596 (Bankr. S.D. Tex. 1991), *aff'd,* 158 B.R. 421 (S.D. Tex. 1993) ("A classification scheme satisfies section 1122(a) of the Bankruptcy Code when a reasonable basis exists for the choices made and all claims within a particular class are substantially similar."); *see also In re Vitro Asset Corp.*, No. 11-32600-hdh, 2013 WL 6044453, at *5 (Bankr. N.D. Tex. Nov. 14, 2013) ("[A] plan may provide for multiple classes of claims or interests so long as each claim or interest within a class is substantially similar to other claims or interests."); *In re Mirant Corp.*, No. 03-46590 (DML), 2005 WL 6443614, at *19 (Bankr. N.D. Tex. Dec. 9, 2005).

76.     The classification structure of the Plan is rational and complies with the Bankruptcy Code.  All Claims and Interests within a Class have the same or similar rights against the Debtors.  *See* Schmaltz Decl. ¶ 17.  The Plan provides for the separate classification of Claims against and Interests in each Debtor based upon the differences in legal nature and priority of such

Claims and Interests. *See id.* Accordingly, the classification scheme of the Plan complies with section 1122 of the Bankruptcy Code.

## 2. <u>Section 1123(a): Plan's Content Is Appropriate</u>

77. Section 1123(a) of the Bankruptcy Code sets forth the requirements that a plan must satisfy. *See* 11 U.S.C. § 1123(a). The Plan satisfies each such applicable requirement:

i. <u>Section 1123(a)(1)</u>. The Plan designates Classes of Claims and Interests as required by section 1123(a)(1). *See* Plan § 3.3.

ii. <u>Section 1123(a)(2)</u>. The Plan specifies whether each Class of Claims or Interests is Impaired or Unimpaired under the Plan as required by section 1123(a)(2). *See id.*

iii. <u>Section 1123(a)(3)</u>. The Plan specifies the treatment of any Class of Claims or Interests that is Impaired as required by section 1123(a)(3). *See id.*, Art. IV.

iv. <u>Section 1123(a)(4)</u>. Except as otherwise agreed to by a holder of a particular Claim or Interest, the opportunity for recovery to each holder of a Claim or Interest in each Class is the same as the opportunity for recovery to all holders in such Class, as required by section 1123(a)(4). *See id.*

v. <u>Section 1123(a)(5)</u>. The Plan provides adequate means for its implementation through, among other things, the: (i) appointment of the Plan Administrator to implement the Plan and Wind Down of the Debtors, *see id.* § 5.4; (ii) establishment of Wind Down Co, *see id.*; (iii) establishment and funding of the Fee Escrow Account, *see id.* § 2.3; (iv) funding of the Creditors' Committee Settlement Amount, *see id.* § 5.2; (v) funding of the Counterparty Reserve for all expected undisputed obligations arising under any executory contract or unexpired lease that has not been rejected or assumed and assigned to a third party, *see id.*; (vi) preservation of certain Claims and Causes of Action, *see id.* § 10.10; (vii) provision of certain releases by the Debtors and by holders of Claims and Interests, *see id.* § 10.6; (viii) appointment of the Claims Ombudsman to participate in the Claims reconciliation process, *see id.* § 5.2; and (ix) exculpation of the Exculpated Parties, *see* Plan § 10.7.

vi. <u>Section 1123(a)(6)</u>. The organizational documents of HoldCo have been or will be amended on or prior to the Effective Date to prohibit the issuance of non-voting equity securities in accordance with section 1123(a)(6) of the Bankruptcy Code. Because HoldCo, both before and after the Effective Date, directly or indirectly owns and controls 100% of the equity interests in the other Debtors, no amendments to the organizational documents of the other Debtors are necessary to comply with section 1123(a)(6). Further, as part of the Wind

Down, the Debtors will ultimately be dissolved and/or terminated after the Effective Date. Therefore, section 1123(a)(6) is not applicable to the Debtors.

vii. <u>Section 1123(a)(7)</u>. The Plan provides that, as of the Effective Date, the existing board of directors or managers, as applicable, of the Debtors shall be dissolved without any further action required on the part of the Debtors or the Debtors' officers, directors, managers, shareholders, or members. *See id.* § 5.4. Notwithstanding the foregoing, following the Effective Date, the Plan Administrator, or one or more designees thereof, shall serve as the member(s) or director(s) of any such dissolved board in the event that the Plan Administrator deems doing so is necessary at any time following the Effective Date in order to effectuate the provisions of the Plan. *Id.*

78. Accordingly, the Plan satisfies section 1123(a) of the Bankruptcy Code.

### 3. **Section 1123(b): Plan's Content Is Permitted**

79. Section 1123(b) of the Bankruptcy Code sets forth permissive provisions that may be incorporated into a plan. Here, the relevant provisions of the Plan are permissible under section 1123(b), as set forth in more detail below.

i. <u>Section 1123(b)(1)</u>. Pursuant to <u>Articles III</u> and <u>IV</u> of the Plan, Class 3 (OpCo Lender Secured Claims), Class 4 (OpCo General Unsecured Claims), Class 5 (HoldCo Lender Secured Claims), Class 6 (HoldCo General Unsecured Claims), Class 7 (Intercompany Claims) (only in the event that Intercompany Claims are not reinstated), Class 8 (Subordinated Claims), and Class 9 (HoldCo Equity Interests) are Impaired. *See id.*, Arts. III & IV.

ii. <u>Section 1123(b)(2)</u>. <u>Section 8.1</u> of the Plan and the Plan Supplement provide for the rejection of executory contracts and unexpired leases of the Debtors as of the Effective Date, unless such executory contract or unexpired lease: (i) was previously assumed or rejected by the Debtors pursuant to an order of the Court, *see id.* § 8.1(a); (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto, *see id.*; (iii) is the subject of a motion to assume or reject filed by the Debtors on or before the Confirmation Date, *see id.*; (iv) is identified in <u>Section 8.6</u> of the Plan, *see id.*; (v) is identified for assumption on the Schedule of Assumed Contracts, *see id.*; Plan Suppl., Ex. B-1; (vi) is identified for assumption and assignment on the Schedule of Transferred Contracts, *see* Plan Suppl., Ex. B-3; (vii) is identified for assumption and assignment on the Schedule of Shared Contracts, *see* Plan Suppl., Ex. B-4; (viii) is identified on the Schedule of Rejected Contracts for rejection following the Effective Date in accordance with the requirements set forth in the Plan, including the Rejection Outside Date, *see* Plan § 8.1(a); Plan Suppl., Ex. B-2; (ix) is the subject of a pending Assumption Dispute, *see* Plan

37

§ 8.1(a); or (x) is identified for assumption and assignment in any subsequent Plan Supplement.

iii.    <u>Section 1123(b)(3)(B)</u>.  The Plan preserves and retains certain rights, Claims, and Causes of Action to be pursued by the Plan Administrator on behalf of the Debtors or Wind Down Co (as applicable).  *See id.* § 10.10; Plan Suppl., Ex. A.

iv.    <u>Section 1123(b)(5)</u>.  <u>Article IV</u> of the Plan modifies the right of holders of OpCo Lender Secured Claims (Class 3), OpCo General Unsecured Claims (Class 4), HoldCo Lender Secured Claims (Class 5), HoldCo General Unsecured Claims (Class 6), Intercompany Claims (Class 7) (only in the event that Intercompany Claims are not reinstated), Subordinated Claims (Class 8), and HoldCo Equity Interests (Class 9) and leaves Unimpaired the rights of holders of Other Secured Claims (Class 1), Other Priority Claims (Class 2), Intercompany Claims (Class 7) (only in the event that Intercompany Claims are reinstated), and Intercompany Interests (Class 10).  *See* Plan, Art. IV.

v.    <u>Section 1123(b)(6)</u>.  <u>Article X</u> of the Plan contains certain release, exculpation, and injunction provisions.  These provisions are essential to the Plan.  *See id.* §§ <u>10.5</u>, <u>10.6</u>, <u>10.7</u>, and <u>10.8</u>.

80.    Accordingly, each of the foregoing permissive provisions are consistent with section 1123(b) of the Bankruptcy Code.  In addition, as discussed in more detail above, the Plan Releases, Exculpation Provision, and Injunction Provisions are permitted pursuant to sections 105, 1103, 1107, 1123(b)(3)(A), 1125(e), and 1141 of the Bankruptcy Code and applicable law.  *See supra* ¶¶ 34–67.

81.    For the foregoing reasons, the Plan complies fully with sections 1122 and 1123 of the Bankruptcy Code, and, therefore, satisfies the requirements of section 1129(a)(1) of the Bankruptcy Code.

