**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § § § | **Chapter 11** |
| **EVERSTREAM SOLUTIONS LLC,** *et al.*, | § § | **Case No. 25-90144 (CML)** |
| | § § | **(Jointly Administered)** |
| Debtors.[1] | § § | |

**DECLARATION OF JUSTIN SCHMALTZ IN SUPPORT OF**
**CONFIRMATION OF SECOND AMENDED JOINT CHAPTER 11 PLAN**
**OF EVERSTREAM SOLUTIONS LLC AND ITS AFFILIATED DEBTORS**

I, Justin Schmaltz, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true to the best of my knowledge, information, and belief:

1. I am a Managing Director at Alvarez & Marsal North America, LLC ("**A&M**"). For the past two years, my team and I have been working closely with Everstream Solutions LLC and its affiliated debtors, as debtors and debtors in possession (collectively, the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**") on their restructuring initiatives. As a result of my work with the Debtors, I am familiar with the Debtors' day-to-day operations, business affairs, financial performance, and restructuring efforts.

2. A&M is a leading restructuring consulting firm with extensive experience providing high quality, specialized management and restructuring advisory services to debtors and distressed companies. Specifically, A&M's core services include turnaround advisory services,

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Midwest Fiber Holdings LP (3804); Midwest Fiber Acquisition Topco LLC (N/A); Midwest Fiber Acquisition Midco1 LLC (6061); Midwest Fiber Acquisition LLC (N/A); Everstream Solutions LLC (2361); Everstream Networks LLC (4542); Everstream GLC Holding Company LLC (4493); American Fiber Comm L.L.C. (2389); HRS Internet, LLC (5042); Lynx Network Group, Inc. (6261); 15955 State Street LLC (2731); Rocket Fiber LLC (7722); Lynx Fiber One, LLC (7151); and Lynx Fiber Two, LLC (3416). The Debtors' mailing address is 1228 Euclid Ave. Suite 250, Cleveland, OH 44115.

interim and crisis management, revenue enhancement, claims management, and creditor and risk management advisory services.  A&M provides a wide range of debtor advisory services targeted at stabilizing and improving a company's financial position, including:  developing or validating forecasts, business plans, and related assessments of strategic position; monitoring and managing cash, cash flow, and supplier relationships; assessing and recommending cost reduction strategies; and designing and negotiating financial restructuring packages.  In addition, A&M provides advice on specific aspects of the turnaround process and helps manage complex constituency relations and communications.  A&M is known for its ability to work alongside company management and key constituents during chapter 11 restructurings to develop a feasible and executable chapter 11 plan.

3.     I have over 22 years of experience providing financial and restructuring services and have held senior roles at financial advisory and investment management firms.  I also have experience serving as a chief restructuring officer.

4.     My experience spans multiple industries, including telecommunications, media, and technology, and involves managing teams that focus on restructuring and performance improvement.  I provide a wide range of services to the companies I advise, and my expertise includes business improvement and turnarounds, restructurings, and successful bankruptcy reorganizations.

5.     In April 2023, the Debtors retained A&M to assist with liquidity management, evaluate the Debtors' business plan, and identify cost-reduction opportunities.  More recently, A&M was asked by Debtors' counsel, Weil, Gotshal & Manges LLP ("**Weil**"), on behalf of the Debtors, to assist with the Debtors' chapter 11 filing.  From the outset of A&M's retention,

I have worked closely with the Debtors' management team and other advisors on numerous activities to support the Debtors' turnaround and restructuring efforts.

6.     I submit this declaration (the "**Declaration**") in support of confirmation of the *Second Amended Joint Chapter 11 Plan of Everstream Solutions LLC and Its Affiliated Debtors*, dated November 11, 2025 (Docket No. 561) (as amended, supplemented, or otherwise modified from time to time, the "**Plan**"), pursuant to section 1129 of title 11 of the United States Code (the "**Bankruptcy Code**"), including in support of the Plan's satisfaction of section 1129(a)(7) of the Bankruptcy Code with respect to the liquidation analysis (the "**Liquidation Analysis**")[2] that was annexed as Exhibit C to the *Disclosure Statement for Amended Joint Chapter 11 Plan of Everstream Solutions LLC and Its Affiliated Debtors* (Docket No. 505) (the "**Disclosure Statement**") and is annexed hereto as **Appendix A**.

7.     Except as otherwise indicated, all statements in this Declaration are based on my personal knowledge of the Debtors' operations and finances, my discussions with members of the Debtors' management, the Debtors' advisors, members of the A&M team, and my review of relevant documents, or my opinion based upon my experience and knowledge of the Debtors' operations.  If called to testify, I could and would testify to each of the facts set forth herein based on such personal knowledge, discussions, review of documents, or opinion.

8.     In the Chapter 11 Cases, I have personally been involved in preparing or reviewing the Debtors' first day filings, the 13-week cash flow forecasts, the Wind Down Budget, the Liquidation Analysis, and claims analysis.  In doing so, I have become very familiar with the

---

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan and the Liquidation Analysis, as applicable.

Debtors' assets and liabilities, books and records, business, capital structure, and wind-down efforts.

9.      I have reviewed and am generally familiar with the terms and provisions of the Plan and the Liquidation Analysis, including the agreements and other documents set forth in that certain supplement to the Plan, dated November 4, 2025 and November 11, 2025 (Docket Nos. 543 & 564) (as amended, supplemented, or otherwise modified from time to time, the "**Plan Supplement**"), and the requirements for confirmation of the Plan under section 1129 of the Bankruptcy Code.

10.     I am not being specifically compensated for this testimony other than through payments received as a Managing Director at A&M.  I am over the age of 18 and authorized to submit this Declaration on behalf of the Debtors.

## I.      DEVELOPMENT OF DEBTORS' CHAPTER 11 PLAN

11.     The Debtors commenced the Chapter 11 Cases to pursue and implement a value-maximizing, going-concern sale for substantially all their assets and to wind down any remaining assets following such sale.  Following an extensive sale process that spanned over eight months between the prepetition and postpetition periods and included a full-day, in-person auction (the "**Auction**"), the Debtors selected Bluebird MidWest, LLC ("**Bluebird**") as the Successful Bidder for WholeCo pursuant to that certain *Asset Purchase Agreement*, dated as of July 31, 2025, with Bluebird (the "**Bluebird APA**") and Metro Everstream Bidco, LLC ("**Metro Comm**") as the Back-Up Bidder.  The Auction yielded multiple rounds of competitive bidding among qualified bidders, with Bluebird and Metro Comm competing for several additional hours, primarily over purchase price, assumed liabilities, and provisions related to regulatory approvals until Bluebird's final bid was selected as the highest or otherwise best bid.  In addition to increases in the purchase price for Bluebird's Successful Bid, the Debtors were also able to negotiate a number of

improvements from the initial Bluebird APA, including provisions related to the timing of regulatory filings and approvals.

12.     In parallel with the sale process for the WholeCo Sale Transaction, the Debtors developed and negotiated the terms of the Plan with the Prepetition Lenders and the DIP Lenders.  As initially proposed, the Plan contemplated the distribution of proceeds from the WholeCo Sale Transaction with the Successful Bidder, a wind down of the Debtors' remaining assets  (the "**Wind  Down**"),  and  the  appointment  of  a  plan  administrator  (the "**Plan Administrator**") to facilitate the Wind Down.  Importantly, Allowed OpCo General Unsecured Claims were to receive no recovery under the initial Plan.

13.     Prior to the hearing to consider approval of the Disclosure Statement, the Debtors, the Prepetition Lenders, and the DIP Lenders engaged in several weeks of discussion and negotiations with the Official Committee of Unsecured Creditors (the "**Creditors' Committee**" and, together with the Debtors, the Prepetition Lenders, and the DIP Lenders, the "**Settlement Parties**") regarding the terms of an amended version of the Plan.  Following such negotiations, the parties reached a global compromise and settlement with respect to the Plan and the Chapter 11 Cases (the "**Creditors' Committee Settlement**"), the terms of which are memorialized in the Plan.  Among other things, the Creditors' Committee Settlement (i) provides that the OpCo Lenders will contribute $2 million of WholeCo Sale Transaction proceeds to which they otherwise would be entitled (the "**Creditors' Committee Settlement Amount**") to fund distributions to holders of Allowed OpCo General Unsecured Claims, (ii) ends the Creditors' Committee investigation into Claims and Causes of Action, which the Debtors believe—through the independent SIC Investigation—were not viable or worth pursuing, and (iii) forecloses litigation with the Creditors' Committee and its members with respect to the Plan that would have cost

valuable Estate resources. I believe that broad support of the Plan by all Voting Classes (as defined below) is a testament to the efforts of the Settlement Parties to reach consensus for the benefit of all the Debtors' creditors.

