IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § § | Chapter 11 |
| EVERSTREAM SOLUTIONS LLC, *et al.*, | § § § | Case No. 25-90144 (CML) |
| Debtors.[1] | § § § § | (Jointly Administered) |

## DECLARATION OF MELKER SANDBERG IN SUPPORT OF CONFIRMATION OF SECOND AMENDED JOINT CHAPTER 11 PLAN OF EVERSTREAM SOLUTIONS LLC AND ITS AFFILIATED DEBTORS

I, Melker Sandberg, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true and correct to the best of my knowledge, information, and belief:

1. On August 15, 2024, I was appointed as an independent manager of the board of managers of Midwest Fiber Holdings LP ("**HoldCo**," and its board of managers, the "**HoldCo Board**"). Since that date, through various governance changes detailed in the *Disclosure Statement for Amended Joint Chapter 11 Plan of Everstream Solutions LLC and Its Affiliated Debtors* (Docket No. 505) (the "**Disclosure Statement**"), I now also serve as (i) a member of the Restructuring Advisory Committee of the HoldCo Board and a member of the Special Investigation Committee of the HoldCo Board, (ii) an independent manager of the board of managers of Midwest Fiber Acquisition LLC ("**OpCo**," and its board of managers, the "**OpCo**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Midwest Fiber Holdings LP (3804); Midwest Fiber Acquisition Topco LLC (N/A); Midwest Fiber Acquisition Midco1 LLC (6061); Midwest Fiber Acquisition LLC (N/A); Everstream Solutions LLC (2361); Everstream Networks LLC (4542); Everstream GLC Holding Company LLC (4493); American Fiber Comm L.L.C. (2389); HRS Internet, LLC (5042); Lynx Network Group, Inc. (6261); 15955 State Street LLC (2731); Rocket Fiber LLC (7722); Lynx Fiber One, LLC (7151); and Lynx Fiber Two, LLC (3416). The Debtors' mailing address is 1228 Euclid Ave. Suite 250, Cleveland, OH 44115.

**Board**"), a member of the Restructuring Advisory Committee of the OpCo Board, and a member of the Special Investigation Committee of the OpCo Board, and (iii) an independent director of the board of Lynx Network Group, Inc. ("**Lynx**," and its board of directors, the **"Lynx Board"**) and a member of the Special Investigation Committee of the Lynx Board.

2. I submit this declaration (this "**Declaration**") in support of confirmation of the *Second Amended Joint Chapter 11 Plan of Everstream Solutions LLC and Its Affiliated Debtors* (Docket No. 561) (as amended, supplemented, or otherwise modified from time to time, the "**Plan**").[2]

3. I have extensive experience serving in advisory, board, and operating roles. In addition to my roles discussed above with HoldCo, OpCo, and Lynx (collectively, with their debtor affiliates, the "**Debtors**" or the "**Company**"), I currently serve on the board of directors of Verve Cloud and BAM Broadband. Previously, I was employed by FTI Consulting Inc. ("**FTI**") from 2008–2022 in their Telecom, Media and Technology practice. During the term of my employment at FTI, I advised clients on M&A, business transformation, and restructuring matters, including (i) leading the out-of-court wind down of two separate telecommunications companies and (ii) advising on several in-court restructurings, including Fusion Connect, INAP, Nortel, Intelsat, and Paniolo. Prior to employment with FTI, I was employed by Level 3 Communications (which is now known as Lumen).

4. Except as otherwise indicated, all statements in this Declaration are based on my personal knowledge of the Debtors' operations and finances, my discussions with members of the Debtors' management and the Debtors' advisors, my review of relevant documents, or my opinion based upon my experience and knowledge of the Debtors' operations. If called to testify,

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan or the Disclosure Statement, as applicable.

I could and would testify to each of the facts set forth herein based on such personal knowledge, discussions, review of documents, or opinion.

5.  I am not being specifically compensated for this testimony other than through payments received for my service on the HoldCo Board, OpCo Board, and Lynx Board. I am over the age of 18 and authorized to submit this Declaration on behalf of the Debtors.