**B.    Section 1129(a)(2):  Debtors Have Complied with Bankruptcy Code**

82.    Under section 1129(a)(2) of the Bankruptcy Code, "[t]he proponent of the plan [must] compl[y] with the applicable provisions of this title."  11 U.S.C. § 1129(a)(2).  The "applicable provisions" of the Bankruptcy Code have been interpreted to include, principally, sections 1125 and 1126 of the Bankruptcy Code.  *See, e.g.*, *Mabey v. Sw. Elec. Power Co. (In re*

*Cajun Elec. Power Coop., Inc.*), 150 F.3d 503, 512 n.3 (5th Cir. 1998) (noting that section 1129(a)(2) includes requirement of compliance with section 1125); *In re Star Ambulance Serv. LLC*, 540 B.R. 251, 262 (Bankr. N.D. Tex. 2015) ("Courts interpret this language to require that the plan proponent comply with the disclosure and solicitation requirements set forth in Bankruptcy Code §§ 1125 and 1126."). Often, courts have also considered whether the debtor "is a proper debtor under [s]ection 109 of the Bankruptcy Code and a proper proponent of [a plan] under [s]ection 1121(a) of the Bankruptcy Code." *J T Thorpe*, 308 B.R. at 786 (holding that debtor's compliance with sections 109, 1125, and 1126 satisfied requirements of section 1129(a)(2)); *see also Moody Nat'l*, 2010 WL 5116872, at *4 (same); *In re Harborwalk, LP*, Nos. 10-80043, 10-80044, 10-80045, 2010 WL 5116620, at *4 (Bankr. S.D. Tex. Oct. 25, 2010) (same).

### 1.    Debtors Are Proper Debtors and Plan Proponents

83.    Under section 109(a) of the Bankruptcy Code, "a person that resides or has a domicile, a place of business, or property in the United States . . . may be a debtor." 11 U.S.C. § 109(a). Further, "a person that may be a debtor under chapter 7 of [the Bankruptcy Code, with exceptions not applicable here] . . . may be a debtor under chapter 11." 11 U.S.C. § 109(d). Here, each Debtor has a domicile, a place of business, and property in the United States and is eligible for relief under chapter 7 of the Bankruptcy Code. *See* Schmaltz Decl. ¶ 24. Therefore, each Debtor is a proper chapter 11 debtor and Plan proponent.

### 2.    Debtors Have Complied with Section 1125

84.    Under section 1125(b) of the Bankruptcy Code:

An acceptance or rejection of a plan may not be solicited after the commencement of the case under [the Bankruptcy Code] from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written

> disclosure statement approved, after notice and a hearing, by the court as containing adequate information.

11 U.S.C. § 1125(b).

85.    Here, on October 14, 2025, the Bankruptcy Court entered the Disclosure Statement Order, which approved the Disclosure Statement as containing "adequate information" in accordance with section 1125(b) of the Bankruptcy Code and approved the Solicitation Package. *See* Disclosure Statement Order ¶ 1.  As detailed in the Tabulation Declaration, the Debtors solicited votes from holders of Claims in the Voting Classes.  *See* Tabulation Decl. ¶ 7.  In compliance with section 1125(b), the Debtors did not solicit votes on the Plan until after the Disclosure Statement Order was entered.  *See* Solicitation Certificate.

86.    Section 1127(a) of the Bankruptcy Code provides that "[t]he proponent of a plan may modify such plan at any time before confirmation, but may not modify such plan so that such plan as modified fails to meet the requirements of sections 1122 and 1123 of this title." 11 U.S.C. § 1127(a).  Section 1127(c) further provides that the proponent of a modification to a plan must comply with section 1125 with respect to the plan as modified.  11 U.S.C. § 1127(c). Bankruptcy Rule 3019 provides that a plan that is modified after it has been accepted "shall be deemed accepted by all creditors and equity security holders who have previously accepted the plan" to the extent the "the proposed modification does not adversely change the treatment . . . ." Fed. R. Bankr. P. 3019(a).

87.    On November 11, 2025, the Debtors filed the *Second Amended Joint Chapter 11 Plan of Everstream Solutions LLC and Its Affiliated Debtors* (Docket No. 561), reflecting certain conforming and other non-substantive changes to the previous Plan.  The modifications do not adversely change the treatment of any holders of Claims that have already

voted on the Plan.  Accordingly, the Debtors submit that these modifications to the Plan satisfy section 1127(c) of the Bankruptcy Code and Bankruptcy Rule 3019.

88.     In addition, the Debtors may make certain additional immaterial changes to the Plan prior to or during the Confirmation Hearing pursuant to section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.  In accordance with Bankruptcy Rule 3019, these modifications will not require additional disclosure under section 1125 of the Bankruptcy Code or the re-solicitation of votes under section 1126 of the Bankruptcy Code.  Further, these modifications to the Plan will be consistent with section 1129 of the Bankruptcy Code.

### 3.     Debtors Have Complied with Section 1126

89.     Section 1126 of the Bankruptcy Code sets forth the procedures for soliciting votes on a chapter 11 plan and determining acceptance thereof.  Pursuant to section 1126 of the Bankruptcy Code, only holders of Allowed Claims or Interests that are Impaired *and* will receive or retain property under the Plan on account of such Claims or Interests may vote to accept or reject the Plan.  *See* 11 U.S.C. § 1126.

90.     As provided in the Tabulation Declaration, the Debtors solicited votes on the Plan from the Voting Classes, which included the holders of OpCo Lender Secured Claims (Class 3), OpCo General Unsecured Claims (Class 4), and HoldCo Lender Secured Claims (Class 5).  *See* Tabulation Decl. ¶ 7.  In accordance with sections 1126(f) and 1126(g) of the Bankruptcy Code, the Debtors did not solicit votes on the Plan from holders of Claims and Interests, as applicable, in Class 1 (Other Secured Claims), Class 2 (Other Priority Claims), Class 6 (HoldCo General Unsecured Claims), Class 7 (Intercompany Claims), Class 8 (Subordinated Claims), Class 9 (HoldCo Equity Interests), and Class 10 (Intercompany Interests) because holders of such Claims and Interests are either Unimpaired and conclusively presumed to have accepted the Plan or Impaired and deemed to reject the Plan.  *See* Plan § 3.3; Tabulation Decl. ¶ 8.

41

91.     Section 1126(c) of the Bankruptcy Code specifies the requirements for acceptance of a plan by impaired classes of claims entitled to vote to accept or reject the plan:

> A class of claims has accepted a plan if such plan has been accepted by creditors, other than any entity designated under subsection (e) of this section, that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors, other than any entity designated under subsection (e) of this section, that have accepted or rejected such plan.

11 U.S.C. § 1126(c).

92.     Similarly, Section 1126(d) of the Bankruptcy Code specifies the requirements for acceptance of a plan by impaired classes of interests entitled to vote to accept or reject the plan:

> A class of interests has accepted a plan if such plan has been accepted by holders of such interests, other than any entity designated under subsection (e) of this section, that hold at least two-thirds in amount of the allowed interests of such class held by holders of such interests, other than any entity designated under subsection (e) of this section, that have accepted or rejected such plan.

11 U.S.C. § 1126(d).

93.     As set forth in the Tabulation Declaration, with respect to each of the Debtors, the Plan has been accepted by at least two-thirds in amount and more than one-half in number of Claims in Class 3 (OpCo Lender Secured Claims), Class 4 (OpCo General Unsecured Claims), and Class 5 (HoldCo Lender Secured Claims).  *See* Tabulation Decl., Ex. A.

94.     Based on the foregoing, the Debtors have satisfied the requirements of section 1129(a)(2) of the Bankruptcy Code.

## C.     Section 1129(a)(3):  Plan Has Been Proposed in Good Faith and Not by Any Means Forbidden by Law

95.     Section 1129(a)(3) of the Bankruptcy Code requires that a plan be "proposed in good faith and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3).  Good

faith is determined through consideration of whether the plan was proposed with "the legitimate and honest purpose to reorganize and has a reasonable hope of success." *Brite v. Sun Country Dev., Inc. (In re Sun Country Dev., Inc.)*, 764 F.2d 406, 408 (5th Cir. 1985). The plan must also achieve a result consistent with the Bankruptcy Code. *See Ronit, Inc. v. Stemson Corp. (In re Block Shim Dev. Co.-Irving)*, 939 F.2d 289, 292 (5th Cir. 1991). The good faith standard is "viewed in light of the totality of circumstances surrounding establishment of a Chapter 11 plan, keeping in mind the purpose of the Bankruptcy Code to give debtors a reasonable opportunity to make a fresh start." *Sun Country Dev.*, 764 F.2d at 408; *W. Real Estate Equities, L.L.C. v. Vill. at Camp Bowie I, LP, (In re Vill. at Camp Bowie I, L.P.)*, 710 F.3d 239, 247 (5th Cir. 2013) ("Good faith should be evaluated 'in light of the totality of the circumstances' . . . mindful of the purposes underlying the Bankruptcy Code.") (citing *In re Cajun Elec. Power*, 150 F.3d at 519); *Fin. Sec. Assurance, Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship)*, 116 F.3d 790, 802 (5th Cir. 1997); *see also In re Couture Hotel Corp.*, 536 B.R. 712, 735 (Bankr. N.D. Tex. 2015) (finding that plan that is "the result of arm's-length discussions and negotiations among the Debtor [and other relevant parties and stakeholders] . . . clearly promotes the objectives and purposes of the Bankruptcy Code and is being proposed in good faith.").