14. I understand that the Creditors' Committee Settlement included in the Plan provides numerous benefits to holders of OpCo General Unsecured Claims. Among other things, the Creditors' Committee Settlement provides for:

(i) enhanced Plan recovery for holders of OpCo General Unsecured Claims by virtue of the Creditors' Committee Settlement Amount;

(ii) information rights regarding the Debtors' progress towards sale closing and the Wind Down completion;

(iii) appointment of the Claims Ombudsman with the oversight and consultation rights set forth in the Plan;

(iv) a waiver of any Avoidance Actions against unsecured creditors that support the Plan and its releases; and

(v) certain additional protections for counterparties related to the Debtors' treatment of executory contracts and unexpired leases.

15. I understand that, pursuant to the Creditors' Committee Settlement, the Creditors' Committee and its members, in their capacity as members of the Creditors' Committee and in their individual capacity as creditors in the Chapter 11 Cases, have agreed to support the Plan in its entirety, as amended to reflect the settlement, including the Third-Party Releases and Exculpation Provision set forth in the Plan. I believe the Creditors' Committee Settlement results in improved recoveries to holders of Allowed OpCo General Unsecured Claims, establishes a framework to address the unique matters presented by the Chapter 11 Cases, including treatment of the numerous executory contracts and unexpired leases related to the Debtors' business operations and Wind Down, and forecloses litigation with the Creditors' Committee and its members with respect to the Plan that would have cost valuable Estate resources.

## II.      BANKRUPTCY CODE REQUIREMENTS FOR CONFIRMATION OF PLAN

16.     I am aware that the Debtors must demonstrate the Plan satisfies the requirements of section 1129 of the Bankruptcy Code.  Below I set out facts with respect to certain of those requirements and the relevant events that have occurred in the Chapter 11 Cases related to such requirements.  Based on my understanding of the requirements of section 1129 of the Bankruptcy Code, I believe the Plan complies with each of the requirements and should be confirmed.

### A.      <u>Section 1129(a)(1):  Plan Complies with All Applicable Bankruptcy Code Provisions</u>

#### i.      *Section 1122:  Classification*

17.     I understand that the Plan provides for the separate classification of Claims against and Interests in each Debtor based upon the different legal nature and priority of such Claims and Interests and the distinct interests of the holders of such Claims and Interests.  All Claims and Interests within a Class have the same or similar rights against the Debtors.  I, thus, believe that Claims and Interests in each particular Class at each Debtor are substantially similar to the other Claims and Interests in such Class at each Debtor.

#### ii.      *Section 1123(a):  Plan's Content Is Appropriate*

18.     <u>Section 1123(a)(4)</u>.  Pursuant to <u>Article IV</u> of the Plan, except as otherwise agreed to by a holder of a particular Claim or Interest, the treatment of each Claim or Interest in each particular Class is the same as the treatment of each other Claim or Interest in such Class.

19.     <u>Section 1123(a)(5)</u>.   The Plan provides adequate means for its implementation through, among other things, (i) appointment of the Plan Administrator to implement the Plan and Wind Down of the Debtors, (ii) establishment of Wind Down Co, (iii) establishment and funding of the Fee Escrow Account, (iv) funding of the Creditors'

Committee Settlement Amount, (v) funding of the Counterparty Reserve for all expected undisputed obligations arising under any executory contract or unexpired lease that has not been rejected or assumed and assigned to a third party, (vi) preservation of certain Claims and Causes of Action, (vii) provision of certain releases by the Debtors and by holders of Claims and Interests, (viii) appointment of the Claims Ombudsman to participate in the Claims reconciliation process, and (ix) exculpation of the Exculpated Parties.

20.     <u>Section 1123(a)(6)</u>.   I understand that the organizational documents of HoldCo have been or will be amended on or prior to the Effective Date to prohibit the issuance of non-voting equity securities.  Because HoldCo, both before and after the Effective Date, directly or indirectly owns and controls 100% of the equity interests in the other Debtors, no amendments to the organizational documents of the other Debtors are necessary.  Further, as part of the Wind Down, the Debtors will ultimately be dissolved and/or terminated after the Effective Date.

### iii.       Section 1123(b):  Plan's Content Is Permitted

21.     <u>Section 1123(b)(2)</u>.   I am aware that <u>Section 8.1</u> of the Plan and the Plan Supplement provide for the rejection of executory contracts and unexpired leases of the Debtors as of the Effective Date, unless such executory contract or unexpired lease:  (i) was previously assumed or rejected by the Debtors pursuant to a Final Order of the Court, (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto, (iii) is the subject of a motion to assume or reject filed by the Debtors on or before the Confirmation Date, (iv) is identified in <u>Section **Error! Reference source not found.**</u> of the Plan, (v) is identified for assumption on the Schedule of Assumed Contracts included in the Plan Supplement, (vi) is identified for assumption and assignment on the Schedule of Transferred Contracts included in the Plan Supplement, (vii) is identified for assumption and assignment on the Schedule of Shared Contracts included in the Plan Supplement, (viii)  is identified for rejection on the Schedule of

Rejected Contracts included in the Plan Supplement, (ix) is the subject of a pending Assumption Dispute, or (x) is identified for assumption and assignment in any subsequent Plan Supplement.

22.     <u>Section 1123(b)(3)(A)</u>.  I believe that the settlements and compromises contemplated by the Plan represent a good-faith compromise of Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Claim or Interest holder may have with respect to any Allowed Claim or Interest or any distribution to be made on account of such Allowed Claim or Interest.

23.     <u>Section 1123(b)(6)</u>.  The Plan contains certain provisions for, among other things:  (a) distributions to holders of Claims and Interests; (b) the resolution of Disputed Claims; (c) the allowance of certain Claims; (d) the release, injunction, and exculpation provisions set forth in <u>Article X</u> of the Plan; and (e) the retention of the Court's jurisdiction for any matter arising in or under, or related to, the Chapter 11 Cases.

**B.      Section 1129(a)(2):  Debtors Are Proper Plan Proponents**

24.     I understand each Debtor has a domicile, a place of business, and property in the United States.

**C.      Section 1129(a)(3):  Plan Is Proposed in Good Faith and Is Not by Any Means Forbidden by Law**

25.     I believe the Plan has been proposed in good faith and for the legitimate purpose of winding down the Estates and providing recovery to certain of the Debtors' stakeholders, each in accordance with the Plan.  As discussed above, the Debtors engaged in a thorough and value-maximizing marketing process and Auction for the sale of WholeCo, which were approved by the Court pursuant to the Bidding Procedures Order and WholeCo Sale Order. Further, the Debtors engaged in extensive, arm's-length negotiations over the Plan, as well as the settlements memorialized therein, with a number of their key stakeholders, including the

Settlement Parties, each of which is represented by experienced and sophisticated legal counsel and other advisors.  Such negotiations culminated in agreement on the terms of the Plan.  I also believe the acceptance of the Plan by all Voting Classes reflects the Plan's inherent fairness and good-faith efforts to achieve the objectives of chapter 11.  Thus, I believe the Plan maximizes value for the Debtors' stakeholders, and recoveries to creditors under the Plan are better than the expected recoveries in a hypothetical liquidation scenario.

26.     Additionally, I believe that the Debtors, officers, directors, and managers, each of whom has acted on the Debtors' behalf throughout the Chapter 11 Cases, have upheld their fiduciary duties to stakeholders throughout the Chapter 11 Cases by seeking to maximize the value of the Estates through engagement and consensus whenever reasonably possible.  In all stages of the Chapter 11 Cases, I believe that the Debtors, officers, directors, and managers understood they owed fiduciary duties to the Estates and were guided by such duties in seeking to maximize value for all parties in interest.

**D.     Section 1129(a)(5):  Debtors Have Disclosed All Necessary Information Regarding Directors, Officers, and Insiders**

27.     I believe that the appointment of Melker Sandberg, through Melker Sandberg LLC, as the Plan Administrator is consistent with the interests of Debtors, creditors, and other parties in interest in the Chapter 11 Cases.

**E.     Section 1129(a)(9):  Payment in Full of Priority Claims**

28.     I understand Article II of the Plan provides that all Allowed Administrative Expense Claims and Allowed Priority Tax Claims will either be paid in full or receive treatment that otherwise complies with the Bankruptcy Code.

29.     As demonstrated by the Wind Down Budget (Docket No. 564, Ex. D), I believe Wind Down Co will have sufficient cash to pay any unpaid Allowed Administrative Expense Claims, Fee Claims, and Priority Tax Claims.

**F.     Section 1129(a)(11):  Plan Is Feasible**

30.     To determine whether the Plan is feasible, the Debtors analyzed their ability to fulfill their obligations under the Plan, and I understand they determined that they will be able to fulfill their obligations under the Plan.  The Plan provides for the (i) payment in full of all Allowed Administrative Expense Claims, DIP Claims, Priority Tax Claims, Other Priority Claims, and Other Secured Claims, (ii) distributions to the Prepetition Lenders and holders of Allowed OpCo General Unsecured Claims and (iii) disposition of the Debtors' remaining assets following the Wind Down.  Additionally, the Plan incorporates a "waterfall" classification and distribution scheme that strictly follows the statutory priorities prescribed by the Bankruptcy Code with the addition of $2 million from Sale Proceeds Distributable Consideration (to which holders of OpCo Lender Secured Claims otherwise would be entitled) funded to the Creditors' Committee Settlement Amount as part of the integrated Creditors' Committee Settlement.