### Debtor Releases

6.  I understand that Section 10.6(a) of the Plan contains certain releases by the Debtors and the Estates in favor of the Released Parties (the "**Debtor Releases**"). I believe the Debtor Releases are proper based on (i) the SIC Investigation (as defined below) conducted by Richards, Layton & Finger P.A. ("**RL&F**") at the direction of the Special Investigation Committees of the HoldCo Board, OpCo Board, and the Lynx Board (collectively the "**SIC**"), (ii) my understanding of the 2023 independent investigation conducted by the Special Committee (the "**SC Investigation**"), as detailed in the Disclosure Statement, (iii) the integral support and contributions provided by the Released Parties to the Debtors, both before and during the Chapter 11 Cases, to facilitate the WholeCo Sale Process, the Plan, and the eventual Wind Down of the Debtors, and (iv) the fact that no party has objected to the Debtor Releases and all key stakeholders, including the Creditors' Committee, the Prepetition Lenders, and the DIP Lenders all affirmatively support approval of the Debtor Releases.

### Investigations Support Debtor Releases

7.  Before agreeing to the Debtor Releases, the SIC directed RL&F to conduct an extensive and thorough investigation under the SIC's supervision (the "**SIC Investigation**," and, together with the SC Investigation, the "**Investigations**"). The SIC Investigation began in September 2024.

3

8.  In conducting the SIC Investigation, as is typical of similar investigations, the SIC directed RL&F to analyze certain potential Claims and Causes of Action belonging to the Company with respect to certain current and former members of the Boards, affiliates, equity holders, officers, and other insiders of the Company. As part of the SIC Investigation conducted prior to the Petition Date, RL&F made extensive diligence requests to the Debtors, reviewed thousands of pages of documents, including Board materials and internal Company documents, and conducted four interviews of certain current officers and directors. RL&F communicated regularly with the SIC in conjunction with the SIC Investigation and advised the SIC in connection therewith. Ultimately, based on the SIC Investigation, the SIC concluded that none of the Claims or Causes of Action subject to the SIC Investigation were viable and worth pursuing.

9.  After the Petition Date, on August 13, 2025, the Creditors' Committee sent a demand letter (the "**Demand Letter**") to the Debtors asserting the existence of certain potential Claims and Causes of Action against certain Entities and individuals that fell within the scope of the SIC's authority to investigate. As a result of that Demand Letter, the SIC, with the assistance of RL&F, conducted a further investigation examining the allegations in the Demand Letter, which raised issues beyond allegations that were previously raised to and investigated by the SIC. RL&F reviewed hundreds of additional pages of documents and conducted several additional interviews of the Debtors' advisors and current officers. As part of that further investigation, RL&F likewise communicated regularly with the SIC and advised the SIC in connection therewith. Ultimately, based on the SIC Investigation, the SIC concluded that none of the Claims or Causes of Action outlined in the Demand Letter were viable and worth pursuing.

10. Additionally, I understand that from August 2023 through October 2023, the Special Committee,[3] with the assistance of Weil, Gotshal & Manges LLP ("**Weil**") as counsel, oversaw the SC Investigation. As part of the SC Investigation, I understand that Weil analyzed whether there were viable Claims and Causes of Action against any of the Company's then current and former directors, managers, officers and employees, affiliates (including direct and indirect subsidiaries), and equity sponsors. I understand that the SC Investigation included interviews of the Company's current and former officers, directors, and employees, the review of over twenty thousand Company documents, and forensic analyses by the Company's financial advisor, Alvarez & Marsal North America, LLC. I understand that the Special Committee did not identify any viable Claims or Causes of Action worth pursuing. As a result, I understand that the Special Committee approved certain mutual releases as part of the 2023 Recapitalization Transactions.

11. Through the Investigations, which analyzed numerous transactions between or involving the Released Parties, no viable Claims or Causes of Action worth pursuing were identified. Because no viable Claims or Causes of Action that would likely result in a net positive value for the Estates were identified, the Debtor Releases with respect to the parties that were the subject of the Investigations reflect a reasonable balance of the risk and expense of litigating the released Claims and Causes of Action, on the one hand, against (i) the benefits provided to the Debtors by the Released Parties, along with (ii) the benefits of resolving various disputes and issues, on the other hand, and thereby removing what could otherwise be potentially substantial impediments to consummating the WholeCo Sale Transaction, the Plan, and an efficient Wind

---

[3] As detailed in the Disclosure Statement, the Special Committee consisted of Michael Robinson and Gary Bageman. As is also detailed in the Disclosure Statement, on December 15, 2023, following the 2023 Recapitalization Transactions, the Special Committee was disbanded.