96.     Here, the Plan has been proposed in good faith and for the legitimate purpose of winding down the Estates and providing recovery to certain of the Debtors' stakeholders, each in accordance with the Plan. *See* Schmaltz Decl. ¶ 25. As discussed above, the Debtors engaged in a thorough and value-maximizing marketing process and Auction for the sale of WholeCo, which were approved by the Court pursuant to the Bidding Procedures Order and WholeCo Sale Order. *See supra* ¶¶ 13–17; Schmaltz Decl. ¶ 25. Further, the Debtors engaged in extensive, arm's-length negotiations over the Plan, as well as the settlements memorialized therein,

with a number of their key stakeholders, including the Settlement Parties, each of which is represented by experienced and sophisticated legal counsel and other advisors.  *See* Schmaltz Decl. ¶ 25.  Such negotiations culminated in agreement on the terms of the Plan.  *See id.*  Further, the acceptance of the Plan by all Voting Classes reflects the Plan's inherent fairness and good-faith efforts to achieve the objectives of chapter 11.  *See id.*

97.     The Plan is not by any means forbidden by law and fully complies with the Bankruptcy Code and applicable non-bankruptcy law.  Accordingly, the Debtors have proposed the Plan in good faith in compliance with section 1129(a)(3) of the Bankruptcy Code.

### D.     Section 1129(a)(4):  Plan Provides that Professional Fees and Expenses Are Subject to Court Approval

98.     Section 1129(a)(4) requires that "[a]ny payment made or to be made by the proponent . . . for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable."  11 U.S.C. § 1129(a)(4).  Section 1129(a)(4) has been construed to require that all payments of professional fees made from estate assets be subject to review and approval as to their reasonableness by the court.  *See In re Cajun Elec. Power*, 150 F.3d at 513-14; *see also In re Chapel Gate Apartments, Ltd.*, 64 B.R. 569, 573 (Bankr. N.D. Tex. 1986) (noting "there must be a provision [in the plan] for review by the Court of any professional compensation").  This is a "relatively open-ended standard" involving a case-by-case inquiry and, under the appropriate circumstances, does not necessarily require that a bankruptcy court review the amount charged.  *See In re Cajun Elec. Power*, 150 F.3d at 517 (finding with respect to routine legal fees and expenses that have been approved, "the court will ordinarily have little reason to inquire further with respect to the amount charged").

44

99.     Here, all payments for professional services provided to the Debtors during the Chapter 11 Cases that require Court approval will continue to be subject to such requirement through the Effective Date in accordance with section 1129(a)(4) of the Bankruptcy Code. Specifically, Section 2.3 of the Plan provides that all fees of retained professionals must be approved by the Court pursuant to fee applications filed with the Court and according to the order approving procedures for the submission and approval of fee applications by professionals retained by the Debtors and the Creditors' Committee in the Chapter 11 Cases.  *See* Plan § 2.3(a) and (b); *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* (Docket No. 268).  Further, Section 11.1 of the Plan provides that the Court shall retain jurisdiction to "hear and determine all Fee Claims."  Plan § 11.1(i).  Accordingly, the Plan complies with the requirements of section 1129(a)(4) of the Bankruptcy Code.

E.     **Section 1129(a)(5): Debtors Have Disclosed All Necessary Information Regarding Directors, Officers, and Insiders**

100.     Section 1129(a)(5) of the Bankruptcy Code requires that (i) the plan proponent disclose the identity and affiliations of the proposed officers and directors of the debtors post-confirmation, (ii) the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy, and (iii) to the extent that there are any insiders that will be retained or employed by the debtors post-confirmation, there be disclosure of the identity and nature of any compensation of any such insiders.  11 U.S.C. § 1129(a)(5).

101.     Here, the Debtors have satisfied the requirements under section 1129(a)(5) of the Bankruptcy Code through their disclosure that Melker Sandberg, through Melker Sandberg LLC, will serve as Plan Administrator under the Plan.  *See* Plan Suppl., Ex. E.  Mr. Sandberg, an Independent Manager of the Boards, is competent, familiar with the Debtors and their Estates, and

45

well-equipped to assist with the Wind Down.  Additionally, the Plan provides that the existing board of directors or managers, as applicable, of the Debtors shall be dissolved without any further action required on the part of the Debtors or the Debtors' officers, directors, managers, shareholders, or members. *See* Plan § 5.4.  Notwithstanding the foregoing, following the Effective Date, the Plan Administrator, or one or more designees thereof, shall serve as the member(s) or director(s) of any such dissolved board in the event that the Plan Administrator deems doing so necessary at any time following the Effective Date in order to effectuate the provisions of the Plan. *See id.*  Accordingly, the Plan satisfies the requirements of section 1129(a)(5) of the Bankruptcy Code.

### F.   Section 1129(a)(6):  Plan Does Not Contain Any Rate Changes

102.   Section 1129(a)(6) of the Bankruptcy Code requires applicable government approval of "any rate change provided for in the plan."  *See* 11 U.S.C. § 1129(a)(6).  Here, the Plan does not provide for rate changes by the Debtors.  Accordingly, section 1129(a)(6) does not apply to the Plan.

### G.   Section 1129(a)(7):  Plan Satisfies Best Interests Test

103.   Section 1129(a)(7) of the Bankruptcy Code requires that each holder of an impaired claim or interest has either accepted the plan or will receive or retain property having a present value, as of the effective date of the plan, of not less than what such holder would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code at that time—commonly referred to as the "best interests" test.  *See* 11 U.S.C. § 1129(a)(7).  The "best interests" test is satisfied where the estimated recoveries for a debtor's stakeholders in a hypothetical chapter 7 liquidation are less than or equal to the estimated recoveries for a holder of an impaired claim or interest under the debtor's chapter 11 plan.  *Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 n.13 (1999) ("The 'best interests' test applies to individual creditors

holding impaired claims, even if the class as a whole votes to accept the plan."); *In re Tex. Extrusion Corp.*, 844 F.2d 1142, 1159 n.23 (5th Cir. 1988) (noting that a bankruptcy court is required to determine whether impaired claims would receive no less under a reorganization than through a liquidation). A party's speculation that it would fare better in a hypothetical chapter 7 liquidation is insufficient to challenge a plan proponent's liquidation analysis. *Block Shim*, 939 F.2d at 292.

104. Here, the relative recoveries of holders of Impaired Claims or Interests under the Plan and in a hypothetical chapter 7 liquidation are set forth in <u>Exhibit B</u> to the Disclosure Statement (the "**Liquidation Analysis**") and more fully described in the Schmaltz Declaration. *See* Schmaltz Decl. ¶¶ 41–47. Specifically, the Debtors determined that, subject to the assumptions and limitations described in the Liquidation Analysis, the net Liquidation Proceeds[14] available for distribution would be between approximately $99.6 million and $136.5 million. *See id.* ¶ 41. The Liquidation Analysis demonstrates that each holder of an Impaired Claim or Interest would receive or retain on account of such Claim or Interest under the Plan property with a value equal to or higher than the value of the property such holder would receive or retain if the Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code, as summarized in the table below:

| Class and Designation | Plan Recoveries | Chapter 7 Liquidation |
|---|---|---|
| DIP Claims | 100% | 49.9–70.8% |
| Administrative & Priority Claims | 100% | 0% |
| 1 (Other Secured Claims) | 100% | 0% |
| 2 (Other Priority Claims) | 100% | 0% |
| 3 (OpCo Lender Secured Claims) | 9.3–20.6% | 0% |

---

[14]   "**Liquidation Proceeds**" means the cash proceeds a chapter 7 trustee would generate if each Debtor's chapter 11 case was converted to a case under chapter 7 and the assets of such Debtor's estate were liquidated.

| Class and Designation | Plan Recoveries | Chapter 7 Liquidation |
|---|---|---|
| 4 (OpCo General Unsecured Claims) | 5.4–12.2% | 0% |
| 5 (HoldCo Lender Secured Claims) | 0.1% | 0% |
| 6 (HoldCo General Unsecured Claims) | 0% | 0% |
| 7 (Intercompany Claims) | 0% | 0% |
| 8 (Subordinated Claims) | 0% | 0% |
| 9 (HoldCo Equity Interests) | 0% | 0% |
| 10 (Intercompany Interests) | 0% | 0% |

*See id.* § IV(A).