31.     I understand the Debtors have filed the Wind Down Budget, which specifies the estimated costs and expenses of administering and consummating the Plan.  Based on the Wind Down Budget, I believe the Debtors will have sufficient funding to make all payments required to implement the Plan.  In particular, the Wind Down Budget includes the Counterparty Reserve to allow Wind Down Co to honor its and the Post-Effective Date Debtors' undisputed obligations under any executory contracts and unexpired leases that have not been rejected or assumed and assigned to a third party.  Accordingly, I believe the Plan is feasible.

G.     **Section 1129(b):  Cramdown of Rejecting Classes**

32.     As set forth in the *Declaration of Alexa Westmoreland of Stretto, Inc. Regarding Solicitation and Tabulation of Ballots Cast on Second Amended Joint Chapter 11 Plan of Everstream Solutions and Its Affiliated Debtors*, filed November 14, 2025 (Docket No. 569), Class 3 (OpCo Lender Secured Claims), Class 4 (OpCo General Unsecured Claims), and Class 5 (HoldCo Lender Secured Claims) are Impaired and have voted to accept the Plan.  Class 1 (Other Secured Claims), Class 2 (Other Priority Claims), Class 7 (Intercompany Claims) (only in the event that Intercompany Claims are reinstated), and Class 10 (Intercompany Interests) were conclusively presumed to accept the Plan because those Classes were Unimpaired under the Plan. Therefore, I understand that the only Classes to which cram down is relevant are the Classes that are deemed to reject the Plan—Class 6 (HoldCo General Unsecured Claims), Class 7 (Intercompany Claims) (only in the event that Intercompany Claims are not reinstated), Class 8 (Subordinated Claims), and Class 9 (HoldCo Equity Interests).

*i.        Plan Does Not Discriminate Unfairly*

33.     I understand specifically that (i) Class 6 (HoldCo General Unsecured Claims) consists only of unsecured Claims against HoldCo and TopCo held by third parties, which are distinct from the OpCo General Unsecured Claims against the remaining Debtors and that, due to nature of the Debtors' prepetition capital structure, Claims against HoldCo and TopCo are structurally subordinated to Claims against MidCo, OpCo, or any of their direct or indirect subsidiaries, (ii) Class 7 (Intercompany Claims) contains Claims held by and against Debtors and non-Debtor affiliates, (iii) no similar class of Claims exists with respect to Class 8 (Subordinated Claims), and (iii) Class 9 (HoldCo Equity Interests) consists only of non-Debtor holders of Interests in a Debtor.  Because no Impaired Class is similarly situated to any other Class under the Plan or each other, the Plan does not discriminate unfairly with respect to any impaired Classes of

Claims or Interests.

### ii.        Plan Is Fair and Equitable

34.     I understand that this is assessed by whether any holder of a claim or interest junior to an impaired creditor will receive or retain property under a plan on account of such junior claim or interest.

35.     I understand that distributions under the Plan will be made in the order of priority prescribed by the Bankruptcy Code.  Further, I understand that, with respect to each Class that is deemed to reject the Plan, no holder of a Claim or Interest junior to the holders of such Claims and Interests will receive or retain property under the Plan.

36.     I understand that, while Intercompany Interests will be reinstated under the Plan, there is a reasonable basis for such difference in treatment.  Reinstating Class 10 (Intercompany Interests) preserves the legal structure of the Debtors and allows the implementation of the Wind Down as set forth in the Plan, has no economic consequence, and is not structured to unfairly prejudice holders of Claims and Interests, as applicable, in Class 6 (HoldCo General Unsecured Claims), Class 7 (Intercompany Claims), Class 8 (Subordinated Claims), and Class 9 (HoldCo Equity Interests), as no holder of an Interest in Class 10 (Intercompany Interests) will receive a distribution.

## III.    BACKGROUND AND SCOPE OF LIQUIDATION ANALYSIS

37.     I am familiar with the Liquidation Analysis, the underlying financial and asset data, and the assumptions upon which the Liquidation Analysis is based, which are described in the Liquidation Analysis and notes thereto.

38.     I understand that section 1129(a)(7) of the Bankruptcy Code requires the Court to determine that a chapter 11 plan provides, with respect to each impaired class of claims or equity interests, that each holder of a claim or an equity interest in such class either (i) has

accepted the plan or (ii) will receive under the plan value that is not less than the amount that the holder would receive if the debtors had liquidated under chapter 7 of the Bankruptcy Code (the "**Best Interests Test**").

39.     To assist the Debtors and the Court in evaluating the confirmability of the Plan, Weil, on behalf of the Debtors, requested that I and A&M analyze whether the Plan would satisfy the Best Interests Test.  To complete that analysis, the Debtors, with the assistance of A&M and the Debtors' other advisors, calculated the estimated value of the distributions that each holder of an Impaired Claim or Interest would receive under the Plan and each holder's estimated recovery as a percentage of its total Allowed Claim or Interest, in each case, as of November 30, 2025 (the "**Conversion Date**").[3]  I, along with others at A&M and the Debtors, then estimated the cash distributions that these holders of Claims and Interests would receive in a hypothetical liquidation under chapter 7 of the Bankruptcy Code commencing on the Conversion Date and compared those distributions against the estimated Plan recoveries.

40.     These calculations are set forth in the Disclosure Statement and detailed below.

## IV.     SUMMARY OF LIQUIDATION ANALYSIS

41.     The Liquidation Analysis demonstrates that each holder of an Impaired Claim or Interest would receive or retain on account of such Claim or Interest under the Plan property with a value equal to or higher than the value of the property such holders would receive or retain if the Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code and the Debtors were subsequently liquidated under chapter 7 of the Bankruptcy Code, as

---

[3]     At the time of preparing the Liquidation Analysis, the milestone for entry of a Confirmation Order as set forth in the that certain *Super-Priority Term Loan Debtor-In-Possession Credit and Guaranty Agreement*, as approved by the Final DIP Order, was November 26, 2025.

summarized in the table below.  Based on the Liquidation Analysis, in a hypothetical chapter 7 liquidation of the Debtors' assets commencing on or about the Conversion Date, the net Liquidation Proceeds[4] available for distribution would be between $99.6 million and $136.5 million, resulting in the following projected recoveries to each Class:

A.    **Liquidation vs. Plan Recoveries[5]**

| Class and Designation | Plan Recoveries | Chapter 7 Liquidation |
|---|---|---|
| DIP Claims | 100% | 49.9–70.8% |
| Administrative & Priority Claims | 100% | 0% |
| 1 (Other Secured Claims) | 100% | 0% |
| 2 (Other Priority Claims) | 100% | 0% |
| 3 (OpCo Lender Secured Claims) | 9.3–20.6% | 0% |
| 4 (OpCo General Unsecured Claims) | 5.4–12.2% | 0% |
| 5 (HoldCo Lender Secured Claims) | 0.1% | 0% |
| 6 (HoldCo General Unsecured Claims) | 0% | 0% |
| 7 (Intercompany Claims) | 0% | 0% |
| 8 (Subordinated Claims) | 0% | 0% |
| 9 (HoldCo Equity Interests) | 0% | 0% |
| 10 (Intercompany Interests) | 0% | 0% |

42.    The Debtors and A&M reserve the right to supplement, modify, or adjust any part of the Liquidation Analysis, including a change of the underlying assumptions and analysis as set forth herein.  However, as of the date of this Declaration, I have no reason to believe that the assumptions used in preparing the Liquidation Analysis should be revised based on facts

---

[4]    "**Liquidation Proceeds**" means the Cash proceeds a chapter 7 trustee would generate if each Chapter 11 Case was converted to a case under chapter 7 on the Conversion Date and the assets of such Debtor's estate were liquidated.

[5]    This table is a summary of the recoveries of Claims and Interests under the Plan and the Liquidation Analysis. The Liquidation Analysis should be referred to for additional detail on the assumptions relied on and the facts underlying the recoveries in a chapter 7 liquidation for all Claims and Interests.

or data I have learned since the filing of the Liquidation Analysis, as amended.

## V.  METHODOLOGY & ASSUMPTIONS UNDERLYING LIQUIDATION ANALYSIS

43.  The Liquidation Analysis represents an estimate of recovery values based upon a hypothetical liquidation of the Debtors.  It is assumed that, on the Conversion Date, the Court would appoint a chapter 7 trustee (the "**Trustee**"), who would try to sell or otherwise liquidate the Debtors' remaining assets (if any).  The Trustee would oversee the orderly process of liquidating such assets and making distributions to the Debtors' creditors in accordance with the priority scheme set forth in chapter 7 of the Bankruptcy Code.  The Debtors have assumed that the liquidation process would take approximately three months.  The Liquidation Analysis further assumes that Liquidation Proceeds would be reduced by certain wind-down costs, fees for the Trustee, and fees for the U.S. Trustee.