Down of the Estates. This reasonable balance, in addition to the considerable support and value the Released Parties provided to the Debtors (as discussed in more detail below), formed the foundation of the Debtors' business judgment in determining whether to provide the Debtor Releases.

### Debtor Releases Given for Valuable Consideration

12. The Plan, including the Debtor Releases, was heavily negotiated with, among others, the Debtors' key stakeholders, including the Prepetition Lenders, the DIP Lenders, and the Creditors' Committee. The Plan, including the Debtor Releases, is therefore the result of extensive, good-faith, and arm's-length negotiations. Of note, I understand that no party has objected to approval of the Debtor Releases.

13. To that end, I believe the Debtor Releases were a material inducement for the Released Parties to provide their support for the Chapter 11 Cases, the WholeCo Sale Process, and the Plan. For example, the Debtors' Related Parties that are Released Parties provided substantial contributions, both before and after the Petition Date, to the success of the Chapter 11 Cases. The service of those parties, which, in many instances, exceeded their normal duties, were critical to the successful WholeCo Sale Process and Plan process. In addition, the Sponsor and its Related Parties made critical and necessary contributions, both before and after the Petition Date, which directly contributed to the success of the Chapter 11 Cases. Among other things, the Sponsor and its Related Partes supported the Company through capital contributions made before the Petition Date, consented to the delegation of decision-making authority to the Special Committee, the RAC and the SIC and, overall, have been both cooperative and supportive throughout the entirety of the chapter 11 process. Further, in the nearly two years leading up to the Petition Date, the Prepetition Lenders made substantial efforts to support the Debtors'

business and ensure that the Debtors were able to file the Chapter 11 Cases on a consensual basis and pursue the value maximizing WholeCo Sale Transaction for the benefit of all of the Debtors' stakeholders. Among other things, in addition to the significant contributions and concessions that the Prepetition Lenders made as part of the Creditors' Committee Settlement (as defined below), I understand that the Prepetition Lenders agreed to the following:

a. Several amendments to the OpCo Credit Agreement and HoldCo Credit Agreement, which, among other things, waived entitlement to sale proceeds, granted multiple instances of covenant relief, and most importantly, provided the Debtors with more than $187 million of liquidity through a combination of PIK relief, escrowing of the Illinois Sale Proceeds and Missouri Sale Proceeds, and funding of the OpCo Super-Priority DDTL; and

b. To support the WholeCo Sale Process and ultimate Wind Down by providing the Debtors with much-needed liquidity for the Chapter 11 Cases in the form of the DIP Facility, including $55 million of new money DIP Loans, which ensured that the Chapter 11 Cases were adequately funded.

14. In sum, absent the substantial support of the Released Parties, I believe that the Debtors would not have been in a position to pursue the value-maximizing transactions contemplated under the Plan and ensure the continued operation of the Debtors' business as a going concern through the WholeCo Sale Process, which would not have been available absent the Debtor Releases.

15. Moreover, after the Petition Date, on October 7, 2025, the Debtors, Prepetition Lenders, DIP Lenders, and Creditors' Committee (collectively, the "**Settlement Parties**") reached an integrated compromise and settlement regarding, among other things, the treatment of OpCo General Unsecured Claims under the Plan (such settlement, the "**Creditors' Committee Settlement**"). As a result of that settlement, which was the culmination of months of good-faith, arm's-length negotiations among the Settlement Parties, the Prepetition Lenders made significant concessions that would allow holders of OpCo General Unsecured Claims to receive a meaningful recovery. Among other things, the Creditors' Committee Settlement provides that

(i) the OpCo Lenders shall contribute the Creditors' Committee Settlement Amount, on a Pro Rata basis, of the Sale Proceeds Distributable Consideration to which such OpCo Lenders would otherwise be entitled on the Effective Date, (ii) the OpCo Lenders, OpCo Agent, HoldCo Lenders, and HoldCo Agent shall waive any entitlement to a recovery from the Creditors' Committee Settlement Amount on account of the OpCo Lender Deficiency Claims and HoldCo Lender Deficiency Claims (but shall retain the right to vote such Claims), and (iii) the OpCo Lenders, OpCo Agent, HoldCo Lenders, and HoldCo Agent shall waive certain Adequate Protection Claims to which they are entitled under the Plan.  Moreover, as part of the Creditors' Committee Settlement, the Creditors' Committee agreed to support the Disclosure Statement and Plan in their entirety, including, among other things, the Debtor Releases (which, for the avoidance doubt, included any Claims and Causes of Action identified in the Demand Letter).