105.    The Liquidation Analysis provides a fair and reasonable assessment of the effects that a conversion of the Chapter 11 Cases to cases under chapter 7 would have on the proceeds available for distribution to holders of Allowed Claims.  *See id.* ¶ 47.  Furthermore, the assumptions and methodology used to prepare the Liquidation Analysis are consistent with Mr. Schmaltz's experience as a restructuring advisor to the Debtors.  *See id.*  As this Bankruptcy Court has explained:

> [A] chapter 7 liquidation would increase the administrative costs of the Bankruptcy Cases and adversely affect the ultimate proceeds available for distribution to all holders of Allowed Claims in the Bankruptcy Cases and the Debtors' [post-effective] date operations. Moreover, the increased costs associated with a liquidation under chapter 7 would further reduce the proceeds available for distribution.  These costs would include, among other things, administrative fees and costs payable to a trustee in bankruptcy and professional advisors to such trustee.

> . . . The Bankruptcy Court here considers, *inter alia:* (1) the problems associated with the quick sale of assets as contemplated in chapter 7; (2) the limitations of section 721 of the Bankruptcy Code; and (3) loss of value through passage of time.

*Pisces Energy*, 2009 WL 7227880, at *12 & n.7 (holding that plan satisfied best interests test); *accord In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 252–58 (Bankr. S.D.N.Y. 2007)

(considering, among other things, costs of regulatory compliance, administrative costs of one or more chapter 7 trustees and their professionals; a trustee's lack of familiarity with debtors' business; potential for delays in claim and interest holders' receipt of distributions; and likelihood that chapter 7 trustees would adopt settlements embodied in plan), *appeal dismissed*, 371 B.R. 660 (S.D.N.Y. 2007), *aff'd*, 544 F.3d 420 (2d Cir. 2008).

106.     Accordingly, the Debtors' assumptions and estimates used in the Liquidation Analysis are appropriate.  Because the Plan provides the holders of Allowed Claims in each Impaired Class with a recovery that is greater than or equal to the value of any distributions that would be made to such holders in a liquidation of the Estates under chapter 7 of the Bankruptcy Code, the Plan complies with section 1129(a)(7) of the Bankruptcy Code.  *See* Schmaltz Decl. ¶ 47.

## H.     Section 1129(a)(8):  Plan Has Been Accepted by Impaired Voting Class

107.     Section 1129(a)(8) of the Bankruptcy Code requires that each class of impaired claims or interests accept a plan.  11 U.S.C. § 1129(a)(8).  Section 1126(c) of the Bankruptcy Code provides that a plan is accepted by an impaired class of claims if the accepting class members hold at least two-thirds in amount and more than one-half in number of the claims voted in their respective class.  11 U.S.C. § 1126(c).

108.     As set forth above, Class 3 (OpCo Lender Secured Claims), Class 4 (OpCo General Unsecured Claims), and Class 5 (HoldCo Lender Secured Claims) voted to accept the Plan.  Holders of Claims or Interests, as applicable, in Class 1 (Other Secured Claims), Class 2 (Other Priority Claims), Class 7 (Intercompany Claims) (only in the event that Intercompany Claims are reinstated), and Class 10 (Intercompany Interests) are Unimpaired and, therefore, are conclusively presumed to accept the Plan.  Holders of Claims in Class 6 (HoldCo General Unsecured Claims), Class 7 (Intercompany Claims) (only in the event that Intercompany Claims

are not reinstated), Class 8 (Subordinated Claims), and Class 9 (HoldCo Equity Interests) will not receive or retain any property on account of their Claims and Interests and, as such, are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

109.    As discussed more fully below, the Debtors have satisfied the "cram down" requirements under section 1129(b) of the Bankruptcy Code and may obtain confirmation of the Plan notwithstanding the rejection by Class 6 (HoldCo General Unsecured Claims), Class 7 (Intercompany Claims) (only in the event that Intercompany Claims are not reinstated), Class 8 (Subordinated Claims), and Class 9 (HoldCo Equity Interests).

## I.    Section 1129(a)(9):  Plan Provides for Payment in Full of All Allowed Priority Claims

110.    Section 1129(a)(9) of the Bankruptcy Code requires that claims entitled to priority under section 507(a) of the Bankruptcy Code be paid in full in cash unless the holders of such claims agree to a different treatment with respect thereto.  *See* 11 U.S.C. § 1129(a)(9). Pursuant to Article II of the Plan, Allowed Administrative Expense Claims and Allowed Priority Tax Claims will be paid in full in cash on (or as soon thereafter as is reasonably practicable) the later of (i) the Effective Date and (ii) the first Business Day after the date that is 30 calendar days after the date each such Claim becomes an Allowed Claim, consistent with sections 1129(a)(9)(A)–(C) of the Bankruptcy Code.  Pursuant to Sections 4.1 and 4.2 of the Plan, as applicable, Allowed Other Secured Claims and Allowed Other Priority Claims will be paid in full in cash on (or as soon thereafter as is reasonably practicable) the later of (i) the Effective Date and (ii) the date that is 10 Business Days after the date each such Claim becomes an Allowed Claim, consistent with sections 1129(a)(9)(A)–(C) of the Bankruptcy Code.  Accordingly, the Plan complies with section 1129(a)(9).

**J.       Section 1129(a)(10):  At Least One Class of Impaired Claims Has Accepted Plan**

111.     Section 1129(a)(10) of the Bankruptcy Code requires the affirmative acceptance of a plan by at least one class of impaired claims, "determined without including any acceptance of the plan by any insider."  11 U.S.C. § 1129(a)(10).  As set forth above, Class 3 (OpCo Lender Secured Claims), Class 4 (OpCo General Unsecured Claims), and Class 5 (HoldCo Lender Secured Claims) are Impaired and have voted to accept the Plan.  *See supra* ¶ 93.  Thus, the Plan satisfies section 1129(a)(10) of the Bankruptcy Code.

**K.       Section 1129(a)(11):  Plan Is Feasible**

112.     Section 1129(a)(11) of the Bankruptcy Code requires the Court to determine that a plan is feasible as a condition precedent to confirmation.   11 U.S.C. § 1129(a)(11).  Specifically, the Court must determine that confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the debtor (or any successor thereto), unless such liquidation or reorganization is proposed in the plan.  Even if a plan proposes liquidation (rather than reorganization), the feasibility test set forth in section 1129(a)(11) focuses on whether a plan may be implemented and has a reasonable likelihood of success.  *See United States v. Energy Res. Co.*, 495 U.S. 545, 549 (1990); *In re T-H New Orleans Ltd. P'Ship*, 116 F.3d at 801; *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988).

113.     The key element of feasibility is whether there is a reasonable probability that the provisions of the plan can be performed.  The purpose of the feasibility test is to protect against visionary or speculative plans.  *See Pizza of Haw., Inc. v. Shakey's, Inc. (In re Pizza of Haw., Inc.)*, 761 F.2d 1374, 1382 (9th Cir. 1985) (quoting 5 COLLIER ON BANKRUPTCY ¶ 1129.02[11] at 1129–34 (15th ed. 1984)); *see also In re Lakeside Glob. II, Ltd.*, 116 B.R. 499, 506 (Bankr. S.D. Tex. 1989) (holding that feasibility "contemplates whether the debtor can

realistically carry out its plan . . . and whether the plan offers a reasonable prospect of success and is workable") (citations omitted).  "To establish the feasibility of a plan, [a] debtor must present proof through reasonable projections that there will be sufficient cash flow to fund the plan" and "[s]uch projections cannot be speculative, conjectural or unrealistic."  *In re Idearc Inc.*, 423 B.R. at 167.

114.    The feasibility standard is greatly simplified when a liquidating chapter 11 plan is tested against section 1129(a)(11) of the Bankruptcy Code.  In the context of a liquidating chapter 11 plan, feasibility is established by demonstrating that a debtor is able to satisfy the conditions precedent to the effective date and otherwise has sufficient funds to make the payments required under such plan and to meet its post-effective date obligations to pay for the costs of administering and fully consummating the plan and closing the chapter 11 case.  *See, e.g.*, *In re J. Reg. Co.*, 407 B.R. 520, 539 (Bankr. S.D.N.Y. 2009) (explaining that the feasibility test is "whether the things which are to be done after confirmation can be done as a practical matter under the facts"); *In re Finlay Enters., Inc.*, No. 09-14873 (JMP), 2010 WL 6580628, at *7 (Bankr. S.D.N.Y. June 29, 2010).