44.  The pro forma values referenced in the Liquidation Analysis are based upon the estimated asset and liability balances as of June 30, 2025, adjusted to account for the changes in such balances estimated to occur between June 30, 2025 and the Conversion Date, where applicable.  I believe that these estimates represent a reasonable proxy for the balances as of the Conversion Date.

45.  As is the case in any liquidation analysis, many of the assumptions underlying the Liquidation Analysis are subject to uncertainties that are beyond my control and the control of the Debtors, including the timing, confirmation, and consummation of the Plan.  Some assumptions may not materialize, and unanticipated events and circumstances may affect the actual results.  Projections are inherently subject to substantial and numerous uncertainties and to a wide variety of risks, and the assumptions underlying the Liquidation Analysis may be inaccurate in material respects.  Additionally, the Liquidation Analysis does not include estimates

for tax consequences that may be triggered upon the liquidation and sale of assets, which may be material.

46.     Here, the Debtors have assumed, among other things, that (i)  three months from the Conversion Date is expected to be the minimal amount of time required to conduct the orderly disposition of substantially all of the Debtors' assets and expeditiously wind down the Debtors' estates, (ii) a Trustee would choose to retain, among other professionals, counsel and a financial advisor to provide expertise and assistance in the liquidation of the Debtors' assets and would employ or otherwise retain certain of the Debtors' current employees, (iii) the cessation of business in a chapter 7 liquidation could cause additional Claims to be asserted against the Debtors' estates, including administrative expenses and priority unsecured Claims, that otherwise may not exist absent such a liquidation, (iv) no recovery or related litigation costs have been attributed to any potential Avoidance Actions under the Bankruptcy Code nor any additional recovery or claims that may arise from the outcome of current or potential actions by or against the Debtors, and (v) the professional fees, Trustee fees, Administrative Expense Claims, and other priority Claims would have to be paid in full from the Liquidation Proceeds before any proceeds are made available to holders of general unsecured Claims and other Claims, which would negatively impact creditors' recoveries.

47.     Based on my experience, the methodology used to prepare the Liquidation Analysis is appropriate, and the assumptions and conclusions set forth in the Liquidation Analysis, including the estimate of the proceeds that would be realized in a chapter 7 liquidation of the Debtors, are reasonable.  The Liquidation Analysis provides a fair and reasonable assessment of the effects that a conversion of the Chapter 11 Cases to cases under chapter 7 would have on the proceeds available for distribution to holders of Claims and Interests.  Based on the Liquidation

Analysis, the Plan provides the holders of Allowed Claims in each Impaired Class with a recovery that is greater than or equal to the value of any distributions that would be made to such holders in a liquidation of the Debtors under chapter 7 of the Bankruptcy Code. Therefore, I believe the Liquidation Analysis shows that the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code.

## VI.  CAUSE EXISTS TO WAIVE ANY STAY OF PROPOSED CONFIRMATION ORDER

48.  A waiver of the stay would permit the Debtors to consummate the Plan and commence implementation thereof without delay after confirmation of the Plan. Each day the Debtors remain in chapter 11, they incur material administrative and professional costs. The requested waiver of the stay will allow the Debtors to advance the Wind Down and satisfy their milestone with respect to the effectiveness of the Plan, as required by the DIP Credit Agreement, and is in the best interests of the Debtors' creditors and will not prejudice any parties in interest.

I declare under penalty of perjury that, after reasonable inquiry, the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 17th day of November 2025.

Respectfully submitted,

By:     /s/ *Justin Schmaltz*
_____
Justin Schmaltz, Managing Director
Alvarez & Marsal

**<u>Appendix A</u>**

**Liquidation Analysis**

## LIQUIDATION ANALYSIS

THE DEBTORS MAKE NO REPRESENTATIONS OR WARRANTIES REGARDING THE ACCURACY OF THE ESTIMATES AND ASSUMPTIONS CONTAINED HEREIN. THERE CAN BE NO ASSURANCE THAT THE VALUES REFLECTED IN THIS LIQUIDATION ANALYSIS WOULD BE REALIZED IF THE DEBTORS WERE, IN FACT, TO UNDERGO SUCH A LIQUIDATION UNDER CHAPTER 7 OF THE BANKRUPTCY CODE, AND ACTUAL RESULTS COULD VARY MATERIALLY FROM THOSE ESTIMATED HEREIN. THE DEBTORS RESERVE ALL RIGHTS TO SUPPLEMENT, MODIFY, OR AMEND THIS LIQUIDATION ANALYSIS. NOTHING CONTAINED HEREIN IS INTENDED TO BE OR CONSTITUTES A CONCESSION, ADMISSION, OR ALLOWANCE BY THE DEBTORS (OR ANY OTHER PARTY) OF ANY CLAIMS BY OR AGAINST THE DEBTORS. THE ESTIMATED AMOUNT OF ALLOWED CLAIMS SET FORTH HEREIN SHOULD NOT BE RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING ANY DETERMINATION OF THE VALUE OF ANY DISTRIBUTION TO BE MADE ON ACCOUNT OF ALLOWED CLAIMS UNDER THE PLAN, OTHER THAN THE PRESENTATION OF A HYPOTHETICAL LIQUIDATION ANALYSIS. ACCORDINGLY, THE ASSET VALUES, AMOUNTS, AND PRIORITY OF ALLOWED CLAIMS IN THIS LIQUIDATION ANALYSIS COULD DIFFER MATERIALLY FROM THE AMOUNTS SET FORTH IN THE PLAN OR THE DISCLOSURE STATEMENT.

## 1.    Introduction

Everstream Solutions LLC and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"),[1] with the assistance of their restructuring, legal, and financial advisors, have prepared this hypothetical liquidation analysis (the "**Liquidation Analysis**") in connection with the *Joint Chapter 11 Plan of Everstream Solutions LLC and Its Affiliated Debtors* (Docket No. 429) (as may be amended, supplemented, or otherwise modified from time to time, the "**Plan**") and related *Disclosure Statement for Joint Chapter 11 Plan of Everstream Solutions LLC and Its Affiliated Debtors*, filed concurrently herewith (as may be amended, supplemented, or otherwise modified from time to time, the "**Disclosure Statement**").[2] This Liquidation Analysis indicates the estimated recoveries that may be obtained by holders of Allowed Claims and Interests in a hypothetical liquidation pursuant to chapter 7 of the Bankruptcy Code as an alternative to the Plan.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Midwest Fiber Holdings LP (3804); Midwest Fiber Acquisition Topco LLC (N/A); Midwest Fiber Acquisition Midco1 LLC (6061); Midwest Fiber Acquisition LLC (N/A); Everstream Solutions LLC (2361); Everstream Networks LLC (4542); Everstream GLC Holding Company LLC (4493); American Fiber Comm L.L.C. (2389); HRS Internet, LLC (5042); Lynx Network Group, Inc. (6261); 15955 State Street LLC (2731); Rocket Fiber LLC (7722); Lynx Fiber One, LLC (7151); and Lynx Fiber Two, LLC (3416). The Debtors' mailing address is 1228 Euclid Ave. Suite 250, Cleveland, OH 44115.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Plan, Disclosure Statement, or the final order approving the Debtors' DIP Facility (Docket No. 198) (the "**DIP Order**") as applicable.

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that the Bankruptcy Court find, as a condition to confirmation of the Plan, that each holder of an Allowed Claim or Interest in each Impaired Class (a) has accepted the Plan or (b) will receive or retain under the Plan property of a value, as of the Effective Date of the Plan, that is not less than the amount that such holder would receive if the Debtors were to liquidate their assets in cases under chapter 7 of the Bankruptcy Code.

To demonstrate compliance with section 1129(a)(7) of the Bankruptcy Code, this Liquidation Analysis:

1) estimates the Cash proceeds (the "**Liquidation Proceeds**") that a chapter 7 trustee (the "**Trustee**") would generate if each of the Chapter 11 Cases were converted to a chapter 7 case on the Conversion Date (as defined herein) and the assets of each Debtor's Estate were liquidated;

2) determines the distribution that each holder of an Allowed Claim or Interest would receive from the Liquidation Proceeds under the priority scheme dictated under chapter 7 of the Bankruptcy Code (the "**Liquidation Distribution**"); and

3) compares each holder's Liquidation Distribution to the distribution that such holder would receive if the Plan were confirmed and consummated. Accordingly, asset values discussed herein may be different than amounts expected to be distributed under the Plan. This Liquidation Analysis is based upon certain assumptions discussed herein and in the Disclosure Statement.