16. Accordingly, the Released Parties have made substantial contributions to the Chapter 11 Cases, including the Plan and, without the Debtor Releases, the Debtors and their stakeholders would not have been able to secure the substantial benefits provided by the transactions contemplated by the Plan.  The Debtors and their Estates will also receive reciprocal releases from potential Claims and Causes of Action of the Released Parties against the Debtors, providing further benefits to the Estates.

17. I also understand that, pursuant to the Final DIP Order, the DIP Claims, which include both the new money DIP Loans and the Roll-Up DIP Loans, encumber the Claims and Causes of Action (to the extent they exist) that were the subject of the Investigations.  In other words, to the extent any value would be realized by the successful prosecution of the Claims and Causes of Action subject to the Debtor Releases, I understand such Claims and Causes of Action (and any proceeds derived therefrom) are the DIP Lenders' collateral.  Therefore, such Claims

and Causes of Action would inure to the benefit of the DIP Lenders that support the Plan, including the Debtor Releases. Finally, as noted above, I understand the Creditors' Committee, which is an independent fiduciary of the Estates, likewise supports the Debtor Releases.

18. Accordingly, the Debtor Releases, to which no party has objected, have the affirmative support of two fiduciaries (*i.e.*, the Debtors (through the SIC) and the Creditors' Committee) and the DIP Lenders, which are the only parties that have an economic interest in the Claims and Causes of Action subject to such release.

### Third-Party Releases Are Appropriate

19. I understand that Section 10.6(b) of the Plan contains certain releases by the Releasing Parties, including certain non-Debtor third parties, in favor of the Released Parties (the "**Third-Party Releases**" and, together with the Debtor Releases, the "**Plan Releases**").

20. The Third-Party Releases are the product of extensive good-faith, arm's-length negotiations and were a material inducement for the Released Parties to support the Debtors, the WholeCo Sale Process, and the Plan. As noted above, the Released Parties have provided and continue to provide integral support to the Debtors throughout the Chapter 11 Cases and have contributed meaningfully to the success of the Chapter 11 Cases.

21. I understand that all parties in interest benefit from the transactions contemplated by the Plan, including the Third-Party Releases, and the significant contributions of the Released Parties in furtherance thereof, as such contributions have maximized creditor recoveries. As noted above, since the outset of the Chapter 11 Cases, the Released Parties have engaged in good-faith negotiations to facilitate the implementation of the WholeCo Sale Transaction and subsequent Wind Down pursuant to the Plan. These efforts have avoided potential litigation and the related costs and delay attendant thereto. More importantly, these

efforts have avoided a potential conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, which I understand would largely eliminate recoveries for many of the Debtors' creditors, which creditors instead will now receive a distribution under the Plan.

## Conclusion

22. For the reasons stated above, I believe that the Plan Releases reflect good-faith, arm's-length compromises of the Debtors and the Released Parties. The Plan Releases are an essential component of the Plan and, in my view, constitute a sound exercise of the Debtors' business judgment. Indeed, without the Plan Releases, the Debtors and their stakeholders would not have been able to secure the substantial benefits provided by the Plan.

23. The Debtors and the Debtors' advisors have carefully considered the Plan, including the Plan Releases. I believe that the Plan Releases are fair, reasonable, and in the best interests of the Estates. Based upon my experience, and in the exercise of my fiduciary duties, I believe that the benefits provided by the Plan Releases and the Plan far outweigh the value to the Estates of any potential Claims and Causes of Action that are being released or compromised by the Debtors and the Estates as a result of the Plan Releases.

24. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 17, 2025
      Gallatin Gateway, Montana

                                                                                                            _/s/ Melker Sandberg_
                                                                              Name: Melker Sandberg
                                                                              Title: Member of Special Investigation Committees of the HoldCo Board, OpCo Board, and Lynx Board