115.    As set forth in the Schmaltz Declaration, the Debtors will be able to satisfy the conditions precedent to the Effective Date and will have sufficient funds to meet their post-Effective Date obligations—including the costs of operating the business through the Wind Down and administering and consummating the Plan—through the Wind Down Fund.  *See* Schmaltz Decl. ¶ 31.  The Plan is straightforward and provides for (i) the payment in full of all Allowed Administrative Expense Claims, Allowed DIP Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, and Allowed Other Secured Claims, (ii) distributions to the Prepetition

Lenders and holders of Allowed OpCo General Unsecured Claims, and (iii) the disposition of the Debtors' remaining assets following the Wind Down.  *See id.* ¶ 30.

116.     In addition, the Debtors have filed the Wind Down Budget, which specifies the estimated costs and expenses of administering and consummating the Plan.  *See* Plan Suppl., Ex. D.  Based on the Wind Down Budget, the Debtors believe they have sufficient funding to make all payments required to implement the Plan.  *See* Schmaltz Decl. ¶ 31.  In particular, the Wind Down Budget includes the Counterparty Reserve to allow Wind Down Co to honor its and the Post-Effective Date Debtors' undisputed obligations under any executory contracts and unexpired leases that have not been rejected or assumed and assigned to a third party.  *See id.*  Accordingly, the Plan has more than a reasonable likelihood of success and satisfies the feasibility requirements of section 1129(a)(11) of the Bankruptcy Code.

**L.     Section 1129(a)(12):  All Statutory Fees Have Been or Will Be Paid**

117.     Section 1129(a)(12) of the Bankruptcy Code requires the payment of "[a]ll fees payable under section 1930 of title 28, as determined by the court at the hearing on confirmation of the plan."  11 U.S.C. § 1129(a)(12).  Section 507 of the Bankruptcy Code provides that "any fees and charges assessed against the estate under [section 1930] of title 28" are afforded priority as administrative expenses.  11 U.S.C. § 507(a)(2).

118.     In accordance with these provisions, Section 12.1 of the Plan provides that (i) all Statutory Fees due and payable prior to the Effective Date shall be paid by the Debtors in full on the Effective Date.  *See* Plan § 12.1.  Section 12.1 of the Plan also provides that, after the Effective Date, the Debtors and Wind Down Co shall be jointly and severally liable to pay any and all Statutory Fees when due and payable until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.  *See id.* Therefore, the Plan complies with section 1129(a)(12) of the Bankruptcy Code.

**M.     Sections 1129(a)(13)–(16) and 1129(e):  Inapplicable Provisions**

119.    Section 1129(a)(13) of the Bankruptcy Code is applicable only to debtors that maintain "retiree benefits," as that term is defined in section 1114 of the Bankruptcy Code. The Debtors do not maintain any such retiree benefits and, as such, section 1129(a)(13) does not apply.

120.    Section 1129(a)(14) of the Bankruptcy Code relates to the payment of domestic support obligations.  The Debtors are not subject to any domestic support obligations and, as such, section 1129(a)(14) does not apply.

121.    Section 1129(a)(15) of the Bankruptcy Code applies only in cases in which the debtor is an "individual" (as that term is defined in the Bankruptcy Code).  The Debtors are not "individuals" and, accordingly, section 1129(a)(15) does not apply.

122.    Section 1129(a)(16) of the Bankruptcy Code applies to transfers of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust.  Each Debtor is a moneyed, business, or commercial corporation, and, accordingly, section 1129(a)(16) does not apply.

123.     The provisions of section 1129(e) of the Bankruptcy Code apply only to "small business case[s]" as defined by that section.  Here, the Chapter 11 Cases are not "small business cases" and, accordingly, section 1129(e) of the Bankruptcy Code does not apply.

124.    Accordingly,    sections    1129(a)(13),    1129(a)(14),    1129(a)(15),    and 1129(a)(16) of the Bankruptcy Code do not apply to the Plan.

**N.     Plan Satisfies "Cram Down" Requirements for Non-Accepting Classes Under Section 1129(b) of Bankruptcy Code**

125.    Section 1129(b) of the Bankruptcy Code provides a mechanism (known colloquially as "cram down") for confirmation of a chapter 11 plan in circumstances where the

plan is not accepted by all impaired classes of claims.  Under section 1129(b), the court may "cram down" a plan over the dissenting vote of an impaired class of claims or interests as long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to such dissenting class or classes.

126.     As noted above, Class 3 (OpCo Lender Secured Claims), Class 4 (OpCo General Unsecured Claims), and Class 5 (HoldCo Lender Secured Claims) voted to accept the Plan pursuant to the requirements of section 1126 of the Bankruptcy Code.  *See* Tabulation Decl., Ex. A.  Class 1 (Other Secured Claims), Class 2 (Other Priority Claims), Class 7 (Intercompany Claims) (only in the event that Intercompany Claims are reinstated), and Class 10 (Intercompany Interests) were conclusively presumed to accept the Plan because those Classes were Unimpaired under the Plan.  *See* Plan § 3.8.  Class 6 (HoldCo General Unsecured Claims), Class 7 (Intercompany Claims) (only in the event that Intercompany Claims are not reinstated), Class 8 (Subordinated Claims), and Class 9 (HoldCo Equity Interests) were deemed to reject the Plan because those Classes will not receive any distribution on account of their Claims or Interests, as applicable.  *See id.*

127.     Therefore, cramdown is relevant with respect to Class 6 (HoldCo General Unsecured Claims), Class 7 (Intercompany Claims) (only in the event that Intercompany Claims are not reinstated), Class 8 (Subordinated Claims), and Class 9 (HoldCo Equity Interests).  *See* Schmaltz Decl. ¶ 32.

### 1.     Plan Does Not Discriminate Unfairly

128.     Under section 1129(b) of the Bankruptcy Code, a plan unfairly discriminates where similarly-situated classes are treated differently without a reasonable basis for the disparate treatment. *See In re Armstrong World Indus., Inc.*, 348 B.R. 111, 121 (D. Del. 2006) (noting that the "'hallmarks of the various tests have been whether there is a reasonable basis for

the discrimination, and whether the debtor can confirm and consummate a plan without the proposed discrimination.”’) (citing *In re Lernout & Hauspie Speech Prods., N.V.*, 301 B.R. 651, 660 (Bankr. D. Del. 2003), *aff’d*, 308 B.R. 672 (D. Del. 2004)).  As between two classes of claims or two classes of equity interests, there is no unfair discrimination if (i) the classes are comprised of dissimilar claims or interests, *see, e.g.*, *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986), *aff’d*, 78 B.R. 407 (S.D.N.Y. 1987), *aff’d sub nom. Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988), or (ii) there is a reasonable basis for such disparate treatment, taking into account the particular facts and circumstances of the case.  *See, e.g.*, *In re Drexel Burnham Lambert Grp.*, 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992).

129.    The Plan does not discriminate unfairly with respect to Class 6 (HoldCo General Unsecured Claims), Class 7 (Intercompany Claims), Class 8 (Subordinated Claims), Class 9 (HoldCo Equity Interests), and Class 10 (Intercompany Interests).  Specifically, Class 6 (HoldCo General Unsecured Claims) consists only of unsecured Claims against HoldCo and TopCo held by third parties, which are distinct from the OpCo General Unsecured Claims against the remaining Debtors.  *See* Schmaltz Decl. ¶ 33.  Due to the nature of the Debtors’ prepetition capital structure, Claims against HoldCo and TopCo are structurally subordinated to Claims against MidCo, OpCo, or any of their direct or indirect subsidiaries.  *See Declaration of Justin Schmaltz in Support of Debtors’ Chapter 11 Petitions and First Day Relief* (Docket No. 5) ¶ 34.  Furthermore, (i) Class 7 (Intercompany Claims) contains Claims held by and against Debtors and non-Debtor affiliates, (ii) no similar class of Claims exists with respect to Class 8 (Subordinated Claims), and (iii) Class 9 (HoldCo Equity Interests) non-Debtor holders of Interests in a Debtor. *See* Schmaltz Decl. ¶ 33.

130.     Accordingly, the Debtors have a reasonable basis for the differing classification and treatment of such Classes as they are not similarly situated.  *See* Schmaltz Decl. ¶ 36.  Therefore, there is no unfair discrimination in the Plan in accordance with section 1129(b) of the Bankruptcy Code.