As the Liquidation Analysis is a hypothetical analysis based on certain assumptions, certain aspects may vary from the Plan, as discussed in the Disclosure Statement, including with respect to asset values. The Liquidation Analysis is based upon certain estimates and assumptions discussed herein and in the Disclosure Statement, which should be read in conjunction with the Liquidation Analysis.

## 2.     Basis of Presentation

This Liquidation Analysis has been prepared assuming that the WholeCo Sale Transaction fails to close and the Debtors convert their cases from chapter 11 to chapter 7 on or about November 30, 2025 (the "**Conversion Date**"). Upon such conversion, the Debtors' assets would be liquidated pursuant to chapter 7 of the Bankruptcy Code.

The pro forma values referenced herein are based upon the estimated asset and liability balances as of June 30, 2025, adjusted to account for the changes in such balances estimated to occur between June 30, 2025 and the Conversion Date, where applicable. The Debtors' management (the "**Management**") and advisors believe that these estimates represent a reasonable proxy for the balances as of the Conversion Date.

The Debtors have neither fully evaluated Claims filed against the Debtors nor adjudicated such Claims before the Bankruptcy Court. Additionally, certain deadlines to file certain Claims

against the Debtors, including the Governmental Bar Date (as defined in the Bar Date Order[3]), have not passed as of the date hereof.  Accordingly, the amount of the final Allowed Claims against the Debtors' Estates may differ from the Claim amount used in the Liquidation Analysis.

This Liquidation Analysis represents an estimate of recovery values and percentages based upon a hypothetical liquidation of the Debtors.  It is assumed that, on the Conversion Date, the Bankruptcy Court would appoint the Trustee who would attempt to sell the Debtors' assets over a period of approximately three months following the Conversion Date and distribute the Cash proceeds, net of liquidation-related costs, to holders of Allowed Claims and Interests in accordance with the priority scheme set forth in chapter 7 of the Bankruptcy Code.  There can be no assurance that the liquidation would be completed in such a limited time frame, nor is there any assurance that the recoveries assigned to the assets would, in fact, be realized.  It is assumed that the Trustee would retain counsel and other necessary advisors to assist in the liquidation and wind-down of the Estates.

The estimation of proceeds from a hypothetical liquidation of assets is a highly uncertain process involving the extensive use of estimates and assumptions, which, although considered reasonable by Management and the Debtors' advisors, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtors and Management.  The Liquidation Analysis should be read in conjunction with the assumptions, qualifications, and explanations set forth in the Disclosure Statement and the Plan in their entirety, as well as the notes and assumptions set forth herein.

The conversion to a chapter 7 liquidation is likely to give rise to certain Claims that otherwise may not exist under the Plan.  The amount of such additional Claims could be significant, and some may be entitled to treatment as Administrative Expense Claims or otherwise entitled to priority over General Unsecured Claims, including pursuant to sections 503(b) and 507(b) of the Bankruptcy Code.  The Liquidation Analysis does not include estimates for such additional Claims.  Further, the Liquidation Analysis does not include estimates for additional contract damage Claims that may arise from the rejection of the Debtors' executory contracts and unexpired leases upon conversion to chapter 7.  More specific assumptions are detailed in the notes below. Additionally, certain factors, such as a seizure of collateral by secured creditors and/or delays in the liquidation process may limit the amount of proceeds generated by the liquidation of the Debtors' assets.  These factors could materially reduce the value of the Liquidation Proceeds and yield significantly lower recoveries than those estimated in the Liquidation Analysis.

The estimate of the amount of Allowed Claims set forth in this Liquidation Analysis should not be relied upon for any other purpose, including any determination of the value of any distribution to be made on account of Allowed Claims under the Plan.  The actual amount of Allowed Claims could be materially different from the amount of Claims estimated in this Liquidation Analysis.  NOTHING CONTAINED IN THIS LIQUIDATION ANALYSIS IS INTENDED TO BE OR SHALL BE CONSTRUED AS A CONCESSION OR ADMISSION BY THE DEBTORS.

---

[3] "**Bar Date Order**" means the Order (I) Establishing Deadlines and Procedures for Filing Proofs of Claim, (II) Approving Form and Manner of Notice Thereof, and (III) Granting Related Relief (Docket No. 276).

No recovery or related litigation costs have been attributed to any potential Avoidance Actions under the Bankruptcy Code, including potential preference or fraudulent transfer actions. This Liquidation Analysis also does not account for the related cost of such litigation, the uncertainty of the outcome, and anticipated disputes regarding these matters.

Professional fees, Trustee fees, Administrative Expense Claims, and priority Claims would have to be paid in full from the Liquidation Proceeds before any proceeds are made available to holders of General Unsecured Claims and other Claims.  Under the priority scheme dictated under chapter 7 of the Bankruptcy Code, no junior creditor of a Debtor would receive any distributions until all senior creditors of such Debtor are paid in full, and no equity holder of a Debtor would receive any distribution until all creditors of such Debtor are paid in full.  The assumed distributions to creditors as reflected in this Liquidation Analysis are estimated in accordance with the priority scheme dictated under chapter 7 of the Bankruptcy Code.

**3.      Liquidation Process**

For purposes of this Liquidation Analysis, the Debtors' hypothetical liquidation would be conducted pursuant to chapter 7 of the Bankruptcy Code, with the Trustee managing the bankruptcy estate of each Debtor to maximize recoveries in an expedited process.  The Trustee's initial step would be to develop a liquidation plan to generate proceeds from the sale of entity-specific assets (if applicable) and/or recover value of the Debtors for distribution to creditors.  The three major components of the liquidation are as follows:

- generation of Cash proceeds from the sale of the Debtors' owned fiber network, non-deployed inventory and equipment, and the collection of Cash and accounts receivable;

- payment of costs related to the liquidation process, such as costs associated with a wind-down of the Debtors' estates (the "**Wind-Down Costs**") and Trustee, professional, broker, and other administrative fees; and

- distribution of net proceeds generated from asset sales (if applicable) and/or recovered value to the holders of Claims and Interests in accordance with the priority scheme under chapter 7 of the Bankruptcy Code.

**4.      Distribution of Net Proceeds to Claimants**

Any available net proceeds would be allocated to the applicable holders of Allowed Claims and Interests in strict accordance with the priority scheme set forth in section 726 of the Bankruptcy Code.  A detailed Liquidation Analysis was completed for the OpCo Debtors[4] and the HoldCo

---

[4] "**OpCo Debtors**" means, collectively, Midwest Fiber Acquisition Midco1 LLC, Midwest Fiber Acquisition LLC, Everstream Solutions LLC, Everstream Networks LLC, Everstream GLC Holding Company LLC), American Fiber Comm L.L.C., HRS Internet, LLC, Lynx Network Group, Inc., 15955 State Street LLC, Rocket Fiber LLC, Lynx Fiber One, LLC, and Lynx Fiber Two, LLC.

Debtors.[5]  The waterfall of Liquidation Proceeds, summarized below, includes:

- <u>Professional Fee Carve-Out</u>:  All fees required to be paid to the U.S. Trustee and all Allowed Fee Claims incurred by Professional Persons prior to the Conversion Date;

- <u>Chapter 7 Liquidation Adjustments</u>:  Wind-Down Costs, estimated fees paid to the Trustee, and certain professional and/or broker fees incurred during the three-month liquidation period;

- <u>DIP Superpriority Claims</u>:  Aggregate principal balance, plus applicable interest, expenses, fees, and premiums from the New Money DIP Loans and Roll-Up DIP Loans, which, as of the Conversion Date, is estimated to be $176.5 million in the aggregate;

- <u>Prepetition Secured Claims</u>:  OpCo Lender Secured Claims, HoldCo Lender Secured Claims, and Other Secured Claims;

- <u>Administrative Expense Claims and Other Priority Claims</u>:  Preliminary estimates for Administrative Expense Claims incurred prior to the Conversion Date, along with certain estimated unsecured Claims entitled to priority under section 507 of the Bankruptcy Code; and

- <u>General Unsecured Claims</u>:  General Unsecured Claims of each Debtor.

---

[5] "**HoldCo Debtors**" means, together, Midwest Fiber Holdings LP and Midwest Fiber Acquisition Topco LLC.