### 2.     Plan Is Fair and Equitable

131.     To be "fair and equitable" as to holders of unsecured claims, section 1129(b)(2)(B) of the Bankruptcy Code requires a plan to provide that a holder of a claim or interest that is junior to the claims of the nonaccepting class will not receive or retain any property under such plan.  *See* 11 U.S.C. § 1129(b)(2)(B).

132.     Here, the "fair and equitable" rule is satisfied because distributions under the Plan will be made in the order of priority prescribed by the Bankruptcy Code.  *See* Schmaltz Decl. ¶ 35.  With respect to each Class that is deemed to reject the Plan—Class 6 (HoldCo General Unsecured Claims), Class 7 (Intercompany Claims) (only in the event that Intercompany Claims are not reinstated), Class 8 (Subordinated Claims), and Class 9 (HoldCo Equity Interests)—no holder of a Claim or Interest junior to the holders of such Claims and Interests will receive or retain property under the Plan.  *See id.*

133.     While Intercompany Interests will be reinstated under the Plan, there is a reasonable basis for such difference in treatment.  Reinstating Class 10 (Intercompany Interests) preserves the legal structure of the Debtors and allows the implementation of the Wind Down as set forth in the Plan, has no economic consequence, and is not structured to unfairly prejudice holders of Claims and Interests, as applicable, in Class 6 (HoldCo General Unsecured Claims), Class 7 (Intercompany Claims), Class 8 (Subordinated Claims), and Class 9 (HoldCo Equity Interests), as no holder of an Interest in Class 10 (Intercompany Interests) will receive a

57

distribution.   Accordingly, the Plan is fair and equitable because it complies with section 1129(b)(2)(B) of the Bankruptcy Code.

### O.      Section 1129(c):  Plan Is Only Plan on File

134.    Under section 1129(c) of the Bankruptcy Code, "the court may confirm only one plan."  11 U.S.C. § 1129(c).  Here, the Plan is the only plan currently on file in the Chapter 11 Cases.  Therefore, section 1129(c) of the Bankruptcy Code does not apply.

### P.      Section 1129(d):  Principal Purpose of Plan Is Not Avoidance of Taxes

135.    Under section 1129(d) of the Bankruptcy Code, "the court may not confirm a plan if the principal purpose of the plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933."  11 U.S.C. § 1129(d).  Here, the principal purpose of the Plan is not the avoidance of taxes or section 5 of the Securities Act, and no party has objected on any such grounds.  The Plan, therefore, satisfies the requirements of section 1129(d) of the Bankruptcy Code.

### R.      Request for Waiver of Bankruptcy Rules 3020(e) and 6004(h)

136.    As set forth in Section 12.9 of the Plan, the Debtors respectfully request that the Court direct that the Proposed Confirmation Order be effective immediately upon its entry, notwithstanding the 14-day stay imposed by operation of Bankruptcy Rules 3020(e) and 6004(h). Bankruptcy Rule 3020(e) provides that "[u]nless the court orders otherwise, a confirmation order is stayed for 14 days after its entry."  Fed. R. Bankr. P. 3020(e).  As such, and as the Advisory Committee notes on Bankruptcy Rule 3020(e) state, "the court may, in its discretion, order that Rule 3020(e) is not applicable so that the plan may be implemented and distributions may be made immediately."   Fed. R. Bankr. P. 3020(e), Adv. Comm. Notes, 1999 Amend.   Similarly, Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use . . . of property (other than cash collateral) is stayed for 14 days after the order is entered."  Fed. R. Bankr. P. 6004(h).  The

Advisory Committee Notes on Bankruptcy Rule 6004(h) (when it was codified as subsection (g)) similarly state that "[t]he court may, in its discretion, order that Rule 6004(g) is not applicable so that the property may be used . . . immediately." Fed. R. Bankr. P. 6004(h), Adv. Comm. Notes, 1999 Amend.

137.    Under the circumstances, good cause exists for waiving the stay.  It is appropriate for the Court to exercise its discretion to order that Bankruptcy Rules 3020(e) and 6004(h) are not applicable.  *See, e.g.*, *In re Energy Partners, Ltd.*, No. 09-32957, 2009 WL 2898876, at *19 (Bankr. S.D. Tex. Aug. 3, 2009) (waiving stay of confirmation order); *In re Idearc*, 423 B.R. at 158 (same).  A waiver of the stay would permit the Debtors to consummate the Plan and commence implementation thereof without delay after the Plan is confirmed.  *See* Schmaltz Decl. ¶ 48. Each day the Debtors remain in chapter 11, they incur material administrative and professional costs.  *See id.*  Therefore, the requested waiver of the stay will allow the Debtors to advance the Wind Down and satisfy their milestone with respect to the effectiveness of the Plan, as required by the DIP Credit Agreement. *See id.*  Accordingly, waiver of the 14-day stay imposed by operation of Bankruptcy Rules 3020(e) and 6004(h) is in the best interests of all of the Debtors' creditors and will not prejudice any parties in interest.

### III.    Bankruptcy Court Should Overrule Unresolved U.S. Trustee Objection and Confirm Plan

138.    As set forth herein and in the Response Chart, the Debtors have resolved the only creditor Objection to Plan confirmation.[15]  The only Objection that remains outstanding in connection with confirmation of the Plan is the U.S. Trustee Objection.  The U.S. Trustee objects to confirmation of the Plan on the basis that (i) the Plan contains non-consensual third-party

---

[15]    The Debtors have summarized the resolutions reached with Cigna Health and Life Insurance Company and Cincinnati Life Insurance Company, which provided informal comments to the Proposed Confirmation Order, in the Response Chart.

releases that are impermissible under *Purdue* (*see* U.S. Trustee Obj. ¶¶ 14–51), (ii) the Exculpation Provision in the Plan is overly broad because it includes the Debtors' officers, directors, and professionals and the Claims Ombudsman (*see* U.S. Trustee Obj. ¶¶ 52–54), (iii) the application of the Injunction Provisions and Gatekeeper Provision to enforce the Plan's Third-Party Releases violates Fifth Circuit precedent and the Bankruptcy Code (*see* U.S. Trustee Obj. ¶¶ 55–59), and (iv) the Plan provides a discharge to the Debtors in violation of section 1141(d)(3) of the Bankruptcy Code (s*ee* U.S. Trustee Obj. ¶¶ 60–65).

139.    The Debtors worked constructively with the U.S. Trustee to resolve all but one of the Objections set forth in the U.S. Trustee Objection by amending the applicable provisions of the Plan and including language in the Proposed Confirmation Order.  As a result, the only outstanding issue is whether Plan includes nonconsensual Third-Party Releases.  For the reasons set forth in Section I.B.2. herein and below, the Debtors submit that the Third-Party Releases, which afforded voting and non-voting parties with an opportunity to opt out, are consensual and comply with well-established Fifth Circuit precedent.  Accordingly, the U.S. Trustee Objection should be overruled.

### A.    Third-Party Releases in Plan Are Consensual

140.    The Third-Party Releases, including the opt-out feature, are consensual and consistent with precedent in this jurisdiction, including the Court's decision in *Robertshaw*.  *See In re Robertshaw US Holding Corp*, 662 B.R. 300, 322 (Bankr S.D. Tex. 2024) ("Even before *Purdue*, Fifth Circuit case law appeared to prohibit non-consensual third-party releases.").  The U.S. Trustee, however, asserts that the Plan's opt-out feature, which complies with the Complex Case Rules and the case law in this jurisdiction, is insufficient to render the Third-Party Releases consensual in light of the Supreme Court's decision in *Purdue*.  *See* U.S. Trustee Obj. ¶¶ 33–51.  In doing so, the U.S. Trustee reads words into the *Purdue* opinion that are not there.  In

*Purdue*, the Supreme Court held that ***non-consensual*** third-party releases are impermissible.  *See*

*Purdue*, 603 U.S. at 227.   It did not, however, examine the validity of consensual third-party

releases or dictate what qualifies as consent:

> As important as the question we decide today are ones we do not.
> ***Nothing in what we have said should be construed to call into***
> ***question consensual third-party releases*** offered in connection with
> a bankruptcy reorganization plan; those sorts of releases pose
> different questions and may rest on different legal grounds than the
> nonconsensual release at issue here. ***Nor do we*** have occasion today
> to ***express a view on what qualifies as a consensual release*** or pass
> upon a plan that provides for the full satisfaction of claims against a
> third-party nondebtor.

*Purdue*, 603 U.S. at 226 (emphasis added).