5.      **Conclusion**

The Debtors have determined that, upon the Effective Date, the Plan will provide all holders of Allowed Claims and Interests with a recovery (if any) that is not less than what such holders would otherwise receive pursuant to a liquidation of the Debtors under chapter 7 of the Bankruptcy Code.  Accordingly, the Debtors believe that the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code.

| Plan Class | Plan Estimated Recovery % | | | Liquidation Analysis Estimated Recovery % | | |
|---|---|---|---|---|---|---|
| | Low | Mid | High | Low | Mid | High |
| Carve-Out | n.a. | n.a. | n.a. | 100.0% | 100.0% | 100.0% |
| DIP Superpriority Claims | 100.0% | 100.0% | 100.0% | 49.9% | 60.3% | 70.8% |
| Administrative & Priority Claims | 100.0% | 100.0% | 100.0% | 0.0% | 0.0% | 0.0% |
| Class 1 - Other Secured Claims | 100.0% | 100.0% | 100.0% | 0.0% | 0.0% | 0.0% |
| Class 2 - Other Priority Claims | 100.0% | 100.0% | 100.0% | 0.0% | 0.0% | 0.0% |
| Class 3 - OpCo Lender Secured Claims | 9.3% | 14.5% | 20.6% | 0.0% | 0.0% | 0.0% |
| Class 4 - OpCo General Unsecured Claims | 5.4% | 8.5% | 12.2% | 0.0% | 0.0% | 0.0% |
| Class 5 - HoldCo Lender Secured Claims | 0.1% | 0.1% | 0.1% | 0.0% | 0.0% | 0.0% |
| Class 6 - HoldCo General Unsecured Claims | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Class 7 - Intercompany Claims | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Class 8 - Subordinated Claims | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Class 9 - HoldCo Equity Interests | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Class 10 - Intercompany Interests | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |

## DETAILED LIQUIDATION ANALYSIS – OPCO DEBTORS

The following table summarizes this Liquidation Analysis for the OpCo Debtors.  This Liquidation Analysis should be reviewed with the accompanying notes.

| Assets / Claims ($ in Millions) | Notes | Pro Forma ($) Adj. Book Value | Estimated Liquidation Value | | | Estimated Recovery % | | |
|---|---|---|---|---|---|---|---|---|
| | | | Low | Mid | High | Low | Mid | High |
| **Assets** | | | | | | | | |
| Cash | [A] | $12.2 | $12.2 | $12.2 | $12.2 | 100.0% | 100.0% | 100.0% |
| Accounts receivable, net | [B] | 22.9 | 6.2 | 7.2 | 8.2 | 26.9% | 31.4% | 35.9% |
| Network Assets | [C] | 314.3 | 69.2 | 84.9 | 100.6 | 22.0% | 27.0% | 32.0% |
| Inventory & Equipment | [D] | 88.8 | 16.9 | 19.2 | 21.5 | 19.1% | 21.6% | 24.2% |
| Professional Fee Reserve | [E] | 6.5 | 6.5 | 6.5 | 6.5 | 100.0% | 100.0% | 100.0% |
| Other assets | [F] | 45.8 | - - | - - | - - | - - | - - | - - |
| **Total Assets / Gross Liquidation Proceeds** | | **$490.5** | **$110.9** | **$130.0** | **$149.0** | **22.6%** | **26.5%** | **30.4%** |
| **Chapter 7 Fees & Costs** | | | | | | | | |
| Chapter 7 Trustee Fees | [G] | | $2.8 | $3.3 | $3.9 | | | |
| Chapter 7 Professional Fees | [H] | | 3.0 | 3.0 | 3.0 | | | |
| Wind-Down Costs | [I] | | 2.7 | 2.7 | 2.7 | | | |
| Severance Costs (incl. WARN) | [J] | | 3.1 | 3.1 | 3.1 | | | |
| **Total Chapter 7 Fees & Costs** | | | **$11.6** | **$12.1** | **$12.7** | | | |
| **Net Liquidation Proceeds** | | | **$99.4** | **$117.8** | **$136.3** | | | |
| **Claims and Recoveries** | | | | | | | | |
| **Carve-Out** | | | | | | | | |
| Carve-Out Claims | [K] | ($11.5) | ($11.5) | ($11.5) | ($11.5) | 100.0% | 100.0% | 100.0% |
| **Remaining Distributable Value** | | | **$87.8** | **$106.3** | **$124.7** | | | |
| **DIP Superpriority Claims** | | | | | | | | |
| DIP Superpriority Claims | [L] | ($176.5) | ($87.8) | ($106.3) | ($124.7) | 49.8% | 60.2% | 70.7% |
| **Remaining Distributable Value** | | | **- -** | **- -** | **- -** | | | |
| **Secured Claims** | | | | | | | | |
| OpCo Lender Secured Claims | [M] | ($704.5) | - - | - - | - - | 0.0% | 0.0% | 0.0% |
| Other Secured Claims | [N] | (0.3) | - - | - - | - - | 0.0% | 0.0% | 0.0% |
| **Remaining Distributable Value** | | | **- -** | **- -** | **- -** | | | |
| **Administrative & Priority Claims** | | | | | | | | |
| Administrative & Priority Claims | [O] | ($15.9) | - - | - - | - - | 0.0% | 0.0% | 0.0% |
| **Remaining Distributable Value** | | | **- -** | **- -** | **- -** | | | |
| **General Unsecured Claims** | | | | | | | | |
| General Unsecured Claims | [P] | ($37.5) | - - | - - | - - | 0.0% | 0.0% | 0.0% |
| **Remaining Distributable Value** | | | **- -** | **- -** | **- -** | | | |

7

**Notes to Specified Line Items of Liquidation Analysis**

*Gross Liquidation Proceeds*

[A] <u>Cash and Cash Equivalents</u>:  This entry consists of unrestricted Cash held in bank accounts. The Cash and Cash equivalents reflect an estimate of $12.2 million as of the Conversion Date.

[B] <u>Accounts Receivable</u>:  The estimated proceeds from forecasted accounts receivable balances as of the Conversion Date are assumed to be recoverable between 27%–36% of net book value. These assumed recovery rates are based on the Debtors' ability to collect accounts receivable, taking into consideration the aging of the outstanding balances and the likelihood of collecting receivables that are over 90 days outstanding.  Ceasing operations in a chapter 7 liquidation would effectively terminate all contracts and relationships, which could further impact the collectability of outstanding receivables.  Proceeds from the collection of accounts receivable are estimated to be between $6.2 million and $8.2 million.

[C] <u>Network Assets</u>:  These assets represent the Debtors' estimated proceeds from the liquidation of the Debtors' fiber network.  Upon converting to a chapter 7 liquidation, it is assumed that all existing contracts, including indefeasible rights of use agreements ("**IRUs**") and dark fiber leases, would be terminated, and the Debtors would effectively cease operations.  The Trustee would then attempt to liquidate the Debtors' owned fiber network over a three-month wind-down period.  The analysis assumes the sale would occur under fire-sale conditions where assets would be discounted for (a) lack of a competitive auction process, and (b) the assumption that the buyer would need to price in additional downside risk protection discounts to make up for the lack of diligence rigor in such a limited sale process.

The Debtors' network assets include the owned, deployed fiber optic cables and related network equipment.  A discounted cashflow model was prepared to determine the amount that a hypothetical buyer might pay for the Debtors' owned fiber network.  Specifically, a Net Present Value ("**NPV**") analysis of a standard "desktop" telecommunications company operating model was prepared based on a start-up network's fair share of the addressable market.

- **Total addressable market ("TAM")**:  TAM includes commercial opportunities that potentially can be served by the Debtors' owned, contiguous network, and TAM excludes IRUs, leases, and stretches of "islands" that are isolated from the rest of the network.  The contiguous network footprint is defined as the regions of the network that either (1) have rings or sufficient capillarity into metro centers or (2) cover meaningful long-haul routes, connect towns, and pass through the majority of in-town demand.

    o TAM is calculated based on the number of addressable, dedicated fiber adopting enterprise, tower, and data center end points, multiplied by the expected fiber spend per end point.

        ▪ Fiber to the enterprise TAM was determined based on the number of

enterprises[6] within a two-year estimated payback period.[7]

- ▪ Fiber to the tower TAM was determined based on the number of macro towers within a four-year estimated payback period.

- ▪ Fiber to the data center TAM was determined based on the number of colocation data center facilities and enterprise customers within each facility within a two mile distance from the contiguous network.[8]

- ▪ Fiber spend per end point was estimated based on (1) industry pricing benchmarks for enterprise fiber internet across speed tiers (e.g., 100 Mbps, 1 Gbps, 10 Gbps), (2) dedicated fiber internet adoption rate benchmarks by industry and enterprise size, (3) number of tenants on macro towers, based on location to the tower (e.g., urban, suburban, rural), and (4) critical IT capacity of the colocation data centers, as well as per customer deployment size assumptions.

- • **Fair Share Analysis**:  Fair share was calculated at the end-point level depending on the number of fiber competitors addressable to each TAM end point.  For each of the carriers with fiber in the same markets as the contiguous network, a competitive strength analysis was conducted based on each carrier's enterprise offerings, scale, reputation, and expertise. Accordingly, it was estimated that the fair share of each competitor, as well as an operator starting up a network based on the Debtors' owned network footprint, could eventually compete for approximately 23% fair share of TAM.

- • **NPV Analysis**:   Using a standard "desktop" dedicated fiber company operating model, free cash flows were estimated for an operator with no operations or customers on the network, ramping up to market share over time.  It is estimated that the NPV of the Debtors' owned network would be between $69.2 million and $100.6 million to a hypothetical start-up network buyer.