    141.    As the Court has recognized, *Purdue* did not change the law in the Fifth

Circuit because (i) non-consensual third-party releases were already prohibited under Fifth Circuit

precedent, *see Bank N.Y. Tr. Co. v. Off. Unsecured Creditors' Comm.* (*In re Pac. Lumber Co.*),

584 F.3d 229, 299 (5th Cir. 2009) (collecting cases), and (ii) *Purdue* did not address what

constitutes a "consensual" release.  *Robertshaw*, 662 B.R. at 323; *see also Feld v. Zale Corp. (In*

*re Zale Corp.)*, 62 F.3d 746, 766 (5th Cir. 1995) (prohibiting a non-consensual third-party release

under a chapter 11 plan).  In the Southern District of Texas (as well as other jurisdictions across

the country), a process by which third parties have the opportunity to opt out of granting third-

party releases is sufficient to render such release consensual and has been for some time, as

"[h]undreds of chapter 11 cases have been confirmed in this District with consensual third-party

releases with an opt-out."  *Robertshaw*, 662 B.R. at 323.  That is because, as the Court found in

*Robertshaw*, "[t]here is nothing improper with an opt-out feature for consensual third-party

releases in a chapter 11 plan" when parties giving such releases receive a "meaningful opportunity

to opt out."  *Id.*  The Court is not alone, as other courts in the Fifth Circuit follow the same

approach.  *See In re CiCi's Holdings, Inc.*, No. 21-30146 (SGJ), 2021 WL 819330, at *10 (Bankr.

N.D. Tex. Mar. 3, 2021) (finding that third-party releases provided under the plan were consensual in light of the parties receiving appropriate notice of proceeding, plan, and objection deadline, having opportunity to be heard, and emphasis of release language with conspicuous typeface); *In re Sandridge Energy, Inc.*, No. 16-32488, 2016 Bankr. LEXIS 4622, at *47 (Bankr. S.D. Tex. Sept. 20, 2016) (finding adequately noticed, conspicuous opportunity to opt out of third-party release constitutes consent); *In re Vista Proppants & Logistics, LLC*, No. 20-42002-ELM-11, 2020 WL 6325526, at *7 (Bankr. N.D. Tex. Oct. 28, 2020) (same).

142.    The U.S. Trustee's argument that an opt-out feature is insufficient to establish consent to the Third-Party Releases because silence cannot manifest consent to a contract under state law is also unavailing. *See* U.S. Trustee Obj. ¶¶ 26–32.  Whether a party has consented to a third-party release in a chapter 11 plan is a question of notice, rather than a question of contract.[16]  *See* Confirmation Hr'g Tr. at 80:21-81:7, *In re Extraction Oil & Gas Inc.*, No. 20-11548-CSS (Bankr. D. Del. Dec. 22, 2020) (Docket No. 1534) ("I have repeatedly ruled that you can imply consent by failing to opt out or respond to a plan, either through a ballot or on the docket, that calls for release.  I don't believe is necessarily a contractual point . . . as much as it is a point of notice under the Bankruptcy Code and the Bankruptcy Rules . . . ."); *see also In re Boy Scouts of Am. & Del. BSA LLC*, 642 B.R. 504, 675 (Bankr. D. Del 2022), *aff'd*, 650 B.R. 87 (D. Del. 2023), *aff'd in part*, *rev'd in part*, 137 F.4th 126 (3d Cir. 2025), *petition for cert. filed*, No. 25-490 (U.S. Oct. 21, 2025) (holding that whether a party has consented to a third-party release with an opt-out feature is a matter of notice).

---

[16]    Even if the Court were to apply state law contract principles, consent may still be inferred from the failure to opt out.  Texas courts have recognized that "[p]rolonged silence or inaction in not asserting a known right is conduct that may amount to waiver."  *Hooks v. Samson Lone Star, Ltd. P'ship*, 457 S.W.3d 52, 66 (Tex. 2015) (quoting *Ohrt v. Union Gas Corp.*, 398 S.W.3d 315, 329 (Tex. App. 2012)); *see also Safeco Ins. Co. of Am. v. Clear Vision Windshield Repair, LLC*, 564 S.W.3d 913, 920 (Tex. App. 2018) ("A party's silence or inaction for a period of time long enough show an intention to yield the known right is also enough to establish waiver.")

143.    Further, the principle that consent can be deemed from a party's failure to act when affected parties receive proper notice is recognized in other contexts within the bankruptcy system, such as forfeiting the right to assert a claim if a proof of claim is not filed by a certain date or the disallowance of a claim if the claimant fails to respond to a claim objection. As acknowledged by the *Smallhold* court:

> Just like a defendant in a civil action that may face a default judgment if the defendant fails to respond to a summons and complaint, a creditor in bankruptcy that is served with a sale motion, a claims objection, or a plan of reorganization is "deemed" to understand that the bankruptcy proceeding may affect their legal rights and faces the risk of forfeiting those rights if the creditor chooses to stay silent in the face of such a motion, objection, or plan.

*In re Smallhold, Inc.*, 665 B.R. 704, 718 (Bankr. D. Del. 2024).

144.    Consequently, courts have recognized that an affected claimant's failure to respond to properly noticed releases within a chapter 11 plan is sufficient to establish consent. *See Cole v. Nabors Corp. Servs., Inc. (In re CJ Holding Co.)*, 597 B.R. 597, 608-09 (S.D. Tex. 2019) (finding that, with respect to chapter 11 plan releases, construing a creditor's silence as consent "serves the bankruptcy law's purpose of quick and efficient resolution of claims to permit a debtor's business to continue") (citation omitted).

145.    Here, the Plan, Disclosure Statement, Ballots, Notice of Non-Voting Status, and Confirmation Hearing Notice all provide a similar "meaningful opportunity" in compliance with the long-standing practice in this district and the Complex Case Procedures. Exhibit C of the Disclosure Statement clearly sets forth the Plan Releases and adequately describes both the Entities and Claims being released. The Ballots, Notice of Non-Voting Status, and Confirmation Hearing Notice conspicuously disclosed (in bolded text) the proposed Plan Releases, the procedures for opting out of the Plan Releases, and the consequences of failing to do so. The Debtors also prepared an abbreviated version of the Confirmation Hearing Notice that includes the full text of

the Plan Releases and was published in a national newspaper, ensuring parties yet another "meaningful opportunity" to review the Plan Releases and, if so determined, to opt out of them. Each of the foregoing instances provided ample notice and information specifically regarding the Third-Party Releases, what the Releasing Parties were being asked to do, and benefits they would forego should they choose to opt out.  Only holders of Claims and Interests who do not opt out of the Third-Party Releases will be deemed to have released the Released Parties pursuant to the Plan.

146.    Accordingly, the U.S. Trustee Objection to the Third-Party Releases should be overruled because the opt-out feature is sufficient to establish consent as such releases were properly noticed to all affected claimants in compliance with precedent in this jurisdiction.[17]

## CONCLUSION

147.    Based on the foregoing, the Plan complies with all of the requirements of the Bankruptcy Code and the Bankruptcy Rules.  Accordingly, the Debtors respectfully request that the Court enter the Proposed Confirmation Order and grant such other and further relief as is just and appropriate.

---

[17]    The Debtors understand that all other Objections set forth in the U.S. Trustee Objection are resolved.

Dated: November 17, 2025
     Houston, Texas

         /s/  Clifford W. Carlson
        WEIL, GOTSHAL & MANGES LLP
        Gabriel A. Morgan (24125891)
        Clifford W. Carlson (24090024)
        700 Louisiana Street, Suite 3700
        Houston, Texas 77002
        Telephone:  (713) 546-5000
        Facsimile:  (713) 224-9511
        Email:  gabriel.morgan@weil.com
               clifford.carlson@weil.com

        -and-

        WEIL, GOTSHAL & MANGES LLP
        Matthew S. Barr (admitted *pro hac vice*)
        Andriana Georgallas (admitted *pro hac vice*)
        Alexander P. Cohen (24109739)
        767 Fifth Avenue
        New York, New York 10153
        Telephone:  (212) 310-8000
        Facsimile:  (212) 310-8007
        Email:  matt.barr@weil.com
               andriana.georgallas@weil.com
               alexander.cohen@weil.com

        *Attorneys for Debtors*
        *and Debtors in Possession*

**<u>Certificate of Service</u>**

I hereby certify that on November 17, 2025, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.