[D] Inventory & Equipment:  The Debtors also own inventory and equipment that the Trustee would seek to liquidate.  Discussions with five market participants, including network equipment buyers, suppliers, and manufacturers, were conducted to understand the secondary market and resale value considerations for this inventory and equipment.  Based on these discussions and the Debtors' market expertise, it is estimated that the Trustee could liquidate non-deployed outside plant equipment, such as fiber cables, conduits, splice cases, and hand holes that are in contractor yards or supplier warehouses for proceeds of approximately $6.5 million to $7.8 million, which represents a net recovery between 52–62% of the book value.

---

[6] Enterprises refer to the number of business locations and includes locations that have more than 20 employees.

[7] The payback period is calculated by dividing the estimated success-based capital expenditures by the monthly recurring revenue.

[8] Distances are calculated using geospatial analysis and then converted from aerial mileage to road miles to accurately capture fiber route mileage.

Inside plant ("**ISP**") equipment, such as the equipment supporting dense wavelength division multiplexing and core routing, as well as customer premise equipment that has not been deployed, is also assumed to be liquidated.  ISP equipment can become obsolete over time as new technologies are introduced, making it more difficult to liquidate older inventory.  Approximately 62% of the Debtors' ISP equipment is between 2–3 years old and has an estimated recovery of approximately 35% of the book value.  It is estimated that the Debtors' non-deployed ISP equipment could be liquidated for between $10.4 million and $13.7 million, which represents a net recovery between 31–41%.  Deployed equipment that is physically installed and within the existing network is assumed to be included in the network asset liquidation value by assuming that the hypothetical buyer would utilize certain equipment and mitigate the costs of operating the network assets it acquires.

This analysis estimates that the total proceeds from liquidation of inventory and equipment could be between $16.9 million and $21.5 million, as summarized in the table below.

| ($ in Millions) | Pro Forma ($)<br>Adj. Book Value | Estimated Liquidation Value | | | Estimated Recovery % | | |
|---|---|---|---|---|---|---|---|
| | | Low | Mid | High | Low | Mid | High |
| Fiber Cables | $8.4 | $4.1 | $4.5 | $5.0 | 49% | 54% | 59% |
| Conduit | 0.8 | 0.5 | 0.5 | 0.6 | 59% | 64% | 69% |
| Splice Cases | 0.4 | 0.3 | 0.3 | 0.3 | 65% | 70% | 75% |
| Hand Holes | 1.8 | 1.0 | 1.1 | 1.2 | 55% | 60% | 65% |
| Panels | 1.0 | 0.7 | 0.7 | 0.8 | 65% | 70% | 75% |
| Other | 0.1 | - - | 0.0 | 0.0 | 0% | 5% | 10% |
| Total OSP Inventory | $12.5 | $6.5 | $7.2 | $7.8 | 52% | 57% | 62% |
| DWDM | 13.0 | 4.4 | 5.0 | 5.7 | 34% | 39% | 44% |
| Core Routing | 10.7 | 3.3 | 3.8 | 4.4 | 31% | 36% | 41% |
| Customer Premise | 7.1 | 1.9 | 2.3 | 2.6 | 27% | 32% | 37% |
| Other ISP Inventory | 2.3 | 0.8 | 0.9 | 1.0 | 33% | 38% | 43% |
| Total Non-Deployed ISP Inventory | 33.1 | $10.4 | $12.1 | $13.7 | 31% | 36% | 41% |
| **Total Non-Deployed OSP & ISP** | **$45.6** | **$16.9** | **$19.2** | **$21.5** | **37%** | **42%** | **47%** |
| Deployed ISP Inventory | 43.2 | - - | - - | - - | 0% | 0% | 0% |
| **Total OSP & ISP Inventory** | **$88.8** | **$16.9** | **$19.2** | **$21.5** | **19%** | **22%** | **24%** |

[E] <u>Professional Fees Accounts</u>:  In accordance with the DIP Order, a Professional Fees Account has been established and funded throughout the chapter 11 cases with the accrued and unpaid professional fee estimates from each of the Professional Persons supporting the Debtors and the Creditors' Committee.  This Liquidation Analysis includes an estimation of the balance of the Professional Fees Account at the assumed Conversion Date to fund the Allowed Fee Claims.

[F] <u>Other Assets</u>:  The Debtors' other assets include prepaid expenses for insurance, subscriptions, equipment and fiber maintenance, and prepayment to vendors.  Other assets also include the unamortized portion of IRU agreements, the unamortized portion of contract costs, and unamortized commissions.  These amounts represent expenses that the Debtors have paid for in advance, therefore, it is assumed that in a chapter 7 liquidation there is no recoverable value.

*Chapter 7 Liquidation Adjustments*

[G] <u>Chapter 7 Trustee Fees</u>:  Upon converting to a chapter 7 liquidation, it is assumed that the Trustee would manage the bankruptcy estate of each Debtor to maximize recoveries in an expedited manner.  The Trustee's fees would be limited by the fee guidelines in section 326(a) of the Bankruptcy Code and are assumed to represent 3% of gross Liquidation Proceeds, excluding unrestricted Cash and reserved Cash.  This Liquidation Analysis assumes that fees payable to the Trustee are between $2.8 million and $3.9 million, depending on the range of gross Liquidation Proceeds estimated herein.

[H] <u>Chapter 7 Professional Fees</u>:  These costs include the fees due to a financial advisor and legal counsel retained by the Trustee in connection with the wind-down of the estate.   Chapter 7 professional fees are estimated to be approximately $1.0 million per month of the liquidation, totaling approximately $3.0 million.

[I] <u>Wind-Down Costs</u>:  The Wind-Down Costs include estimates for Debtor employees that would be retained to support the estate wind-down during the three-month liquidation period.  Employees assumed to be retained include the minimum number of employees required to (i) assist with maximizing the recovery on the remaining assets, (ii) minimize the number of Claims, and (iii) generally oversee the liquidation.  A retention bonus representing 30% of the base salary of this limited number of employees has been assumed in order to incentivize employees to remain with the Debtors and assist with the liquidation of the Debtor's assets.  In addition to the retention payments, the Liquidation Analysis assumes that these retained employees would be offered severance at the conclusion of the liquidation to further incentivize employees to remain with the Debtors throughout the entire wind-down period.   The Wind-Down Costs also include other expenses, such as final tax returns, IT costs, and other administrative fees.   Total Wind-Down Costs are estimated to be approximately $2.7 million.

[J] <u>Severance Costs</u>:  This Liquidation Analysis assumes that the Trustee would immediately reduce employee headcount to a minimum staffing level to support the three-month liquidation period.  All employees who are otherwise not retained, as described in the Wind-Down Costs, are assumed to be terminated.  Under the Worker Adjustment Retraining and Notification Act of 1988 ("**WARN**"), terminated employees at locations with more than 50 employees at a single site may be entitled to certain severance or other compensation, which is estimated to be approximately $3.1 million in this Liquidation Analysis.  Since the WARN Claims would arise postpetition under the foregoing scenario, such Claims would be afforded administrative expense priority under sections 503(b) and 507(b) of the Bankruptcy Code.

*Claims & Recoveries*

[K] <u>Carve-Out</u>:  Under paragraph 23 of the DIP Order, the Debtors are required to transfer funds into the Professional Fees Account to ensure the payment of certain administrative expenses and professional fees, including in the event of a default under the DIP Facility or liquidation of the Debtors' assets in chapter 7 cases.  The Carve-Out includes the following amounts:

1. **U.S. Trustee Fees**:  All fees required to be paid to the Clerk of Court and to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930(a) plus interest at the statutory rate

pursuant to 31 U.S.C. § 3717.

2. **Chapter 7 Trustee Fees**:  All reasonable fees and expenses (up to $100,000) incurred by a trustee under section 726(b) of the Bankruptcy Code.

3. **Allowed Professional Fees**:  All accrued and unpaid fees and expenses incurred by the Professional Persons retained by the Debtors and the Creditors' Committee at any time before or on the first Business Day following the date of delivery of a Carve-Out Trigger Notice (which, for purposes of the Liquidation Analysis, is assumed to be the Conversion Date).

4. **Post-Carve-Out Trigger Notice Cap**:  All accrued and unpaid fees and expenses incurred by the Professional Persons retained by the Debtors and the Creditors' Committee after the first Business Day following the date of delivery of a Carve-Out Trigger Notice, up to $2.75 million.