   */s/ Clifford W. Carlson*       
Clifford W. Carlson

**<u>Exhibit A</u>**

**Response Chart**

IN RE EVERSTREAM SOLUTIONS LLC
CH. 11 CASE NO. 25-90144 (CML)

SUMMARY CHART OF CONFIRMATION OBJECTIONS[1]

| No. | Docket No. | Objecting Party | Summary of Objection | Debtors' Response |
|---|---|---|---|---|
| 1. | 551 | Kevin M. Epstein, United States Trustee for the Southern District of Texas (the "**U.S. Trustee**") | The U.S. Trustee objects to confirmation of the Plan on the grounds that the:<br><br>a) Third-Party Releases in the Plan are not consensual and thus contravene the Supreme Court's decision in *Harrington v. Purdue Pharma, L.P.*, 603 U.S. 204 (2024) ("***Purdue Pharma***"). The U.S. Trustee specifically argues that: (i) the opt-out mechanism for the Third-Party Releases does not render them "consensual" and (ii) silence does not confer consent; | **Unresolved.** The Third-Party Releases included in the Plan are consistent with precedent in this jurisdiction, including the Court's decision in *In re Robertshaw US Holding Corp*, 662 B.R. 300 (Bankr. S.D. Tex. 2024), and with the Supreme Court's decision in *Purdue Pharma*. The Third-Party Releases are appropriate and permissible for the reasons provided in the Confirmation Brief, including that:<br><br>i. the Third-Party Releases meet the requirements for such releases in this jurisdiction because they are (i) consensual, (ii) specific in language, (iii) integral to the Plan, (iv) a condition of a settlement, and (v) given for consideration;<br><br>ii. the Debtors provided all parties affected by the Third-Party Releases sufficient notice of, and opportunity to object to, the Third-Party Releases; and<br><br>iii. the law in this jurisdiction permits the use of an opt-out feature to obtain ***consensual*** third-party releases in a chapter 11 plan.<br><br>*See* Confirmation Brief ¶¶ 50, 56, 57, 62. |

---

[1]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the *Debtors' Memorandum of Law In Support of Confirmation of Second Amended Joint Chapter 11 Plan of Everstream Solutions LLC and Its Affiliated Debtors* (the "**Confirmation Brief**"), the applicable Objection or informal comment received, the Plan, or the Disclosure Statement (each, as defined in the Confirmation Brief), as applicable. This chart summarizes certain key issues raised in the Objections and informal comments. To the extent a specific point raised in an Objection or an informal comment is not addressed herein, the Debtors reserve the right to respond to such Objection or informal comment up to and at the Confirmation Hearing.

| No. | Docket No. | Objecting Party | Summary of Objection | Debtors' Response |
|---|---|---|---|---|
| | | | b)   definition of "Exculpated Parties" in the Plan, including the Debtors' directors, officers, and professionals and the Claim Ombudsman, violates applicable Fifth Circuit law because it improperly provides broad exculpation to parties that may not have acted as estate fiduciaries; | **Resolved.** The Debtors have resolved this Objection through the revision or removal, as applicable, of certain parties listed in the definition of "Exculpated Parties." *See* Plan § 1.67. "Exculpated Parties" is now defined as "collectively, solely in their capacities as such, (i) the Debtors, (ii) the Independent Managers, and (iii) the Creditors' Committee and the members of the Creditors' Committee solely in their capacity as such." *Id.* |
| | | | c)   Injunction Provisions enforcing the Third-Party Releases and Exculpation Provision in the Plan are impermissible and such provisions, if approved, would enforce (i) non-consensual third-party releases that violate *Purdue Pharma* and (ii) a gatekeeping provision that violates *Highland Cap. Mgmt. Fund Advisors, L.P. v. Highland Cap. Mgmt., L.P. (In re Highland Cap. Mgmt., L.P.)*, No. 23-10534, 2025 U.S. App. LEXIS 6320 (5th Cir. Mar. 18, 2025) ("***Highland II***"); and | **Partially Resolved.** The Debtors have resolved this Objection by including language in the Proposed Confirmation Order that limits the effect of the exculpation provisions in the Plan to be effective solely "to the extent permitted by applicable law." With respect to the Third-Party Releases, if the Court approves the Debtors' use of the opt-out mechanism, this issue becomes moot for the Third-Party Releases because the Injunction Provisions would not be enforcing an impermissible plan provision.<br><br>Confirmation Order ¶ 13. |
| | | | d)   certain provisions of the Plan impermissibly seek to discharge and permanently enjoin holders of Claims against the Debtors in violation of section 1141(d)(3) of the Bankruptcy Code. | **Resolved.** The Debtors have resolved this Objection by (i) removing the phrase "in full and final satisfaction" from the applicable provisions in the Plan and (ii) modifying the Plan Injunction to include a temporal limitation on the effect of the Plan Injunction on the Debtors "until the Debtors no longer have any assets, subject to further extension or reduction by motion on notice, with all parties' rights with respect to such extension or reduction reserved."<br><br>*See generally* Plan, Arts. II, X. |

| No. | Docket No. | Objecting Party | Summary of Objection | Debtors' Response |
|---|---|---|---|---|
| 2. | 553 | Cigna Health and Life Insurance Company ("**Cigna**") | Cigna objects to confirmation of the Plan on the grounds that the Plan:<br><br>a) impermissibly permits assumption and rejection of contracts after the Effective Date in violation of the Bankruptcy Code; and<br><br>b) fails to provide adequate notice of disposition of contracts, including the Employee Benefits Agreements to which Cigna and the Debtors are party. | **Resolved.** The Debtors have resolved Cigna's Objection through inclusion of the following language in the Confirmation Order:<br><br>Notwithstanding anything in the Plan, this Order, or any subsequent contract notices to the contrary, absent agreement of the Debtors and Cigna (as defined in the *Objection of Cigna to the Amended Joint Chapter 11 Plan of Everstream Solutions LLC and Its Affiliated Debtors* (Docket No. 553) ("**Cigna Objection**")) or further order of this Court, the Employee Benefits Agreements (as defined in the Cigna Objection) will be rejected effective as of the earlier of (i) the WholeCo Closing Date and (ii) the Effective Date. This resolves the Cigna Objection as to Plan confirmation, but all rights, claims, and defenses of the parties relating to any proposed assumption of the Employee Benefits Agreements are hereby preserved.<br><br>Confirmation Order ¶ 33(b). |
| 3. | N/A | Cincinnati Insurance Company ("**Cincinnati**") | Cincinnati requested that the Debtors include certain language in the Confirmation Order in lieu of filing an Objection to the Plan. The proposed language addressed various issues, including, among other things (a) confirmation that nothing in the Confirmation Order or any other order or agreement would be construed to authorize or permit the assumption and assignment of any existing surety bond issued by Cincinnati or the substitution of principal thereunder and (b) Cincinnati's election to opt out of the Third-Party Releases. | **Resolved.** The Debtors have resolved Cincinnati's informal comments through inclusion of the following language in the Confirmation Order:<br><br>Nothing in this Confirmation Order, the Plan, WholeCo Sale Order, the WholeCo Purchase Agreement, or any document related to any of the foregoing, shall be construed to authorize or permit the assumption and assignment of any existing surety bond issued by Cincinnati Insurance Company ("**Cincinnati**") or to obligate Cincinnati to replace any existing surety bond in connection with any transaction contemplated by this Confirmation Order, the Plan, WholeCo Sale Order, the WholeCo Purchase Agreement, or any document related to any of the foregoing. Further, nothing in this Confirmation Order, the Plan, WholeCoSale Order, the WholeCo Purchase Agreement, or any document related to any of the foregoing shall be deemed to provide Cincinnati's consent to the involuntary substitution of any principal under any existing surety bond issued by Cincinnati. Furthermore, nothing in this Confirmation Order, the Plan, WholeCoSale Order, the WholeCo Purchase Agreement, or any document related to any of the foregoing shall be deemed to: (i) alter, limit, expand, modify, release, waive, or prejudice any rights, remedies and/or defenses of Cincinnati under (a) any laws, rules, or regulations, (b) any existing |

| No. | Docket No. | Objecting Party | Summary of Objection | Debtors' Response |
|---|---|---|---|---|
| | | | | surety bond issued by Cincinnati, and/or (c) any indemnity agreement or collateral agreement in favor of Cincinnati; (ii) alter, limit, expand, modify, prejudice, waive, or release any rights of Cincinnati or the Debtors, Post-Effective Date Debtors, or Wind Down Co, as applicable, in any and all collateral held by Cincinnati; (iii) alter, limit, expand, modify, prejudice, waive, or release any rights of Cincinnati in connection with any of the Debtors and their Chapter 11 Cases or the Debtors, Post-Effective Date Debtors, or Wind Down Co, as applicable, in respect of the same vis-à-vis Cincinnati; or (iv) alter, limit, expand, modify, prejudice, waive or release any rights of Cincinnati in connection with any non-Debtors. Nothing herein shall be deemed as cancelling or terminating any existing surety bond issued by Cincinnati and/or any indemnity agreement or collateral agreement in favor of Cincinnati. For the avoidance of doubt, Cincinnati has opted out of the releases contained in the Plan and shall not be deemed to be included in the Released Parties or Releasing Parties. |
| | | | | Confirmation Order ¶ 33(a). |