The Carve-Out protects these funds from being claimed by creditors, including secured creditors, and ensures that the applicable Professional Persons in the Chapter 11 Cases are compensated for their services following delivery of a Carve-Out Trigger Notice.  The Carve-Out is estimated to total approximately $11.5 million.

| Summary of Carve-Out | |
|---|---|
| *($ in Millions)* | |
| **Carve-Out** | |
| U.S. Trustee Fees | ($0.1) |
| Chapter 7 Trustee Fees | (0.1) |
| Allowed Professional Fees | (8.6) |
| Post-Carve-Out Trigger Notice Cap | (2.8) |
| Total Carve-Out Recovery | ($11.5) |

[L] <u>DIP Superpriority Claims</u>:  These Claims represent an estimate of the outstanding DIP Claims as of the Conversion Date, as summarized in the table below.

| Summary of DIP Superpriority Claims | |
|---|---|
| *($ in Millions)* | |
| **DIP Superpriority Claims** | |
| Superpriority DDTL Loans | ($22.3) |
| New Money DIP Facility | (39.4) |
| Roll-Up DIP Loans | (114.8) |
| Total DIP Superpriority Claims | ($176.5) |

[M] <u>OpCo Secured Lender Claims</u>:  These Claims include the estimated amounts outstanding under the Prepetition OpCo Facility, which, as of the Conversion Date, total approximately $704.5 million.

| Summary of Secured Claims | |
|---|---|
| *($ in Millions)* | |
| **Secured Claims** | |
| OpCo DDTL | ($85.8) |
| OpCo Term Loan | (438.1) |
| OpCo PIK | (139.6) |
| OpCo Loans Adequate Protection | (41.0) |
| Total Secured Claims | ($704.5) |

[N] <u>Other Secured Claims</u>:  These Claims include estimates for secured tax, lien, and contract Claims.

[O] <u>Administrative Expense & Other Priority Claims</u>:  These Claims include preliminary estimates for prepetition priority Claims and postpetition Administrative Expense Claims.  The Administrative Expense Claims and Other Priority Claims assumed herein include:

- **Priority Tax Claims**:  Estimated tax liabilities as of the Conversion Date.
- **503(b)(9) Claims**:  Claims related to goods delivered within 20 days of the Petition Date and not paid by the Debtors through vendor settlements prior to the Wind Down.
- **Administrative Expense Claims**:  Postpetition accounts payable for vendors incurred prior to the Conversion Date.
- **Other Priority Claims**:  Other Priority Claims asserted against the Debtors' estates.
- **Intercompany Claims**:  Postpetition intercompany payable amount to HoldCo.

| Summary of Administrative & Priority Claims | |
|---|---|
| *($ in Millions)* | |
| **Administrative & Priority Claims** | |
| Priority Tax Claims | ($2.7) |
| 503(b)(9) Claims | (0.1) |
| Administrative Expense Claims | (13.0) |
| Other Priority Claims | (0.1) |
| Intercompany Claims | (0.0) |
| Total Administrative & Priority Claims | ($15.9) |

[P] <u>General Unsecured Claims – Prepetition</u>:   These Claims represents estimated prepetition unsecured Claims against the Debtors.  The conversion of the cases to chapter 7 may result in incremental Claims that are not contemplated under the Plan, including material contract rejection damage Claims; these incremental Claims have not been estimated herein.  General Unsecured Claims include:

- **Trade Claims**:  Unsecured trade payable Claims filed against the Debtors.
- **Tax Claims**:  Unsecured tax Claims filed against the Debtors that are not entitled to priority under the Bankruptcy Code.
- **Severance Claims**:  Unsecured severance Claims filed against the Debtors.
- **Rejection Damages Claims**:  Estimated unsecured rejection damages Claims for those executory contracts and unexpired leases that the Debtors have rejected.

| Summary of General Unsecured Claims | |
|---|---|
| *($ in Millions)* | |
| **General Unsecured Claims** | |
| Trade Claims | ($35.9) |
| Tax Claims | (0.0) |
| Severance Claims | (0.0) |
| Rejection Damages Claims | (1.6) |
| Total General Unsecured Claims | ($37.5) |

Deficiency Claims for unpaid amounts owed to Secured Claims have been excluded for illustrative purposes.

14

## DETAILED LIQUIDATION ANALYSIS – HOLDCO DEBTORS

The following table summarizes this Liquidation Analysis for the HoldCo Debtors.  This Liquidation Analysis should be reviewed with the accompanying notes.

| Assets / Claims<br>($ in Millions) | Notes | Pro Forma ($)<br>Adj. Book Value | Estimated Liquidation Value | | | Estimated Recovery % | | |
|---|---|---|---|---|---|---|---|---|
| | | | Low | Mid | High | Low | Mid | High |
| **Assets** | | | | | | | | |
| Cash | [A] | $0.3 | $0.3 | $0.3 | $0.3 | 100.0% | 100.0% | 100.0% |
| Accounts receivable, net | | - - | - - | - - | - - | - - | - - | - - |
| Network Assets | | - - | - - | - - | - - | | | |
| Inventory & Equipment | | - - | - - | - - | - - | | | |
| Professional Fee Reserve | | - - | - - | - - | - - | - - | - - | - - |
| Other assets | | - - | - - | - - | - - | | | |
| **Total Assets / Gross Liquidation Proceeds** | | **$0.3** | **$0.3** | **$0.3** | **$0.3** | **100.0%** | **100.0%** | **100.0%** |
| **Chapter 7 Fees & Costs** | | | | | | | | |
| Chapter 7 Trustee Fees | | | - - | - - | - - | | | |
| Chapter 7 Professional Fees | [B] | | - - | - - | - - | | | |
| Wind-Down Costs | | | 0.1 | 0.1 | 0.1 | | | |
| Severance Costs (incl. WARN) | | | - - | - - | - - | | | |
| **Total Chapter 7 Fees & Costs** | | | **$0.1** | **$0.1** | **$0.1** | | | |
| **Net Liquidation Proceeds** | | | **$0.2** | **$0.2** | **$0.2** | | | |
| **Claims and Recoveries** | | | | | | | | |
| **Carve-Out** | | | | | | | | |
| Total Carve-Out Recovery | | - - | - - | - - | - - | - - | - - | - - |
| **Remaining Distributable Value** | | | **$0.2** | **$0.2** | **$0.2** | | | |
| **DIP Superpriority Claims** | | | | | | | | |
| Total DIP Superpriority Claims | [C] | ($176.5) | ($0.2) | ($0.2) | ($0.2) | 0.1% | 0.1% | 0.1% |
| **Remaining Distributable Value** | | | - - | - - | - - | | | |
| **Secured Claims** | | | | | | | | |
| HoldCo Lender Secured Claims | [D] | ($262.7) | - - | - - | - - | 0.0% | 0.0% | 0.0% |
| **Remaining Distributable Value** | | | - - | - - | - - | | | |
| **Administrative & Priority Claims** | | | | | | | | |
| Total Administrative & Priority Claims Recovery | [E] | ($0.1) | - - | - - | - - | 0.0% | 0.0% | 0.0% |
| **Remaining Distributable Value** | | | - - | - - | - - | | | |
| **General Unsecured Claims** | | | | | | | | |
| Total General Unsecured Claims Recovery | [F] | - - | - - | - - | - - | - - | - - | - - |
| **Remaining Distributable Value** | | | - - | - - | - - | | | |

**Notes to Specified Line Items of Liquidation Analysis**

*Gross Liquidation Proceeds*

[A] <u>Cash and Cash Equivalents</u>:  HoldCo holds Cash in the Credit Card Program Bank Account. The Cash and Cash equivalents reflect an estimate of $0.3 million as of the Conversion Date.

*Chapter 7 Liquidation Adjustments*

[B] <u>Wind-Down Costs</u>:  These costs include estimates for Debtor employees that would be retained to support the HoldCo wind-down as well as other expenses, including final tax returns, IT costs, and other administrative fees.  Total Wind-Down Costs are estimated to be $0.1 million.

*Claims & Recoveries*

[C] <u>DIP Superpriority Claims</u>:  These Claims represent an estimate of the outstanding DIP Claims as of the Conversion Date, as summarized in the table below.

| Summary of DIP Superpriority Claims | |
| --- | --- |
| *($ in Millions)* | |
| **DIP Superpriority Claims** | |
| Superpriority DDTL Loans | ($22.3) |
| New Money DIP Facility | (39.4) |
| Roll-Up DIP Loans | (114.8) |
| Total DIP Superpriority Claims | ($176.5) |

[D] <u>HoldCo Secured Claims</u>:  These Claims include the estimated amounts outstanding under the Prepetition HoldCo Facility, which, as of the Conversion Date, total approximately $262.7 million.

| Summary of Secured Claims | |
| --- | --- |
| *($ in Millions)* | |
| **Secured Claims** | |
| HoldCo DDTL | ($42.1) |
| HoldCo Term Loan | (220.6) |
| Total Secured Claims | ($262.7) |

[E] <u>Administrative Expense & Priority Claims</u>:  These Claims include approximately $0.1 million of postpetition Intercompany Claims.

[F] <u>General Unsecured Claims</u>:  These Claims represent estimated prepetition unsecured Claims against the Debtors.  Deficiency Claims for unpaid amounts owed to Secured Claims have been excluded for illustrative purposes.